IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **VISION WARRIORS CHURCH, INC.,** | |
| **Plaintiff,** | **CIVIL ACTION FILE** |
| **v.** | **NO. 1:19-CV-3205-MHC** |
| **CHEROKEE COUNTY, GEORGIA; HARRY JOHNSTON, STEVE WEST, RAY GUNNIN, BENNY CARTER, and COREY RAGSDALE, Individually and in their Official Capacities as Members of the CHEROKEE COUNTY BOARD OF COMMISSIONERS; and MICHAEL CHAPMAN, Individually and in his Official Capacity as Cherokee County Zoning Manager,** | |
| **Defendants.** | |

## <u>ORDER</u>

This case comes before the Court on Defendants' Motion to Dismiss

[Doc. 28], Defendants' Motion to Dismiss or Stay Pursuant to *Colorado River* Abstention [Doc. 29], and Defendants' Second Motion to Dismiss ("Defs.' Second Mot.") [Doc. 45].[1]

## I.   BACKGROUND[2]

Plaintiff Vision Warriors Church, Inc. ("Vision Warriors") is a non-profit organization that operates as a faith-based ministry for men recovering from drug addiction through a residential program, weekly services, and faith-based meetings.  First Am. Compl. ¶¶ 5, 13.  Vision Warriors is not a detoxification facility, not a facility for court-ordered residents, and does not provide medical

---

[1] After Defendants moved to dismiss the Complaint [Doc. 1], Plaintiffs filed their First Amended Complaint [Doc. 33] and dismissed the Superior Court of Cherokee County case upon which Defendants based their request to stay pursuant to Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976). See Dismissal Without Prejudice, Vision Warriors Church, Inc. v. Michael Chapman et al., Civil Action File No. 19CVE1555 (Super. Ct. Cherokee Cty. Oct. 11, 2019) [Doc. 45-2]; Defs.' Br. in Supp. of Mot. to Dismiss of Stay Pursuant to *Colorado River* Abstention [Doc. 29-1] at 2.  "An amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." Dresdner Bank, A.G. v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006) (citation and internal quotation marks omitted).  Accordingly, Defendants' Motion to Dismiss [Doc. 28] and Defendants' Motion to Dismiss or Stay Pursuant to Colorado River Abstention [Doc. 29] are **DENIED AS MOOT**.

[2] Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in the First Amended Complaint.  See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

treatment for drug and alcohol addiction.  Id. ¶¶ 15-16.  It is certified by the Georgia Association for Recovery Residents as a National Alliance for Recovery Residence Level 2 recovery residence, an alcohol and drug-free recovery residence that uses house standards, rules, and peer accountability to maintain safe, healthy, and structured living environments.  Id. ¶¶ 18-19.  Most of the residents and members receiving help from Vision Warriors come directly from short or long-term treatment facilities.  Id. ¶ 21.

On December 13, 2017, Vision Warriors purchased approximately 6.491 acres, identified in the records of Defendant Cherokee County, Georgia (the "County") as Tax Map 02N04, Parcels 314 & 318, commonly known as 1709 Old Country Place, Woodstock, Georgia, 30188 ("the Property") for $750,000.00.  Id. ¶ 22.  Approximately 5.348 acres of the Property is zoned to the R-80 (Residential) zoning district and the northernmost 1.143 acres is zoned to the R-20 (Residential) zoning district.  Id. ¶ 23.

From 1982 until its acquisition by Vision Warriors, the Property was owned by Tom and Jewel Young and was used as a church, a residence, and a retreat for missionaries and families in need, known as Happy Acres Mission Transit Center ("Happy Acres").  Id. ¶ 24.  With the County's knowledge and approval, Happy Acres utilized and operated the following on the Property: (1) the Youngs'

3

personal residence, which consisted of an efficiency apartment on the lower level, (2) a worship/assembly hall, (3) dormitories with kitchen facilities, (4) an auto repair shop, (5) a woodworking shop and warehouse, and (6) a storage building. Id. ¶ 25.  The Youngs, through Happy Acres, housed missionaries in their personal residence and used the workshop/assembly hall and dormitory to house missionaries and their families for classes and worship.  Id. ¶ 26.  Mr. Young used the auto repair shop to repair, buy, and sell vehicles to generate revenue to support Happy Acres.  Id.  The warehouse was used to store donated goods, ship materials, and manufacture wood crates, which also generated revenue to support Happy Acres.  Id.  While the number of missionaries who stayed at Happy Acres at any given time varied over the years, the average was four families staying at once, and some months up to six families stayed at once.  Id. ¶ 27.  Happy Acres also hosted retreats and conferences, during which between thirty and fifty people stayed at one time.  Id. ¶ 28.  Happy Acres did not charge rent but requested donations from missionaries who stayed on the Property and others to help defray operating costs. Id. ¶ 30.

In early 2017, in preparation for selling the Property to an organization with a similar use in mind, Jewel Young and her son, Tori Young, sought confirmation from the County's then-Zoning Administrator, Vicki Taylor Lee ("Lee"), that a

similar use by a purchaser of the Property would be permitted.  Id. ¶ 31.  On or about February 6, 2017, Lee issued a Certification of Zoning for the Property which provided, in part:

> There appears to be four (4) buildings on the parcel, a primary home, a detached garage, a dormitory and a chapel.  As a legal non-confirming use, you may continue to house guests in the dormitory for short periods of time.  You cannot expand the use to something different or increase the number of people served.

Id. ¶ 32.  On or about March 8, 2017, Lee issued a second, more detailed Certification of Zoning for the Property which acknowledged the previously existing warehouse and attached a list of temporary shelters and uses classified under NAICS Code No. 624221.[3]  Id. ¶ 33.

On July 19, 2017, Tori Young and Kirk Driskell ("Driskell") of Vision Warriors met with Lee and another County official to discuss Vision Warriors' proposed acquisition of the Property and to confirm that its proposed use as a temporary home for men recovering from drug and alcohol addiction would be permitted.  Id. ¶ 34.  On July 31, 2017, and August 4, 2017, Tori Young emailed

---

[3] "The North American Industry Classification System (NAICS) is the standard used by federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy."  North American Industry Classification System, U.S. CENSUS BUREAU, https://www.census.gov/eos/www/naics/ (last visited May 18, 2020).

Lee to obtain written confirmation that Vision Warriors' intended use (to house

men, not families or only women, recovering from alcohol and drug addiction) was

consistent with Lee's March 8, 2017, Certification of Zoning letter approving a

non-confirming use.  Id. ¶ 35.  Tori Young noted that Vision Warriors is "geared

around men and this (the NAICS Codes referenced in the March 8, 2017 letter)

references only women related use.  Could it be more specific to Vision Warriors?"

Id. ¶ 36.  Lee replied, "It also says homeless shelters without gender.  I am the

interpreter of land use and I assure you this meets Vision Warriors['] use."  Id.

¶ 37.  On August 4, 2017, Lee issued a third Certification of Zoning for the

Property approving Vision Warriors' proposed use.  See id. ¶ 38.

     On November 22, 2017, Driskell emailed Lee directly to inform Lee that

Vision Warriors would be purchasing the Property and inquired as to what Vision

Warriors needed to do to obtain a business license.  Id. ¶ 40.  Lee responded the

same day and informed Driskell that he was "good to go" and that "what will

happen first is a Tenant Occupancy Change" where "the Fire Marshall and

Building Inspector come out to verify the required life-safety items."  Id. ¶ 41.

Based on Lee's assurances and the Certification of Zoning, Vision Warriors

purchased the Property on December 13, 2017.  Id. ¶ 44.

Vision Warriors immediately began using the Property in the same matter as used by Happy Acres and in the manner for which building permits and zoning approval had been obtained. Id. ¶ 45. Vision Warriors hosts weekly religious services on the Property for forty to eighty people in the community. Id. ¶ 47. Vision Warriors houses approximately twenty to thirty male residents who are struggling to overcome drug addiction. Id. ¶ 49. Vision Warriors does not charge rent or ask residents to sign a lease and does not turn away residents due to inability to pay but asks residents to contribute $600.00 monthly to help offset its costs. Id. ¶ 50. Residents are required to adhere to house rules and guidelines outlined in a membership agreement. Id. ¶ 52. Vision Warriors uses the car and wood shop to provide a vocational training ministry for its residents. Id. ¶ 53. Vision Warriors alleges that its use of the Property is "practically identical" to the previous use of the Property by Happy Acres, which the County never challenged during the decades Happy Acres operated. Id. ¶ 55. The only difference is that Vision Warriors serves men struggling to overcome addition. See id.

In April 2018, Vision Warriors contacted the County to obtain a business license to operate the Property and was instructed that it only needed to obtain a Tenant Occupancy Permit. Id. ¶ 58. On April 20, 2018, the County issued a Tenant Occupancy Change Permit for the Property and Vision Warriors scheduled

a date for an inspection by the County's Fire Marshal.  Id. ¶ 59.  Following

issuance of the Tenant Occupancy Change Permit and scheduling of the Fire

Marshal's inspection, the Fire Marshal called Driskell and asked him about Vision

Warriors' website, its mission, its Facebook page, and certain Facebook posts

made by its supporters.  Id. ¶¶ 60-61.  The Fire Marshal expressed cynicism about

Vision Warriors' use of the Property and insisted that the County's Planner join the

call to further inquire about Vision Warriors' proposed use of the Property.  Id.

¶ 62.  Following this phone call, and on the day the Fire Marshal was scheduled to

inspect the Property, the Fire Marshal abruptly cancelled the inspection.  Id. ¶ 64.

Vision Warriors alleges that the County's Planning and Zoning Department

instructed the Fire Marshal not to conduct the inspection.  Id. ¶ 65.

Following these events, approximately seven County officials, including the

Fire Marshal, Fire Chief, Assistant Fire Chief, and members of the Planning and

Zoning Department, showed up unannounced and conducted an inspection of the

Property.  Id. ¶ 66.  Vision Warriors received no advance notice of this visit.  Id.

¶ 67.  The only concerns raised by the Fire Marshal during this visit were the

height of the fire extinguishers in the dormitory building and the need to clear

boxes out for an open walkway in the warehouse building.  Id. ¶ 69.

In April 2018, the Cherokee County Board of Commissioners ("Board of Commissioners") voted to amend its zoning ordinance to remove dormitories as an "open use" in all residential zoning districts and to limit dormitories by special use permit only in all residential zoning districts.  Id. ¶ 70.  At the time Vision Warriors purchased the Property and learned it would need an occupancy permit, a dormitory was an "open use" in all residential zoned areas, meaning that it was a use permitted by right without additional specialized requirements.  Id. ¶ 56.  A "special use" is permitted only upon the grant of a Special Use Permit by the Board of Commissioners.  Id. ¶ 71.  Vision Warriors contends that Defendants sought to amend the zoning ordinance to remove dormitories as an "open use" in all residential areas following, and in part due to, neighborhood opposition to Vision Warriors' ministry on the Property.  Id. ¶ 72.  Prior to the enactment of this amendment, Vision Warriors had been using the Property with the County's zoning approval for more than four months.  Id. ¶ 73.

On or about April 24, 2018, the County notified Vision Warriors that a dormitory use may not be permitted as of right.  Id. ¶ 74.  Thereafter, Vision Warriors met with the Fire Marshal, Planning Director, and County Planner to discuss Vision Warriors' ministry and use of the Property.  Id. ¶ 76.  During the

meeting, the County officials admitted that neighbors had expressed opposition regarding the type of residents at Vision Warriors.  Id.

On June 12, 2018, Defendants issued a letter via their counsel notifying Vision Warriors that it was "engaging in an unpermitted use of the Property such that the Tenant Occupancy Change Permit was issued in error" and ordering Vision Warriors to discontinue the offending uses.  Id. ¶ 83.  This letter communicated Defendants' position that "the principal use of the property is a temporary shelter, which is prohibited in residential zoning districts.  In addition, we have determined that the church is not being used as a church as alleged."  Id. ¶ 84.

On July 11, 2018, Vision Warriors appealed the County's determination[4] to the Zoning Board of Appeals and the Board of Commissioners.  Id. ¶ 85.  On or about August 9, 2018, Defendant Michael Chapman ("Chapman"), the County's Zoning Administrator,[5] affirmed the Board of Commissioners' June 12, 2018, prior

---

[4] The Complaint attributes the decision communicated in the June 12, 2018, letter to, alternately, "Defendants," First Am. Compl. ¶¶ 83-84, "Defendant County[]," id. ¶ 85, "Defendant County's Board of Commissioners[]," id. ¶ 89, and "the Zoning Administrator[]."  Id. ¶ 91.

[5] The caption and paragraph eighty-nine of the First Amended Complaint also refer to Chapman as the "Zoning Manager."

determination.  See id. ¶ 89.  On September 12, 2018, Vision Warriors attended a meeting with County officials regarding Vision Warriors' intended use and the filing of zoning and special use permit applications.  Id. ¶ 90.  On November 6, 2018, the Board of Commissioners held a work session to discuss Vision Warriors' appeal and, upon Vision Warriors' request, decided to continue appeal proceedings until Vision Warriors submitted land use applications and those applications were decided.  Id. ¶ 91.

On November 20, 2018, Vision Warriors submitted its two land use applications.  Id. ¶ 92.  The first application was for a special use permit to allow a dormitory and religious institution, which if approved would allow Vision Warriors' uses of the Property without changing the underlying zoning category. Id. ¶ 93.  The second application was to rezone the Property to Office/Industrial District to allow Vision Warriors' uses of the Property.  Id. ¶ 94.

On March 5, 2019, the County's Planning Commission held a public hearing regarding Vision Warriors' land use applications.  Id. ¶ 96.  Chapman presented information regarding the current zoning, surrounding uses, land use compliance, and economic uses of the Property.  Id. ¶ 97.  Chapman confirmed that the existing roadway would accommodate any traffic generated by Vision Warriors' use of the Property and explained that future land uses envisioned for both parcels

constituting the Property included residential and semi-public and institutional uses. Id. ¶¶ 100-01.

Approximately eleven people signed up to speak in opposition to Vision Warriors' applications, and several neighbors speaking in opposition expressed concerns based solely on the fact that Vision Warriors houses men in recovery from drug and alcohol addiction. Id. ¶ 102. No evidence was presented that Vision Warriors' more than fifteen months use of the Property had disturbed any neighbors, created parking or traffic issues, or was inconsistent with the residential use of the neighborhood. Id. ¶ 103. The County's Planning Commission referenced and acknowledged the letters, emails, and correspondence of opposition it had received from neighbors regarding Vision Warriors' proposed uses of the Property. Id. ¶ 104. All but two members of the County's Planning Commission voted to recommend denial of both land use applications. Id. ¶ 105.

On April 16, 2019, the Board of Commissioners heard and unanimously denied Vision Warriors' applications both for a special use permit and for rezoning. Id. ¶¶ 107, 109. On July 16, 2019, the Board of Commissioners conducted a hearing on Vision Warriors' administrative appeal of July 11, 2018, and voted unanimously to deny all claims asserted by Vision Warriors, including Vision Warriors' assertion that its use of the Property is allowed and protected as a

legal conforming or nonconforming use, that Vision Warriors has a vested right in such use, and that the County is barred by the doctrine of estoppel from prohibiting such use.  Id. ¶ 110.

Based on the above conduct, Vision Warriors asserts claims against all Defendants for (1) violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 *et seq.* (Count I), (2) violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et seq.* (Count II), (3) violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc(a) (Count III), (4) violation of the Fourteenth Amendment Equal Protection Clause (Count IV), (5) violation of the Fourteenth Amendment Due Process Clause (Count V), and (6) violation of the Fifth Amendment and Fourteenth Amendment Takings Clauses (Count VI).  Id. ¶¶ 112-146.  Vision Warriors also asserts the following claims against Defendants Harry Johnston, Steve West, Ray Gunnin, Benny Carter, and Corey Ragsdale (collectively, the "Commissioners") and Michael Chapman ("Chapman") (collectively, the "Individual Defendants") in both their individual and official capacities: a writ of mandamus pursuant to O.C.G.A. § 9-6-20 (Count VII) and a declaratory judgment pursuant to O.C.G.A. § 9-4-2 (Count VIII). Vision Warriors seeks injunctive relief against the Individual Defendants solely in their individual capacities pursuant to O.C.G.A. § 9-5-1 *et seq.* (Count IX).  Id.

¶¶ 146-62.  Vision Warriors also seeks attorney's fees pursuant to O.C.G.A.

§ 13-6-11 and $300,000.00 in compensatory damages, "together with any special

damages," attorney's fees, and costs in accordance with "applicable federal law."

(Count X).  Id. ¶¶ 162-66 and Prayer for Relief, ¶¶ (l, n).

Defendants move to dismiss all counts in the First Amended Complaint for

failure to state a claim upon which relief can be granted; move to dismiss all

Individual Defendants because no claims actually are asserted against them and,

with respect to certain claims, due to qualified, sovereign, and legislative

immunity; and move to dismiss the County as an improper Defendant.[6]   Defs.'

Second Mot. at 2.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief."  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed

for failure to state a claim upon which relief can be granted if it does not plead

"enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp.

---

[6] Because Defendants fail to explain why the County is an improper defendant, see
Defs.' Br.,  the Court does not address this argument.

v. Twombly, 550 U.S. 544, 570 (2007).  The Supreme Court has explained this

standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.  The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a

claim will survive a motion to dismiss only if the factual allegations in the pleading

are "enough to raise a right to relief above the speculative level."  Twombly, 550

U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the

plaintiff's complaint as true, as well as all reasonable inferences drawn from those

facts.  McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v.

Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only

must the court accept the well-pleaded allegations as true, but these allegations

must also be construed in the light most favorable to the pleader.  Powell v.

Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not

accept legal conclusions, nor must it accept as true legal conclusions couched as

factual allegations.  Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and

"determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III.   DISCUSSION

### A.   FHA (Count I) and ADA (Count II) Claims

Pursuant to the FHA, it is unlawful "[t]o discriminate in the sale or rental, or

to otherwise make unavailable or deny, a dwelling to any buyer or renter because

of a handicap of—a person residing in or intending to reside in that dwelling after

it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1)(B). "Handicap" is

defined as

> (1) a physical or mental impairment which substantially limits one or
> more of such person's major life activities, (2) a record of having such
> an impairment, or (3) being regarded as having such an impairment, but
> such term does not include current, illegal use of or addiction to a
> controlled substance (as defined in section 802 of Title 21).

42 U.S.C. § 3602(h). However, the FHA's implementing regulations provide that

physical or mental impairment includes "drug addiction (other than addiction

caused by current, illegal use of a controlled substance) and alcoholism." 24

C.F.R. § 100.201. Other district courts in the Eleventh Circuit have held that

certain individuals recovering from alcoholism and drug addiction had a handicap

under the FHA. See Jeffrey O. v. City of Boca Raton, 511 F. Supp. 2d 1339,

1346-47 (S.D. Fla. 2007); New Life Outreach Ministry Inc. v. Polk Cty., No. 8:06-CV-1547-T-27MAP, 2007 WL 2330854, at *4 n.2 (M.D. Fla. Aug. 14, 2007) (citation omitted).

Pursuant to the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similar to the FHA's definition of "handicap," the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). The ADA provides that while a "qualified individual with a disability" does not include any employee or applicant "currently engaging in the illegal use of drugs," 42 U.S.C. § 12114(a), that prohibition shall not "be construed to exclude as a qualified individual with a disability an individual who . . . is participating in a supervised rehabilitation program and is no longer engaging in such use . . . ." Id. § 12114(b)(2).

The First Amended Complaint explicitly alleges that Vision Warriors' residents are "disabled persons of a protected class." First Am. Compl. ¶ 117. Defendants appear to deny this assertion but make no arguments and cite no

17

authority to the contrary.  See Defs.' Br. in Supp. of Second Mot. to Dismiss

("Defs.' Br.") [Doc. 45-1] at 25 ("Even assuming plaintiff seeks to house disabled

individuals. . . ."); Defs.' Answer and Defenses to First Am. Compl. ("Answer")

[Doc. 46] ¶ 117.  Based on the foregoing authority, the Court assumes for purposes

of the instant motion that Vision Warriors' residents have a handicap under the

FHA and are qualified individuals with disabilities under the ADA.

"Due to the similarity of the ADA and the FHA's protections of individuals

with disabilities in housing matters, courts often analyze the two statutes as one.

Both the ADA and FHA apply to municipal zoning decisions." Caron Found. of

Fla., Inc. v. City of Delray Beach, 879 F. Supp. 2d 1353, 1367 (S.D. Fla. 2012)

(citations omitted).  However, the FHA only applies to "dwellings." Schwarz v.

City of Treasure Island, 544 F.3d 1201, 1212-13 (11th Cir. 2008); 42 U.S.C.

§ 3604(f)(1)-(2).  "Sober living homes can constitute a dwelling." Caron, 879 F.

Supp. 2d at 1364 (citing Schwarz, 544 F.3d at 1213-16).  The First Amended

Complaint alleges that Vision Warriors' use of the Property constitutes a dwelling.

First. Am. Compl. ¶ 115.  Defendants appear to deny this assertion, see Answer

¶ 115, but make no arguments and cite no authority to the contrary.  Thus, the

Court also assumes for purposes of the instant motion that the Property constitutes

a dwelling under the FHA.

18

"A plaintiff can establish a violation under the FHA by proving (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation."  Bonasera v. City of Norcross, 342 F. App'x 581, 583 (11th Cir. 2009) (citing Schwarz, 544 F.3d at 1201; Hallmark Developers, Inc. v. Fulton Cty., 466 F.3d 1276, 1283 (11th Cir. 2006)).  "The FHA and ADA prohibit disparate treatment of those with disabilities."  Caron, 879 F. Supp. 2d at 1367 (citing 42 U.S.C. §§ 3604(f)(3)(B), 12132).  The First Amended Complaint alleges that Defendants both intentionally discriminated against Vision Warriors and refused to make reasonable accommodations.  See First Am. Compl. ¶¶ 116-17, 124.

Defendants contend that the First Amended Complaint fails to state a claim based on disparate treatment because it does not identify any party that was treated differently.  Defs.' Br. at 22.  Vision Warriors contends that it has identified such a party—Happy Acres.  Pl.'s Br. in Opp'n to Defs.' Second Mot. to Dismiss ("Pl.'s Opp'n") [Doc. 49] at 17.  This Court agrees.  "To prove disparate treatment, the plaintiff must show the defendant in fact intended to discriminate or was improperly motivated in making the discriminating decision."  Caron, 879 F. Supp. 2d at 1367 (citing Bonasera, 342 F. App'x at 584).  "As its name suggests, a disparate treatment claim requires a plaintiff to show that he has actually been

treated differently than similarly situated non-handicapped people."  Schwarz, 544 F.3d at 1216 (citation omitted).

In addition to describing the numerous ways in which Vision Warriors used the Property in the same manner as Happy Acres, the First Amended Complaint includes the allegation that "Vision Warriors' use of the Property is practically identical to that of Happy Acres which was never challenged by the County during the decades it operated.  The only difference is the type of residents served by Vision Warriors – *i.e.*, disabled individuals struggling to overcome addiction." First Am. Compl. ¶ 55.  Defendants "do not dispute that Plaintiff alleged facts Plaintiff believes and alleges constitute 'identical use' of the Property by Happy Acres and Vision Warriors," but contend that "Plaintiff does not connect those facts to the allegations of liability or otherwise contend that Plaintiff was treated differently than Happy Acres."  Defs.' Reply in Supp. of Second Mot. to Dismiss ("Defs.' Reply") [Doc. 52] at 10-11.

However, Vision Warriors alleges that Happy Acres' use of the property "was never challenged by the County during the decades it operated."  First Am. Compl. ¶ 55.  On the other hand, after Vision Warriors purchased and began using the Property, the County amended its zoning ordinance to remove dormitories as an "open use," id. ¶ 70, and Defendants revoked Vision Warriors' zoning approval

and tenant occupancy change permit, and ordered Vision Warriors to discontinue its offending uses.  See id. ¶¶ 83, 91.  These allegations demonstrate that Vision Warriors was treated differently than Happy Acres, a similarly-situated comparator that housed missionaries rather than men recovering from addiction.[7]

Defendants also contend that the First Amended Complaint fails to state a claim based on intentional discrimination because it does not allege that the County acted with the intention to discriminate or was improperly motivated.  Defs.' Br. at 23.  "To prove intentional discrimination, 'a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA.'"  Bonasera, 342 F. App'x at 584 (quoting Reese v. Miami–Dade Cty., 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002)).  "Among the factors that are instructive in determining whether [] discriminatory intent is present are: discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions,

---

[7] Defendants contend that "none of the paragraphs in Counts I and II references Happy Acres at all;" Defendants "recognize that Plaintiff could have been referring to Happy Acres as a similarly situated comparator" but "deny that the [First] Amended Complaint makes this allegation."  Defs.' Reply at 11.  This argument is disingenuous at best.  In the typical fashion, the First Amended Complaint incorporates the factual allegations by reference into each count.  See, e.g., First Am. Compl. ¶¶ 112, 119.

and whether there were any departures from normal or substantive criteria."

Hallmark Developers, Inc. v. Fulton Cty., 466 F.3d 1276, 1283 (11th Cir. 2006)

(citation and internal quotation marks omitted).

> We have held that a plaintiff may meet this burden by presenting evidence that the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial [or other improper] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens."

Bonasera, 342 F. App'x at 584 (emphasis added) (quoting Hallmark, 466 F.3d at 1284).

The allegations in the First Amended Complaint contend that Defendants were improperly motivated in their decision to discriminate against Vision Warriors. Vision Warriors alleges that the Fire Marshal's phone call following issuance of the tenant occupancy change permit was "entirely unrelated to, and unnecessary for, the Fire Marshal to conduct an inspection of the property" and "constitutes a departure from normal practice and procedure of Defendant County." First Am. Compl. ¶¶ 61, 63. It also alleges that following this phone call, the Fire Marshal cancelled the scheduled inspection at the behest of the County's Planning and Zoning Department, id. ¶¶ 64-65, and approximately seven County officials later showed up unannounced at the Property and conducted an inspection without any advance notice to Vision Warriors. Id. ¶¶ 66-67.

22

In addition to these departures from normal practice, the First Amended Complaint contains allegations that, if proven, demonstrate Defendants' unfounded and discriminatory concerns about Vision Warriors' presence on the Property. The First Amended Complaint includes allegations that Defendants amended the zoning ordinance in April 2018 "following, and in part due to, neighborhood opposition to Vision Warriors' ministry on the Property." Id. ¶¶ 70, 72. During a meeting with Vision Warriors on April 24, 2018, County officials admitted "that neighbors had expressed opposition regarding the type of residents Vision Warriors ministers to." Id. ¶ 76. On May 23, 2018, neighbors circulated an email and petition containing false information and unfounded concerns that Property values would decrease, and children would be unsafe because of Vision Warriors' use of the Property. Id. ¶ 78. On May 30, 2018, Defendants' counsel asked Vision Warriors to discount the false claims in that email. Id. ¶ 80. These same unfounded concerns were expressed by neighbors on numerous occasions at public hearings related to Vision Warriors' zoning applications. Id. ¶ 81.

During the March 5, 2019, public hearing on Vision Warriors' land use applications, Chapman confirmed the existing roadways would accommodate any traffic generated by Vision Warriors' use of the Property, both parcels of the Property were in areas where the future land uses envisioned included institutional

uses, and the Property was in a residentially-zoned area.  Id. ¶¶ 96-101.  Eleven

people signed up to speak against Vision Warriors' zoning applications, and

several "again expressed unfounded concerns based solely upon the fact that

Vision Warriors houses men in recovery from drug and alcohol addiction."  Id.

¶ 102.  During the meeting, no evidence was presented to support that Vision

Warriors' more than fifteen months of use of the Property had disturbed any

neighbors, created parking or traffic issues, or was inconsistent with the residential

use of the neighborhood.  Id. ¶ 103.  However, the County's Planning Commission

"specifically referenced and acknowledged the letters, emails[,] and

correspondence of opposition it had received from neighbors regarding Vision

Warriors' proposed uses of the Property."  Id. ¶ 104.  All but two members of the

Planning Commission voted to deny both land use applications.  Id. ¶ 105.  The

two members who voted in favor were the same two members who accepted

Vision Warriors' invitation to visit and tour the Property.  Id. ¶ 106.

Following this hearing, the County Commission unanimously denied Vision

Warriors' land use applications and its administrative appeal of Defendants'

revocation of Vision Warriors' tenant occupancy change permit.  Id. ¶¶ 109-10.

Notably, the previous Zoning Manager, Lee, had issued three Zoning Certifications

for Visions Warriors' proposed use of the Property and had assured Vision

Warriors that its non-confirming use was approved.  See id. ¶¶ 35-38.  County officials were fully aware of Lee's determination and did not take any action to challenge Lee's determination until they became aware of the type of people Vision Warriors serves.  Id. ¶ 43.  Happy Acres' use of the Property was "practically identical" to Vision Warriors' use and was never challenged by the County during the decades it operated.  Id. ¶ 55.  This historical background and the sequence of events leading up to Defendants' challenged actions suggests discriminatory intent.

Defendants rely upon Akridge v. City of Moultrie, No. 6:04 CV 31(HL), 2006 WL 292179 (M.D. Ga. Feb. 7, 2006), wherein the court, in relevant part, granted summary judgment on the plaintiffs' FHA and ADA claims based on intentional discrimination.  In Akridge, the court found there was evidence "that tends to show [d]efendant deviated from its normal practice in enforcing the city's zoning code and that [d]efendant responded to significant public concern about [p]laintiff Akridge's planned use of her property."  Akridge, 2006 WL 292179, at *7.  However, the court found that "there is simply no evidence that [d]efendant's deviation from normal enforcement schemes or the public's concern was due, even in part, to the fact that [p]laintiff Akridge's potential client base was composed of elderly or disabled individuals."  Id.  Thus, the court held that,

"[w]ithout more, the [c]ourt cannot conclude without engaging in rank speculation or conjecture, that [d]efendant's proffered reason, that they were merely attempting to fairly enforce the city's zoning code, was a pretext for discrimination." Id. at *8. Unlike Akridge (decided on a motion for summary judgment as opposed to a motion to dismiss where the facts as alleged in the amended complaint are accepted as true), in this case there are allegations that Defendants' deviation from normal procedure and the public's concern were due to the fact that Vision Warriors housed men in recovery from drug and alcohol addiction. See, e.g., First Am. Compl. ¶¶ 70, 72, 76, 80-82, 104.

Defendants contend that "there is no allegation that the County was aware of any allegedly improper motivations of the citizens." Defs.' Reply at 12. However, the First Amended Complaint alleges that County officials admitted to Vision Warriors "that neighbors had expressed opposition regarding the type of residents Vision Warriors ministers to," First Am. Compl. ¶ 76, that Defendants' counsel asked Vision Warriors to discount the false information and unfounded concerns that Property values would decrease and children would be unsafe because of Vision Warriors' use of the Property, id. ¶¶ 78, 80, and that these same unfounded concerns were expressed by neighbors on numerous occasions at public hearings related to Vision Warriors' zoning applications. Id. ¶ 81.

26

In addition, several neighbors who opposed Vision Warriors' land use applications at the County's March 5, 2019, Planning Commission public hearing "again expressed unfounded concerns based solely upon the fact that Vision Warriors houses men in recovery from drug and alcohol addiction." Id. ¶¶ 96, 102. No evidence was presented at this meeting to support the contention that Vision Warriors' more than fifteen months of use of the Property had disturbed any neighbors, created parking or traffic issues, or was inconsistent with the residential use of the neighborhood. Id. ¶ 103. Construing these allegations in the light most favorable to Vision Warriors, Defendants were aware that the public's opposition was based on false information and unfounded concerns related to Vision Warriors housing men in recovery from drug and alcohol addiction. The Court finds that the First Amended Complaint states a claim for intentional discrimination under the ADA and FHA.

Defendants also contend that the First Amended Complaint fails to state a claim based on failure to provide a reasonable accommodation because it does not identify any accommodation requested by Vision Warriors. Defs.' Br. at 24. Discrimination under the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such

27

accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

> [T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made.  Defendants must instead have been given an opportunity to make a final decision with respect to [p]laintiffs' request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law.

Schwarz, 544 F.3d at 1219 (citation omitted).  "Simply put, a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA."  Id. (citations omitted).

According to Defendants, "Plaintiff has never identified a particular rule[,] policy, practice or service, for which it claims it needs an accommodation to afford handicapped individuals an equal opportunity to housing."  Defs.' Br. at 25. However, the First Amended Complaint alleges that "[o]n November 20, 2018, Vision Warriors submitted its two land use applications to propose and obtain a reasonable accommodation to the County's revocation of zoning approval and application of its newly amended zoning ordinance to deny Vision Warriors zoning approval."  First Am. Compl. ¶ 92.  The rules, policies, and practices for which Vision Warriors requested an accommodation were the County's amended

28

ordinance that removed dormitories as an "open use" and the County's revocation of Vision Warriors' zoning approval.  See id.; see also id. ¶¶ 70, 83-84.

Vision Warriors requested two possible accommodations: (1) "a special use permit to allow a dormitory and religious institution" and (2) "for rezoning of the Property to the Office/Industrial District."  Id. ¶¶ 93-94.  The First Amended Complaint alleges that prior to the hearing on Vision Warriors' land use applications, "Defendants were, once again, notified that their actions in denying Vision Warriors' application for a special use permit and/or in the alternative, application for rezoning, would violate federal laws, including but not limited to the FHA, ADA, and RLUIPA."  Id. ¶¶ 95, 108.  Vision Warriors followed the "local procedure (such as a variance process) through which the plaintiffs can obtain the accommodations they want" prior to filing this suit."  Id. ¶¶ 92-94; see generally Schwarz, 544 F.3d at 1219 n.11 (citations omitted).  Construing these allegations in the light most favorable to Vision Warriors, it requested and was denied an accommodation.  The Court also finds that the First Amended Complaint states a claim based on failure to provide a reasonable accommodation under the FHA and ADA.

## B.     RLUIPA Claim (Count III)

Pursuant to RLUIPA,

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).[8]  RLUIPA applies where, among other cases,

the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

Id. § 2000cc(2)(C).

---

[8] The First Amended Complaint alleges that Vision Warriors is a "religious assembly or institution" as defined by 42 U.S.C. § 2000cc(a)(1).  First Am. Compl. ¶ 127.  Defendants appear to deny this allegation, Answer ¶ 127, and contend that "[w]ithout admitting that Plaintiff constitutes a religious organization as it alleges, Count III still fails to state a RLUIPA violation . . . ."  Defs.' Br. at 27.  However, Defendants make no argument that Vision Warriors is not a religious institution.  Thus, for purposes of the instant motion, the Court assumes that Vision Warriors is a religious assembly or institution under RLUIPA.

"[A] 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004).

> The implementation of a land use regulation that completely bars the use of the property for religious exercise *may* constitute a substantial burden. . . . On the other hand, no substantial burden is imposed where the government action may make religious exercise more expensive or difficult but does not place substantial pressure on a religious institution to violate or forego its religious beliefs and does not effectively bar a religious institution from using its property in the exercise of its religion.

Church of Scientology of Ga., Inc. v. City of Sandy Springs, 843 F. Supp. 2d 1328, 1354-55 (N.D. Ga. 2012) (collecting cases).  The United States Court of Appeals for the Eleventh Circuit has found that "run of the mill" zoning considerations "such as size, congruity with existing uses, and availability of parking" do not constitute substantial burdens on religious exercise."  Midrash Sephardi, 366 F.3d at 1227 n.11 (citing Lady J. Lingerie, Inc. v. Jacksonville, 176 F.3d 1358, 1362 (11th Cir. 1999)).

Defendants contend that the First Amended Complaint fails to state a claim for violation of RLUIPA because "a zoning ordinance that requires a religious institution to relocate because it does not conform to zoning regulations does not constitute a substantial burden within the meaning of RLUIPA."  Defs.' Br. at 27

(citing <u>Midrash Sephardi</u>, 336 F.3d at 1227-28).  The First Amended Complaint alleges that Defendants' actions substantially burdened Vision Warriors' and its members' religious exercise "by effectively shutting down Plaintiffs' ministry." First Am. Compl. ¶ 129.  It also alleges that "[t]he effect of Defendants' actions is to deny zoning approval to Plaintiff and deny housing to those receiving assistance and support from Plaintiff for recovery from alcohol and drug addiction." <u>Id.</u> ¶ 118.

In <u>Midrash Sephardi</u>, a city had denied two Orthodox Jewish synagogues' application for a special use permit and zoning variance to operate in their current location, which were located in the city's business district where churches and synagogues were prohibited.  <u>Midrash Sephardi</u>, 366 F.3d at 1219-20.  On appeal, the synagogues argued, in relevant part, that requiring them to relocate would require congregants to walk further,[9] which would greatly burden the ill, young, or very old, causing these congregants to stop attending services all together.  <u>Id.</u> at 1227.  The synagogues argued that this significant decrease in attendance could cause them to cease operations.  <u>Id.</u>

---

[9] "Orthodox Judaism forbids adherents to use cars or other means of transportation during the weekly Sabbath and religious holidays; thus, adherents prefer to gather for worship and religious study in synagogues close enough to their homes to allow them to walk to services." <u>Midrash Sephardi</u>, 366 F.3d at 1221.

The Eleventh Circuit Court of Appeals found that the zoning ordinance did

not exact a substantial burden on the congregants' religious exercise:

> While walking may be burdensome and "walking farther" may be even
> more so, we cannot say that walking a few extra blocks is "substantial,"
> as the term is used in RLUIPA, and as suggested by the Supreme Court.
> The permitted RD–1 district is in the geographic center of a relatively
> small municipality, proximate to the business, tourist and residential
> districts. Deposition testimony indicated that congregants wishing to
> practice Orthodox Judaism customarily move where synagogues are
> located and do not typically expect the synagogues to move closer to
> them. In any given congregation, some members will necessarily walk
> farther than others, and, inevitably, some congregants will have greater
> difficulty walking than others. While we certainly sympathize with
> those congregants who endure Floridian heat and humidity to walk to
> services, the burden of walking a few extra blocks, made greater by
> Mother Nature's occasional incorrigibility, is not "substantial" within
> the meaning of RLUIPA.

Id. at 1228 (internal citation omitted).

The Court agrees with Defendants that the burden on Vision Warriors is

similarly not substantial under RLUIPA. Vision Warriors seeks to provide "a

faith-based community for men recovering from addiction" and "provides support

services to men striving to overcome addiction through a residential program,

weekly services, and faith-based meetings." Id. ¶ 13. For many people struggling

to overcome addiction for the long-term, "a short-term or long-term residential

program is an integral and essential part of [their] care." Id. ¶ 21.

33

It appears from the First Amended Complaint that, after a series of actions taken by the Defendants, Vision Warriors is no longer permitted to house men recovering from drug and alcohol addiction.[10]  The Board of Commissioners amended the zoning ordinance to remove dormitories as an "open use" in all residential zoning districts.  Id. ¶ 70.  Thus, Vision Warriors could operate a dormitory on the Property only if the Board of Commissioners issued a special use permit, which it denied.  See id. ¶¶ 70, 109-10.  However, contrary to Vision Warriors' assertions, nothing in the First Amended Complaint indicates that Vision Warriors is unable to provide weekly services and faith-based meetings.  See id. ¶¶ 45 (stating that Vision Warriors used the "dormitory/sanctuary" to "host regular religious services and faith-based meetings"), 47 ("Vision Warriors currently hosts weekly services on the Property during which time anywhere from 40-80 people in community gather to engage in praise and worship, prayer and bible study.").  The allegations in the First Amended Complaint do not indicate that "Defendants'

_____

[10] Defendants contend that the reason their actions "only 'effectively' shut down the ministry" is because the decision to operate "is a function of a profit-loss calculation by Vision Warriors, which is based on the number of men it can serve at the Property."  Defs.' Reply at 14.  According to Defendants, the County zoning ordinances could allow Vision Warriors to operate on the Property with six residents.  Id. at 14 n.5.  Regardless, nothing in the First Amended Complaint indicates that Defendants' actions prohibited Vision Warriors from providing the other components of its program.

enforcement of its zoning regulations removes any possibility that Vision

Warriors[] could continue to operate its ministry or that its members could

continue to engage in religious exercise through daily and group bible studies, or

sharing meals together, etc."  See also Jesus Christ is the Answer Ministries, Inc. v.

Baltimore Cty., 915 F.3d 256, 260-61 (4th Cir. 2019) (citing Bethel World

Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 557-58 (4th Cir.

2013)) (concluding that the impediment to an organization's religious practice is

substantial "where use of the property would serve an unmet religious need, the

restriction on religious use is absolute rather than conditional, and the organization

must acquire a different property as a result.").

Assuming that Vision Warriors' use of the property would serve an unmet

religious need, the restriction on its use of the Property imposed by Defendants

does not effectively bar the use of the Property for religious exercise.  Even if

Vision Warriors is not permitted to provide housing to any number of men,

Defendants' actions do not prevent Vision Warriors from providing weekly

services and faith-based meetings on the Property.  Thus, the burden on Vision

Warriors' religious exercise is not a substantial one.  See A Hand of Hope

Pregnancy Res. Ctr. v. City of Raleigh, 386 F. Supp. 3d 618, 625 (E.D.N.C. 2019)

(holding that the city's denial of a rezoning request and reversal of official zoning

code interpretation which prohibited pregnancy resource center from conducting ultrasounds and pregnancy tests did not substantially burden religious exercise because it was still able "promote its message at the [p]roperty through prayer meetings, counseling, and Bible studies, as well as through provision of pamphlets and educational materials"). Accordingly, the RLUIPA claim (Count III) is **DISMISSED**.

### C.    Due Process Claim (Count V)

"The Due Process Clause offers two different kinds of constitutional protection: procedural due process and substantive due process." Slakman v. Buckner, 434 F. App'x 872, 875 (11th Cir. 2011) (citing McKinney v. Pate, 20 F.3d 1550, 1555-56 (11th Cir.1994) (en banc)). "Conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." Id. (internal quotations omitted, alterations accepted) (quoting Waddell v. Hendry Cty. Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003)). "[S]ubstantive due process has two strands—one that protects against deprivation of fundamental rights and one that protects against arbitrary legislation." Hillcrest Prop., LLP v. Pasco Cty., 915 F.3d 1292, 1297 (11th Cir. 2019).

The First Amended Complaint asserts a violation of substantive due process claim.  See First Am. Compl. ¶¶ 142-43; Pl.'s Opp'n at 31-32.  The parties agree that because the Eleventh Circuit Court of Appeals has held that land use rights are state-created and not fundamental rights, and acts of zoning enforcement are non-legislative or executive acts, Vision Warriors' claim does not implicate substantive due process.  Defs.' Br. at 31-33; Pl.'s Opp'n at 31-32; see generally Greenbriar Village, L.L.C. v. Mountain Brook, City, 345 F.3d 1258, 1263 (11th Cir. 2003) (citation omitted) ("[N]on-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary and irrationally.").  Vision Warriors does not oppose dismissal of this claim.  Pl.'s Opp'n at 32.  Accordingly, the Fourteenth Amendment Due Process Claim (Count V) is **DISMISSED**.

### D.    Fifth and Fourteenth Amendment Taking Claim (Count VI)

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'  The Clause is made applicable to the States through the Fourteenth Amendment." Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017) (citation omitted).  "A regulation . . . can be so burdensome as to become a taking . . . ." Id.  The First Amended Complaint

37

alleges that Defendants' denial of Vision Warriors' administrative appeal of the

rescission of Vision Warriors' tenant occupancy permit amounts to a taking under

the Fifth Amendment's Just Compensation Clause and the Fourteenth

Amendment's Due Process Clause.  First Am. Compl. ¶ 145.

> The [United States Supreme] Court has, however, stated two guidelines
> relevant here for determining when government regulation is so
> onerous that it constitutes a taking.  First, with certain qualifications a
> regulation which denies all economically beneficial or productive use
> of land will require compensation under the Takings Clause.  Second,
> when a regulation impedes the use of property without depriving the
> owner of all economically beneficial use, a taking still may be found
> based on a complex of factors, including (1) the economic impact of the
> regulation on the claimant; (2) the extent to which the regulation has
> interfered with distinct investment-backed expectations; and (3) the
> character of the governmental action.

Murr, 137 S. Ct. at 1942-43 (alterations accepted, citations and internal quotation

marks omitted).

Vision Warriors contends that the First Amended Complaint alleges that as

the result of Defendants' "numerous arbitrary and capricious zoning decisions, . . .

it will lose all economically beneficial use of the Property."  Pl.'s Opp'n at 34

(citing First Am. Compl. ¶¶ 111, 129).  The only actions the First Amended

Complaint alleges are a taking are Defendants' actions in denying Vision Warriors'

administrative appeal of the rescission of Vision Warriors' tenant occupancy

permit.  See First Am. Compl. ¶¶ 144-46.  Furthermore, the First Amended

Complaint alleges that Defendants' conduct "has frustrated the mission of Vision Warriors and constitutes a threat of irreparable harm" and has "effectively shut[] down Plaintiffs' ministry."  First Am. Compl. ¶¶ 111, 129.  It does not allege that Vision Warriors lost or will lose "all economically beneficial use of the Property." In fact, the First Amended Complaint says nothing about the economic impact of Defendants' actions.

Vision Warriors contends that Defendants' actions foreclose "any possibility of Plaintiff continuing its ministry on the Property" since "a residentially zoned property containing a dormitory and private residence serve no purpose to Plaintiff if it cannot operate its residential program."  Pl.'s Opp'n at 35.  To be clear, it appears from the First Amended Complaint that the dormitory and sanctuary are one building used to house residents, prepare and provide meals, and host regular religious services and faith-based meetings.  See First Am. Compl. ¶¶ 26, 29, 45, 53.  That Vision Warriors cannot operate its residential program does not mean it cannot operate other elements of its program on the Property.

Regardless, the allegations in the First Amended Complaint do not indicate that denying Vision Warriors' administrative appeal "denies all economically beneficial or productive use" of the Property.  Thus, "a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation

39

on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Murr, 137 S. Ct. at 1942-43. Vision Warriors does not discuss these factors at all in its Response. Moreover, the First Amended Complaint says nothing about the economic impact of Defendants' denial of Vision Warriors' administrative appeal.[11] Accordingly, the Fifth and Fourteenth Amendment taking claim (Count VI) is **DISMISSED**.[12]

---

[11] The Court notes that while the First Amended Complaint does allege that Vision Warriors asks residents to contribute $600.00 per month, "[a] resident is not turned away due to inability to pay." First Am. Compl. ¶ 50.

[12] Vision Warriors also contends that the First Amended Complaint sufficiently alleges a "due process takings" claim. Pl.'s Opp'n at 34. Vision Warriors relies upon Eide v. Sarasota Cty., 908 F.2d 716 (11th Cir. 1990), which states, "a plaintiff can bring a claim that the application of the regulation goes so far and destroys the value of his or her property to such an extent that it has the same effect as a taking by eminent domain." Eide, 908 F.2d at 721. Following some confusion about the meaning of the phrase, the Eleventh Circuit Court of Appeals has clarified that "[t]here is no independent 'substantive due process taking' cause of action. The only substantive due process claim is for arbitrary and capricious conduct." Villas of Lake Jackson, Ltd. v. Leon Cty., 121 F.3d 610, 612 (11th Cir. 1997). Thus, the Court treats Vision Warriors' claim according to the standards for Fifth Amendment takings claims. See BFI Waste Sys. of N. Am. v. DeKalb Cty., 3030 F. Supp. 2d 1335, 1347 n.10 (N.D. Ga. 2004).

### E.    Equal Protection Claim (Count IV)

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  "The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner."  Leib v. Hillsborough Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1305 (11th Cir. 2009).  "The preliminary step in any equal protection analysis is to determine whether persons who are similarly situated are subject to disparate treatment by the statute or ordinance."  Chabad of Nova, Inc. v. City of Cooper City, 575 F. Supp. 2d 1280, 1292 (S.D. Fla. 2008) (citing Campbell v. Rainbow City, 434 F.3d 1306, 1313 (11th Cir. 2006); Johnson v. Smith, 696 F.2d 1334, 1336 (11th Cir. 1983)).

First, Defendants contend that the First Amended Complaint fails to state a claim for violation of the Equal Protection Clause because it does not identify a similarly situated entity that was treated differently.  Defs.' Br. at 28.  "To be similarly situated, the comparators must be *prima facie identical in all relevant respects*."  Grider v. City of Auburn, 618 F.3d 1240, 1264 (11th Cir. 2010) (citation and internal quotation marks omitted).  As explained in part III(A) of this Order, the allegations in the First Amended Complaint establish that Vision

Warriors was similarly situated to Happy Acres, which was permitted to operate on the Property for decades.

Second, Defendants contend that the First Amended Complaint fails to state a claim for violation of the Equal Protection Clause because it does not demonstrate that there was no rational basis for the County to believe that denying Vision Warriors' zoning applications served legitimate government purposes. Defs.' Br. at 30-31.

> In a facial challenge, if the parties are similarly situated the statute or ordinance must then be scrutinized in a manner depending on the classifications the statute or ordinance implicate. . . . '[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.'

Chabad, 575 F. Supp. 2d at 1292 (quoting City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976)).  However, Vision Warriors does not bring a facial challenge to the County's zoning ordinances but alleges that Defendants selectively enforced and unfairly applied the zoning ordinances to Vision Warriors.  Pl.'s Opp'n at 28, 30.

"[I]n order to prevail on an equal protection claim based upon the application of a facially neutral statute, a plaintiff must establish that . . . the defendant unequally applied the facially neutral statute for the purpose of

discriminating against the plaintiff." Chabad, 575 F. Supp. 2d at 1292 (citing

Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir.1996)); Campbell v. Rainbow

City, 434 F.3d 1306, 1314 (11th Cir. 2006) (citation omitted).  One type of as-

applied challenge is a "class of one," which "does not allege discrimination against

a protected class, but rather asserts that the plaintiff 'has been intentionally treated

differently from others similarly situated and that there is no rational basis for the

difference in treatment.'"  Leib, 558 F.3d at 1306 (emphasis added) (quoting

Young Apartments, Inc. v. Town of Jupiter, 529 F.3d 1027, 1032 n.1 (11th Cir.

2008)); see also SP Frederica, LLC v. Glynn Cty., 173 F. Supp. 3d 1362, 1381

(S.D. Ga. 2016) (citation and internal quotation marks omitted) ("[A] property

owner pursuing an equal protection claim as a 'class of one' must show that it has

been intentionally treated different from others similarly situated and that there is

no rational basis for the difference in treatment.").[13]

As explained previously, the First Amended Complaint alleges that

Defendants permitted Happy Acres to operate a virtually identical ministry on the

---

[13] Defendants contend that Vision Warriors' argument that it brings an as-applied
and not facial challenge does not match its allegations" because the First Amended
Complaint refers to actions "without any rational basis."  Defs.' Reply at 16 (citing
First Am. Compl. ¶¶ 135-38).  However, as shown by this case law, Vision
Warriors' inclusion of the words "rational basis" in the Amended Complaint does
not require reading Vision Warriors' claim as a facial attack.

Property for decades and then amended the zoning ordinance, rescinded Vision

Warriors' zoning approvals, and denied its applications for a special use permit and

for rezoning.  The First Amended Complaint specifically alleges that the following

actions were "exclusionary, arbitrary, capricious and without any rational basis"

and "discriminate between Plaintiff and other similarly situated individuals and

property owners": (1) rescinding Lee's zoning determination "only after Vision

Warriors purchased the Property and began operating its ministry and only after

neighbors expressed unfounded concerns and opposition regarding the group of

people Vision Warriors would be ministering to;" (2) amending the zoning

ordinance to remove dormitories as an "open use;" (3) denying Vision Warriors'

land use applications; and (4) denying Vision Warriors' administrative appeal.

First Am. Compl. ¶¶ 135-39.  Thus, the First Amended Complaint sufficiently

states an as-applied equal protection claim.

Vision Warriors' brings its equal protection claim pursuant to 42 U.S.C.

§ 1983 against the County and the Individual Defendants in their official and

individual capacities.  See First Am. Compl. ¶¶ 6-12, 131-33.  A Section 1983 suit

against an official of the government in his official capacity is deemed to be a suit

against the entity that employs the official.  Ky. v. Graham, 473 U.S. 159, 165-66

(1985); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009)

(citing <u>Brown v. Neumann</u>, 188 F.3d 1289, 1290 (11th Cir. 1999)).  Thus, the

equal protection claims against Chapman in his official capacity and the

Commissioners in their official capacities are claims against the County.  <u>See, e.g.</u>,

<u>Higdon v. Fulton Cty.</u>, 746 F. App'x 796, 799 (11th Cir. 2018) (stating that official

capacity claims against a county commissioner are claims against the county).

> Because local government units can be sued directly—and because
> suits against a municipal officer sued in his official capacity and direct
> suits against municipalities are functionally equivalent—there is no
> need to bring official capacity actions against local government
> officials as well.  Thus, officers sued in their official capacity should be
> dismissed, as keeping suits against both the municipality and the
> officers plainly would be redundant.

<u>Higdon v. Tusan</u>, 746 F. App'x 805, 814 (11th Cir. 2018) (citing <u>Busby v. City of

Orlando</u>, 931 F.2d 764, 776 (11th Cir. 1991)).  Accordingly, the equal protection

claim (Count IV) is **DISMISSED** only against the Individual Defendants in their

official capacities.

### F.    Mandamus Against the Individual Defendants (Count VII)

The First Amended Complaint asserts a mandamus claim pursuant to

O.C.G.A. § 9-6-20 against the Individual Defendants.  First Am. Compl.

¶¶ 147-50.  In particular, Vision Warriors seeks a writ of mandamus directing the

Individual Defendants "to recognize the Plaintiff's use of the Property as a legal

use and reissue Plaintiff's Tenant Occupancy Permit."  <u>Id.</u> ¶ 150.  Defendants

contend that this claim fails because, *inter alia*, Vision Warriors has an adequate legal remedy for its claimed injury.  Defs.' Br. at 35-37.

"[W]henever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights . . . ."  O.C.G.A. § 9-6-20.  "Mandamus is not available where another remedy exists, and thus to the extent that an appeal was available to plaintiff, her mandamus action will not lie."  McGarvey v. Bd. of Zoning Appeals of City of Thomson, 243 Ga. 714, 714 (1979) (citations omitted).  Vision Warriors could have appealed the Board of Commissioners' denial of its administrative appeal to the Superior Court of Cherokee County.  See O.C.G.A. §§ 5-4-1 ("The writ of certiorari shall lie for the correction of errors committed by any inferior judicatory or any person exercising judicial powers . . . ."), 5-4-3 ("When either party in any case in any inferior judicatory or before any person exercising judicial powers is dissatisfied with the decision or judgment in the case, the party may apply for and obtain a writ of certiorari by petition to the superior court for the county in which the case was tried . . . .").  Vision Warriors filed such an appeal.  See Dismissal Without Prejudice, Vision Warriors Church, Inc. v. Michael Chapman et al., Civil Action File No. 19CVE1555 (Super. Ct. Cherokee Cty. Oct. 11, 2019).

Vision Warriors contends that this Court may rule on its petition for mandamus because it is "not bound by the procedural requirements of state laws." Pl.'s Opp'n at 37.  Vision Warriors also contends that because it dismissed its Superior Court case—which it alleges it filed only in case this Court declined to exercise supplemental jurisdiction over the mandamus claim—this Court "has no impediment to adjudicating those same claims."  Id. at 37-28.  However, Vision Warriors has not shown, or even alleged, that Georgia's requirement that it appeal to superior court conflicts with the Federal Rules of Evidence or federal common law.  To state a claim for mandamus, Vision Warriors must show that no other legal remedy exists.  McGarvey, 243 Ga. at 714.  This element does not disappear because this case is in federal and not state court.  See generally, e.g., Cotton v. Jackson, 216 F.3d 1328, 1332 (11th Cir. 2000) ("Under Georgia law, when no other specific legal remedy is available and a party has a clear legal right to have a certain act performed, a party may seek mandamus.").

Vision Warriors also contends that state law certiorari was not "a suitable remedy" because the appeal process and the Board of Commissioners' decision "was void for violations of due process and equal protection."  Pl.'s Opp'n at 39. Thus, Vision Warriors contends that the "interest of fairness and justice are not served" by allowing Defendants to prevail in dismissing this claim.  Id.  The Court

notes that Vision Warriors chose to dismiss its Superior Court case.  Vision

Warriors' reliance on <u>W.D. Simpkins & Co. v. Hester</u>, 3 Ga. App. 160 (1907), is

misplaced because there is no allegation that the Board of Commissioners'

decision was "either a void judgment by a court legally constituted, or any

pretended judgment by an individual or body of individuals assuming to exercise

judicial powers without lawful authority."  <u>See generally</u> <u>W.D. Simpkins</u>, 3 Ga.

App. at 160.  The First Amended Complaint does not allege that the Board of

Commissioners lacked the authority to hear Vision Warriors' appeal.

Because Vision Warriors could have appealed the Board of Commissioners'

decision to the Superior Court of Cherokee County, mandamus is not available.

<u>See</u> O.C.G.A. § 9-6-20; <u>McGarvey</u>, 243 Ga. at 714; <u>City of Cumming v. Flowers</u>,

300 Ga. 820, 852 (2017) (citation and internal quotation marks omitted) ("And as

this [c]ourt has often held, in conformance with the text of the mandamus statute, if

there be a specific remedy by certiorari, the right of mandamus will not lie.").

Accordingly, Vision Warriors' mandamus claim (Count VII) is **DISMISSED**.

### G.    Declaratory Judgment Against the Individual Defendants (Count VIII)

The First Amended Complaint seeks a declaratory judgment against the

Individual Defendants in their official and individual capacities pursuant to

O.C.G.A. § 9-4-2, contending that the Individual Defendants' denial of Vision

Warriors' right to use of the Property and its zoning appeals violates various state constitutional provisions.  First Am. Compl. ¶¶ 151-56.  Defendants contend that the declaratory judgment claim should be dismissed the basis of sovereign immunity as to the Individual Defendants in their official capacities and dismissed in its entirety for failure to state a claim upon which relief can be granted.  Defs.' Br. at 40-48.[14]

Over the past several years, the Supreme Court of Georgia has issued a number of decisions which have expanded the scope of sovereign immunity to bar actions against both state and county officials in their official capacities.  In Lathrop, the Georgia Supreme Court pronounced:  "The constitutional doctrine of sovereign immunity bars any suit against the State to which it has not given its consent, including suits against state departments, agencies, and officers in their official capacities, and including suits for injunctive and declaratory relief from the enforcement of allegedly unconstitutional laws."   Lathrop, 301 Ga. at 444.

---

[14] Defendants contend that sovereign immunity bars both Counts VIII and IX against the County and the Individual Defendants in their official capacities. Defs.' Br. at 40, 42.  However, Counts VIII and IX are not asserted against the County.  See First Am. Compl. ¶¶ 151-61.  Furthermore, because Count IX is asserted against the Individual Defendants only in their individual capacities, see id. ¶¶ 157-61, the doctrine of sovereign immunity does not apply to that claim. See, e.g., Lathrop v. Deal, 301 Ga. 408, 434 (2017); Ga. Dep't of Nat. Res. v. Ctr. for a Sustainable Coast, Inc., 294 Ga. 593, 603 (2014).

49

"Under the Georgia Constitution, the protection of sovereign immunity extends to the state and all of its departments, including counties, and thus protects county employees who are sued in their official capacities unless sovereign immunity has been waived." Jobling v. Shelton, 334 Ga. App. 483, 486 (2015) (internal quotation marks and citation omitted); see also Carson v. Brown, 348 Ga. App. 689, 705 (2019) ("Suits for declaratory relief against public officials in their official capacities are barred by sovereign immunity."); Sustainable Coast, 294 Ga. at 602 (holding that sovereign immunity may bar claims for injunctive relief and for declaratory judgments).

Vision Warriors seeks a declaration that Defendants' actions violated the Due Process, Equal Protection, and Taking Clauses of Georgia's Constitution, see First Am. Compl. ¶¶ 154-56, and contends that, notwithstanding the Georgia Supreme Court's recent pronouncements expanding the scope of the application of sovereign immunity to official actions, a suit challenging the constitutionality of a zoning decision as applied to the litigant's property is not barred by sovereign immunity. Pl.'s Opp'n at 42. In Diversified Holdings, LLP v. City of Suwanee, 302 Ga. 597 (2017), the appellant challenged a zoning decision made by a local governmental body. The appeal raised issues of whether the zoning decision resulted in a taking of property and violated due process. Diversified, 302 Ga. at

611.  However, the Georgia Supreme Court held that the claim "is properly understood as sounding in due process" because the appellant "requested relief in the form of rezoning without seeking damages for a taking." Id.  In this case, the only damages sought by Vision Warriors relate to federal statutes and not due to any Georgia constitutional provision.

Although Diversified is silent on the issue of sovereign immunity, in a case decided after Diversified where the plaintiff sought a declaration concerning the constitutionality of a county zoning condition, the Georgia Supreme Court stated that on remand, the trial court "should resolve" the question of sovereign immunity and noted that "even if sovereign immunity bars some of the declaratory relief that [plaintiff] seeks," it would not bar declaratory relief against the county zoning director in his individual capacity.  See Kammerer Real Estate Holdings, LLC v. Forsyth Cty. Bd. of Comm'rs, 302 Ga. 284, 284-85, 285 n.2 (2017).  Kammerer undermines Vision Warriors' assertion that Diversified requires a finding that sovereign immunity is waived when a zoning case sounding in due process is brought against county officials in their official capacities.  Diversified does no such thing.  Vision Warriors has failed to establish that the state has waived its sovereign immunity for zoning claims sounding in due process.

Although Vision Warriors' declaratory judgment action against the Individual Defendants in their official capacities is barred by sovereign immunity, there is no corresponding bar to the same action against the Individual Defendants in their individual capacities. See Sustainable Coast, 294 Ga. at 603 ("Our decision today does not mean that citizens aggrieved by the unlawful conduct of public officers are without recourse. It means only that they must seek relief against such officers in their individual capacities. In some cases, qualified official immunity may limit the availability of such relief, but sovereign immunity generally will pose no bar."). However, Defendants also contend that the declaratory judgment claim fails because there is no uncertainty about the denial of Vision Warriors' administrative appeal or the rejection of its land use applications. Defs.' Br. at 45-47. Vision Warriors agrees that no uncertainty exists about the fact of this denial and rejection but contends that uncertainty exists about the legality and constitutionality of these actions, and that gives rise to a claim. Pl.'s Opp'n at 47.

"The purpose of this chapter is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and this chapter is to be liberally construed and administered." O.C.G.A. § 9-4-1. Courts have the power to "to declare rights and other legal relations of any interested party

petitioning for such declaration, whether or not further relief is or could be prayed" both "in cases of actual controversy" and "in any civil case in which it appears to the court that the ends of justice require that the declaration should be made." O.C.G.A. § 9-4-2(a)-(b).

> The superior court is authorized to enter a declaratory judgment upon petition therefor in cases of actual controversy (OCGA § 9-4-2(a)), and to determine and settle by declaration any justiciable controversy of a civil nature where it appears to the court that the ends of justice require that such should be made for the guidance and protection of the petitioner, and when such a declaration will relieve the petitioner from uncertainty and insecurity with respect to his rights, status, and legal relations.

Baker v. City of Marietta, 271 Ga. 210, 213 (1999) (citations and internal quotation marks omitted).

Vision Warriors seeks a declaration that its use of the Property is allowed and protected as a legal conforming or nonconforming use, that Vision Warriors has a vested right to that use, and that the County is barred by the doctrine of estoppel from prohibiting such use. First Am. Compl. ¶ 153. It also seeks a declaration that Defendants' actions in denying Vision Warriors' vested right to use, including by rescinding and refusing to reissue Vision Warriors' tenant occupancy permit. Id. ¶ 156. At this point in the proceedings, it appears that there is an actual, justiciable controversy over whether the Individual Defendants violated Vision Warriors' constitutional rights.

53

Consequently, Defendants' Motion to Dismiss Count VIII is **GRANTED** as to the declaratory judgment claim against the Individual Defendants in their official capacities but **DENIED** as to the declaratory judgment claim against the Individual Defendants in their individual capacities.

## H.    Injunction Against the Individual Defendants (Count IX)

The Amended Complaint asserts a claim for an injunction against the Individual Defendants in their individual capacities pursuant to O.C.G.A. § 9-5-1. First Am. Compl. ¶¶ 157-61.

> Equity, by a writ of injunction, may restrain proceedings in another or the same court, a threatened or existing tort, or any other act of a private individual or corporation which is illegal or contrary to equity and good conscience and for which no adequate remedy is provided at law.

O.C.G.A. § 9-5-1.  As explained in part III.F of this Order, Vision Warriors had an adequate remedy at law through certiorari proceedings in the Superior Court of Cherokee County.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to Count IX.

**H.     Legislative Immunity of the Commissioners**

Defendants contend that all remaining claims against the Commissioners must be dismissed because, *inter alia*, they are entitled to legislative immunity. Defs.' Br. at 19-20.[15]

Before evaluating Defendants' argument that these remaining claims against the Commissioners are barred by legislative immunity, it is necessary to review the Commissioners' actions as alleged in the First Amended Complaint.  The First Amended Complaint does not identify any actions taken by specific Commissioners.  Despite asserting claims against each Commissioner both individually and in their official capacities, the First Amended Complaint uses their names only in the caption and in five paragraphs describing the parties.  See First Am. Compl. ¶¶ 7-11.

Vision Warriors contends that the First Amended Complaint alleges that the Commissioners:

---

[15] The Court has dismissed Counts III, V, VI, VII, and IX in their entirety, and Counts IV and Count VIII against the Individual Defendants in their official capacities.  Supra parts III(B)-(H).  The following claims remain: (1) Counts I and II; (2) Count IV against the County and the Individual Defendants in their individual capacities; and (3) Count VIII against the Individual Defendants in their individual capacities.  Supra parts III(A), (E), (G).

1.      Amended the County ordinance to remove dormitories as an "open
        use" (citing First Am. Compl. ¶¶ 72, 117, 124);

2.      Rescinded Vision Warriors' zoning approval issued by Lee and
        Vision Warriors' occupancy permit via a June 12, 2018, letter (citing
        First Am. Compl. ¶¶ 73, 83-84, 89, 96-97);

3.      Recommended the denial of Vision Warriors' subsequent land use
        applications (citing First Am. Compl. ¶¶ 97-98, 101, 124);

5.      Held a work session on November 6, 2018, to discuss Vision
        Warriors' appeal and decided to continue appeal proceedings until the
        two land use applications to be submitted by Vision Warriors were
        submitted and decided, see Defs.' Br. at 13;

6.      Heard and voted to deny Vision Warriors' applications for a special
        use permit and for rezoning, see Defs.' Br. at 13; and

7.      Heard and voted to deny Vision Warriors' administrative appeal on
        July 16, 2019, see Defs.' Br. at 13-14.

Pl.'s Opp'n at 9.

However, the First Amended Complaint alleges that "Defendant County's
Planning Commission," not the Commissioners, recommended denial of Vision
Warriors' land use applications.  See First Am. Compl. ¶ 104.  In addition, the

Board of Commissioner's November 6, 2018, work session and its decision to continue appeal proceedings are not the basis of Vision Warriors' claims in this lawsuit and are immaterial.  See generally id. ¶ 91.  It is unclear whether the Board of Commissioners, Chapman, or the County rescinded Vision Warriors' zoning approval and occupancy permit.  See supra n.4.  Assuming that the Commissioners did so,[16] the First Amended Complaint asserts claims against the Commissioners for (1) rescinding Vision Warriors' zoning approval and occupancy permit; (2) amending the County ordinance to remove dormitories as an "open use;" (3) denying Vision Warriors' applications for a special use permit and for rezoning; and (4) denying Vision Warriors' administrative appeal of the decision to rescind its zoning approval and occupancy permit.

The Commissioners are entitled to absolute immunity from suit for any of the above actions that are legislative functions.  See Crymes v. DeKalb Cty., 923 F.2d 1482, 1485 (11th Cir. 1991) (citations omitted).

> [I]t is the official function that determines the degree of immunity required, not the status of the acting officer.  Furthermore, it has been held that although a local legislator may vote on an issue, that alone

---

[16] The Court notes that the June 12, 2018, letter [Doc. 46-3 at 65-66] was written by counsel for the County and the Board of Commissioners, but from the transcript of the July 16, 2019, hearing [Doc. 46-2] and Vision Warriors' July 11, 2018, memorandum in support of its appeal [Doc. 46-3 at 18-27] it appears that Chapman, the Zoning Administrator, made this decision.

does not necessarily determine that he or she was acting in a legislative capacity.

A legislative act involves policy-making rather than mere administrative application of existing policies. Acts of zoning enforcement rather than rulemaking are not legislative. If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative. Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature.

Id. (citations and internal quotation marks omitted, alteration accepted).

Apparently recognizing that not all of the Commissioners' actions were legislative, Defendants contend that "amending the zoning ordinance and denial of a rezoning applications are legislative decisions." Defs.' Reply at 8-9; see also Defs.' Br. at 19. The Court agrees that amending the zoning ordinance was a legislative act for which the Commissioners are entitled to absolute legislative immunity. See Crymes, 923 F.2d at 1485; Brown v. Crawford Cty., 960 F.2d 1002, 1012 (11th Cir. 1992) (citations omitted) ("Zoning and land use decisions by local government officials normally are characterized as a legislative function.").

However, the Court finds that the First Amended Complaint alleges sufficient facts to show that the Commissioners' other actions were not legislative in nature because the Commissioners applied specific facts to make decisions that impacted Vision Warriors only. See Crymes, 923 F.2d at 1485 (citation omitted) (holding that the decision to uphold the denial of a development permit for a

particular property was the application of policy to a specific party for which the members of the DeKalb County Board of Commissioners were not entitled to absolute immunity); see also Brown, 960 F.2d at 1012 (emphasis added) ("By enacting the subject resolution placing a temporary moratorium of general application on issuing mobile home permits for a specified area of Crawford County until a revised zoning development plan could be reviewed, the individual county commissioners were performing a traditional legislative function.").

Accordingly, all claims against the Commissioners in their official and individual capacities arising only from their vote to amend the County ordinance to remove dormitories as an "open use" are **DISMISSED**.[17]

I.      **Remaining Federal Claims Asserted Against the Individual Defendants in their Individual Capacities**

The First Amended Complaint appears to assert all Counts against the Individual Defendants in their official and individual capacities.  See First Am. Compl. ¶¶ 7-12, 112-66.  The Court now considers those federal claims not previously dismissed that are asserted against the Individual Defendants in their

_____

[17] Defendants also contend that Chapman is entitled to absolute legislative immunity.  Defs.' Br. at 19.  Chapman is not entitled to absolute legislative immunity because none of his actions alleged in the First Amended Complaint are legislative acts.

individual capacities: the FHA Claim (Count I), ADA claim (Count II), and Equal Protection claim (Count IV).

### 1.    ADA Claim (Count II) Against the Individual Defendants

Count II of the First Amended Complaint asserts that Defendants violated Title II of the ADA.  First Am. Compl. ¶ 20 (citing 42 U.S.C. § 12132).  However, "there is no individual capacity liability under Title II of the ADA . . . ." Badillo v. Thorpe, 158 F. App'x 208, 211 (11th Cir. 2005) (citation omitted); Stoddard v. Fla. Bd. of Bar Examiners, 509 F. Supp. 2d 1117, 1124 (N.D. Fla. 2006) (citations omitted) ("[A]ny ADA claims against other defendants in their individual capacities . . . in any event are unfounded because the ADA allows recovery only against the entity engaged in the violation, not against individual employees or agents of the entity.").  Accordingly, the ADA claim asserted against the Individual Defendants in their individual capacities is **DISMISSED**.

### 2.    Qualified Immunity as to the FHA Claim (Count I) and Equal Protection Claim (Count IV)

Defendants contend that all claims against the Individual Defendants in their individual capacities are barred by qualified immunity.  Defs.' Br. at 16. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012)

(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To claim qualified

immunity, a defendant must first show that he was performing a discretionary

function. Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing

Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).

> Instead of focusing on whether the acts in question involved the
> exercise of actual discretion, we assess whether they are of a type that
> fell within the employee's job responsibilities. Our inquiry is two-fold.
> We ask whether the government employee was (a) performing a
> legitimate job-related function (that is, pursuing a job-related goal),
> (b) through means that were within his power to utilize.

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004)

(citation omitted).

The First Amended Complaint alleges that Chapman and the Commissioners

rescinded Vision Warriors' zoning approval and occupancy permit, denied Vision

Warriors' applications for a special use permit and for rezoning, and denied Vision

Warriors' administrative appeal of the decision to rescind its zoning approval and

occupancy permit. Defendants contend that because the Individual Defendants had

no authority to take these actions, there are no acts or omissions attributable to the

Individual Defendants under color of law.[18] Defs.' Br. at 18. However, the First

---

[18] Defendants contend that because the First Amended Complaint alleges only the
collective, corporate actions of "Defendants" or "Defendant County's Board of

Amended Complaint alleges that Chapman and the Commissioners took the above actions under color of law.  See First Am. Compl. ¶¶ 132, 141.  Enforcing and applying Cherokee County's zoning laws is a legitimate job-related function that Chapman and the Commissioners performed through means within their power to utilize, namely rescinding zoning approvals and permits, denying permit applications and zoning appeals, and denying an administrative appeal.  The parties do not contend otherwise.  Thus, the Court finds that the Individual Defendants were performing discretionary functions.  See generally Etherton v. City of Rainesville, 662 F. App'x 656, 663 (11th Cir. 2016) (affirming district court's application of qualified immunity to city officials' enforcement and application of zoning ordinance).

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  Edwards v. Shanley,

---

Commissioners" and not of any specific Commissioner, it fails to state individual capacity claims against the Commissioners.  See Defs.' Br. at 12-16, 21-22.  "[T]he distinction between personal- and official-capacity action suits . . . . apparently continues to confuse lawyers."  Kentucky v. Graham, 473 U.S. 159, 165 (1985).  "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."  Id. (citation omitted).  "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."  Id. at 166 (citation omitted).

666 F.3d 1289, 1294 (11th Cir. 2012) (quoting <u>Lewis v. City of W. Palm Beach</u>,

561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified

immunity does not apply by showing: "(1) the defendant violated a constitutional

right, and (2) the right was clearly established at the time of the alleged violation."

<u>Whittier</u>, 581 F.3d at 1308.

 "The judges of the district courts and the courts of appeals should be

permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand."  <u>Pearson v. Callahan</u>, 555 U.S. 223,

236 (2009).  The Court has rejected Defendants' arguments that the First Amended

Complaint fails to state a claim for violations of the FHA and the Equal Protection

Clause.  <u>See</u> <u>supra</u> parts III(A), (E).  Thus, the Court addresses whether these rights

that the Individual Defendants allegedly violated were clearly established.

 A constitutional right is clearly established "only if its contours are

'sufficiently clear that a reasonable official would understand what he is doing

violates that right.'"  <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003)

(quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  "When we consider

whether the law clearly established the relevant conduct as a constitutional

violation at the time that [the government official] engaged in the challenged acts,

we look for 'fair warning' to offic[ial]s that the conduct at issue violated a

constitutional right." <u>Jones v. Fransen</u>, 857 F.3d 843, 851 (11th Cir. 2017) (citing

<u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).  There are three

methods to show that the government official had fair warning:

> First, the plaintiffs may show that a materially similar case has already
> been decided.  Second, the plaintiffs can point to a broader, clearly
> established principle that should control the novel facts of the situation.
> Finally, the conduct involved in the case may so obviously violate the
> constitution that prior case law is unnecessary.  Under controlling law,
> the plaintiffs must carry their burden by looking to the law as
> interpreted at the time by the United States Supreme Court, the
> Eleventh Circuit, or the [relevant state supreme court].

<u>Terrell v. Smith</u>, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation

marks, and alterations omitted).

The first method "looks at the relevant case law at the time of the violation;

the right is clearly established if 'a concrete factual context exists so as to make it

obvious to a reasonable government actor that his actions violate federal law.'"

<u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1291 (11th Cir. 2011) (alterations

accepted) (quoting <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1333 (11th Cir. 2008)).

While the facts of the case need not be identical, "the unlawfulness of the conduct

must be apparent from pre-existing law."  <u>Coffin</u>, 642 F.3d at 1013; <u>see also</u>

<u>Gennusa v. Canova</u>, 748 F.3d 1103, 1113 (11th Cir. 2014) (citation and internal

quotation marks omitted) ("We do not always require a case directly on point

before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate."). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Harris, 138 S. Ct. 1148, 1152 (2018) (citation and internal quotation marks omitted).

The second and third methods, known as "obvious clarity" cases, exist when "case law is not needed" to demonstrate the unlawfulness of the conduct or where the existing case law is so obvious that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vineyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002). Such cases are rare. See, e.g., Santamorena v. Ga. Military Coll., 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that "these exceptional cases rarely arise").

### a.      Qualified Immunity as to the FHA Claim (Count I)

Vision Warriors relies upon Tennessee v. Lane, 541 U.S. 509 (2004), to show that Defendants violated its clearly established rights under the FHA. See Pl.'s Opp'n at 13. However, Lane did not involve the FHA and is not factually analogous. In that case, the United States Supreme Court held that, as it applies to cases implicating the fundamental right of disabled persons to access the courts,

65

Title II of the ADA was a valid exercise of Congress' authority to enforce the Fourteenth Amendment's substantive provisions.  Lane, 541 U.S. at 509, 533-34.

Vision Warriors relies upon Schwarz for the proposition that the FHA applies to zoning decisions.  Pl.'s Opp'n at 13.  However, in that case the Eleventh Circuit Court of Appeals merely observed that "[t]he parties agree that § 3604(f) applies to zoning *and* that the residents of the halfway houses are 'handicapped' within the meaning of the statute."  Schwarz, 544 F.3d at 1211-12 (emphasis added).  The issue on appeal was whether the city violated the FHA by enforcing its occupancy-turnover rule against halfway houses.  Id. at 1212.  Constrained by the record, the Eleventh Circuit Court of Appeals found that the halfway houses were dwellings and the FHA applied to them.  Id. at 1213.  The court found, in relevant part, that it would be a reasonable accommodation for the city to permit operation of four of the six halfway houses, those that were located within zones that already permitted unlimited turnover in the multi-family dwellings that surrounded these four properties.  Id.  Because the district court never determined whether there was a genuine issue of material fact about the "necessity" element of

66

a reasonable accommodation claim,[19] the Eleventh Circuit Court of Appeals remanded the case.  Id.

Neither Lane nor Schwarz hold that the FHA applies to zoning decisions. Even assuming that Schwarz stands for the proposition that the FHA does apply to such decisions, it did not hold whether the city permitting operation of four of the six halfway houses was a necessary accommodation.  See id.  Vision Warriors cites no additional United States Supreme Court, Eleventh Circuit Court of Appeals, or Georgia Supreme Court cases to show that Vision Warriors' right to a reasonable accommodation was clearly established.  Accordingly, the Court finds that the Individual Defendants in their individual capacities are entitled to qualified immunity as to the FHA claim (Count I).

### b.    Qualified Immunity as to the Equal Protection Claim

To show that Defendants' violated its clearly established rights under the Equal Protection Clause, Vision Warriors relies upon City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985), where United States Supreme Court held that a city's application of a zoning ordinance to a group home for the mentally disabled

---

[19] Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

violated the Fourteenth Amendment Equal Protection Clause. Cleburne, 473 U.S. at 435, 450. Under the city's applicable zoning regulations, a special use permit was required for construction of "hospitals for the insane or feeble-minded, or alcohol[] or drug addicts, or penal or correctional institutions." Id. at 436. The zoning regulations allowed "[h]ospitals, sanitariums, nursing homes or homes for convalescents or aged, *other than for the* insane or *feeble-minded* or alcoholics or drug addicts" without a special use permit. Id. at 436 n.6. The city determined that the proposed group home should be classified as a "hospital for the feebleminded," and the city's planning and zoning commission and city council voted to deny a special use permit. Id. at 437 & n.4.

The city's insistence on the permit rested on several factors. First, it was "concerned with the negative attitude of the majority of property owners located within 200 feet of the Featherston facility, as well as with the fears of elderly residents of the neighborhood." Id. at 448. Second, "the facility was across the street from a junior high school, and [the city council] feared that the students might harass the occupants of the Featherston home." Id. at 449. Third, the home's location was located on a five-hundred-year flood plain." Id. Fourth, the city "was concerned with the size of the home and the number of people that would occupy it." Id. The court found that none of these concerns provided a rational

basis for believing that the group home would pose any special threat to the city's legitimate interests, noted that "[t]he short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded," and affirmed the court of appeals' invalidation of the zoning ordinance as applied to the group home. Id. at 450.

The Court is persuaded that Cleburne gave Defendants fair warning that their conduct violated clearly established law. Like this case, Cleburne involved an applied challenge under the Equal Protection Clause. See Pl.'s Opp'n at 28, 30; Cleburne, 473 U.S. at 447. The First Amended Complaint asserts a claim for violation of the Equal Protection Clause in part based on Defendants' rescission of Vision Warriors' tenant occupancy permit and denial of its land use applications. First Am. Compl. ¶¶ 137-38. Like the plaintiff in Cleburne, Vision Warriors was required under zoning regulations to obtain a special use permit in order to operate and was denied that permit.

Just as the city's decision in Cleburne was based "on an irrational prejudice" against the intellectually disabled, Defendants' decision, accepting the allegations in the First Amended Complaint as true, was based upon false information and the community's unfounded concerns about men recovering from drug and alcohol addiction. See First Am. Compl. ¶¶ 78-81, 102, 135. During the fire marshal's

unannounced inspection, the only concerns raised were the height of fire

extinguishers in the dormitory building and the need to clear boxes from an open

walkway in the warehouse building.  Id. ¶ 69.  At the March 5, 2019, public

hearing, no evidence was presented that Vision Warriors' more than fifteen months

of use of the Property had disturbed neighbors, created parking or traffic issues, or

was inconsistent with the residential use of the neighborhood, and Chapman

explained that the existing roadways would accommodate any traffic and that the

Property was in an area where institutional uses were envisioned for the future.  Id.

¶¶ 96-101.  Cleburne is a materially similar case that gave Defendants fair warning

that their application of the zoning ordinances to Vision Warriors violated clearly

established law.  Accordingly, the Individual Defendants in their individual

capacities are not entitled to qualified immunity as to the equal protection claim

(Count IV).[20]

**J.    Attorney's Fees Pursuant to Federal Law and O.C.G.A. § 13-6-11 (Count X)**

The parties agree that a claim for attorney's fees pursuant to O.C.G.A.

---

[20] As discussed in part III(E) of this Order, the allegations in the First Amended Complaint establish that the Individual Defendants violated Vision Warriors' rights under the Equal Protection Clause.

§ 13-6-11 is derivative.  See Defs.' Br. at 49; Pl.'s Opp'n at 49; Defs.' Reply at 25.

Defendants contend that the Court should dismiss this claim because the

mandamus, declaratory judgment, and injunction claims must be dismissed.  See

Defs.' Br. at 49.  Because a portion of the declaratory judgment claim remains,

supra part III(G), Defendants' Second Motion is **DENIED** with respect to the

claim for attorney's fees pursuant to O.C.G.A. § 13-6-11.

Defendants contend that the claim for attorney's fees pursuant to federal

statute must be dismissed because no federal statute is identified, and no facts are

asserted to support any claim for such fees and costs.  Defs.' Br. at 50.  Vision

Warriors contends that the FHA and ADA contain attorney's fees provisions and

42 U.S.C. § 1988 permits attorney's fees for RLUIPA and federal constitutional

claims.  Pl.'s Opp'n at 49.  Defendants do not dispute this, but contend that

because Count X does not reference these statutes, it fails to state a claim.  Defs.'

Reply at 26.  Defendants cite no authority for this proposition.  See id.; Defs.' Br.

at 50.

Nothing in the applicable attorney's fees statutes requires that a plaintiff cite

the statute in its complaint to recover attorney's fees.  See 42 U.S.C. § 3613(c)(2);

42 U.S.C. § 12205; 42 U.S.C. § 1988(b).  Furthermore, the Eleventh Circuit Court

of Appeals has upheld the award of attorney's fees even when they were not

pleaded, see Drill S., Inc. v. Int'l Fidelity Ins. Co., 234 F.3d 1232, 1239-40 & n.13

(11th Cir. 2000) (citations omitted), and the Federal Rules of Civil Procedure

require that "[p]leadings must be construed so as to do justice."  FED. R. CIV. P.

8(e).  Because the Court has not dismissed in their entirety the federal claims for

which the recovery of attorney's fees is permitted, Defendants' Second Motion is

also **DENIED** with respect to the claim for attorney's fees pursuant to federal law.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion

to Dismiss [Doc. 28] and Defendants' Motion to Dismiss or Stay Pursuant to

Colorado River Abstention [Doc. 29] are **DENIED AS MOOT**.

It is further **ORDERED** that Defendants' Second Motion to Dismiss

[Doc. 45] is **GRANTED IN PART and DENIED IN PART**.  The Motion is

**GRANTED** with respect to the following claims, which are **DISMISSED**:

- Counts I and II, against the Individual Defendants in their individual capacities;

- Counts III, V, VI, VII, and IX, in their entirety;

- Counts IV and VIII, against the Individual Defendants in their official capacities; and

- All claims against the Commissioners in their official and individual capacities arising from their April 2018 vote to amend the zoning ordinance.

The Motion is **DENIED** with respect to the following claims, which are **NOT DISMISSED**[21]:

- Counts I and II against (1) the County and (2) the Individual Defendants in their official capacities;

- Count IV, against (1) the County and (2) the Individual Defendants in their individual capacities;

- Count VIII, against (1) the Individual Defendants in their individual capacities; and

- Count X.

---

[21] However, to the extent Counts I, II, IV, VIII, and X are asserted against the Commissioners in their official and individual capacities and arise from their April 2018 vote to amend the zoning ordinance, these claims are **DISMISSED**.

Pursuant to the Court's October 15, 2019, Order [Doc. 39], the stay on all discovery proceedings in this case expires thirty (30) days from the date of this Order.

**IT IS SO ORDERED** this 19th day of May, 2020.

_____
MARK H. COHEN
United States District Judge