## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **VISION WARRIORS CHURCH, INC.,** | |
| **Plaintiff,** | **CIVIL ACTION FILE** |
| v. | **NO. 1:19-CV-3205-MHC** |
| **CHEROKEE COUNTY, GEORGIA; HARRY JOHNSTON, STEVE WEST, RAY GUNNIN, BENNY CARTER, and COREY RAGSDALE, Individually and in their Official Capacities as Members of the CHEROKEE COUNTY BOARD OF COMMISSIONERS; and MICHAEL CHAPMAN, Individually and in his Official Capacity as Cherokee County Zoning Manager,** | |
| **Defendants.** | |

## <u>ORDER</u>

This case comes before the Court on Plaintiff Vision Warriors Church, Inc.

("Vision Warriors")'s Motion for Partial Summary Judgment [Doc. 104] and the

Motion for Summary Judgment filed by Defendants Cherokee County, Georgia

(the "County"), Harry Johnston ("Johnston"), Steve West ("West"), Ray Gunnin

("Gunnin"), Benny Carter ("Carter"), Corey Ragsdale ("Ragsdale"), and Michael

Chapman ("Chapman") (collectively, "Defendants") [Doc. 105].

## I.    BACKGROUND[1]

This case arises from Defendants' denial of Vision Warriors's request for

zoning approval to conduct certain activities on Vision Warriors's property.

Vision Warriors is a non-profit organization that operates as a faith-based ministry

for men recovering from drug and alcohol addiction through a residential program,

weekly services, and faith-based meetings.  Stipulated Facts [Doc. 101] ¶ 20;

Articles of Incorporation of Vision Warriors Church, Inc. [Doc. 101-20 at 3-11];

see also Screenshot of Vision Warriors's Webpage [Doc. 104-3].  At all relevant

times, Defendants Johnston, West, Gunnin, Carter, and Ragsdale were members of

---

[1] At the outset, the Court notes that as this case is before it on the parties' cross motions for summary judgment, the Court views the evidence presented by the parties in the light most favorable to the non-movants and has drawn all justifiable inferences in favor of the non-movants. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Rsch., Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).  In addition, the Court has excluded assertions of facts that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number).  LR 56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in Vision Warriors's Statement of Undisputed Material Facts ("Pl.'s SUMF") [Doc. 104-2] and Defendants' Statement of Unopposed Material Facts ("Defs.' SUMF") [Doc. 105-2] that have not been specifically controverted with citation to the relevant portions of the record.  See LR 56.1B(2), NDGa; Defs.' Resp. to Pl.'s SUMF [Doc. 124]; Pl.'s Resp. to Defs.' SUMF [Doc. 126-4].

the Cherokee County Board of Commissioners (the "Board"), and Chapman was

the County's zoning administrator.  Tr. of Proceedings Before the Cherokee Cnty.

Bd. of Comm'rs (July 16, 2019) ("Tr. of Appeal") [Doc. 102-25] at 2, 19.

On December 13, 2017, Vision Warriors purchased approximately 6.491

acres, identified in the County's records as Tax Map 02N04, Parcel 02N04 314

("Parcel 314") and Parcel 02N04 318 ("Parcel 318"), commonly known as 1709

Old Country Place, Woodstock, Georgia, 30188 ("the Property").  Stipulated Facts

¶¶ 2, 21; Executrix Deed (Dec. 14, 2017) [Doc. 101-22]; Limited Warranty Deed

(Dec. 14, 2017) [Doc. 101-23].  Parcel 314 on the Property is zoned to the R-80

(Residential) zoning district and Parcel 318 is zoned to the R-20 (Residential)

zoning district.  Stipulated Facts ¶ 2.  The Property contains several structures,

including a large church/dormitory, a detached garage, and a warehouse.  Id. ¶¶ 4-

6; Boundary Survey for 1709 Old Country Place [Doc. 101-5]; Aff. of Jewel

Young (March 5, 2019) ("J. Young Aff.") [Doc. 104-5 at 1-5] ¶¶ 4-6, 8, 10.  The

parcels surrounding the Property are in residential use.  Decl. of M. Chapman

[Doc. 105-13] ¶ 7.

A.    **Happy Acres's Operations on the Property**

Tom and Jewel Young acquired the Property in 1972.  Stipulated Facts ¶ 3;

J. Young Aff. [Doc. 104-5 at 1-5] ¶ 2.  Beginning in 1982, Tom and Jewel Young

used part of the Property to operate Happy Acres Mission Transit Center, Inc.

("Happy Acres").  Stipulated Facts ¶ 3; J. Young Aff. ¶ 3.  The purpose of Happy

Acres was "to promote the recreation, health, safety, welfare, common benefit and

enjoyment of missionaries and to help further aid their religious and spiritual

beliefs and goals."  Articles of Incorporation of Happy Acres Mission Transit Ctr.,

Inc. [Doc. 101-8 at 3-4] ¶ 4.  Happy Acres also provided assistance to various

members of the community with approximately seventy-five percent of people

served being missionaries.  Dep. of Jewel Young (March 18, 2021) ("J. Young

Dep.") [Doc. 110] at 62-63.  In 1982, Tom Young submitted a rezoning application

for the Property in order "to have a church and a facility to be able to keep

missionaries in larger number . . . ."  Id. at 66.  Tom and Jewel Young intended to

build several smaller homes on the Property in order for Happy Acres to house

missionaries.  Id. at 67.  The Youngs' rezoning application was denied by the

County.  Id. at 67-68; Resolution No. 831 (Oct. 12, 1982) [Doc. 101-6 at 1]

(denying application for zoning amendment).

Following the denial of its rezoning application, Happy Acres decided to

construct a larger building on the Property (the "Building") that could function as a

church as well as a dormitory to house missionaries.  J. Young Dep. at 69-71; J.

Young Aff. ¶ 4.  Happy Acres applied for a construction permit for the Building,

4

which described the use of the Building as a "church." Building Permit Appl. [Doc. 101-7 at 7]. On September 4, 1986, the County granted Happy Acres's application for a construction permit for the Building. Cherokee Cnty. Bldg. Permits [Doc. 101-7 at 1]; Building Permit [Doc. 101-7 at 8]. The County issued a Certificate of Occupancy for the Building on September 21, 1989. Stipulated Facts ¶ 9; Certificate of Occupancy [Doc. 101-9]. The Certificate of Occupancy described the use classification as R-E.[2] Certificate of Occupancy.

In addition to housing missionaries in the Building, Happy Acres hosted a variety of events in the Building, including pastors' conferences, banquets, weddings and receptions, and overnight retreats. J. Young Dep. at 70-72; J. Young Aff. ¶ 7. Some events, such as retreats for teenagers, would involve housing as many as fifty-five people at the same time. J. Young Dep. at 71. Happy Acres also housed families in the Building. J. Young Aff. ¶ 7. On average, Happy Acres hosted four families at a time, but there were months when six families stayed in the Building. Id. Tom and Jewel Young also constructed a garage and a

---

[2] Under the County Zoning Ordinance in effect at the time, a use classification of RE was for an "Estate Residential District" which listed "[s]ingle-family residence" and "[c]hurch or other place of religious worship" as permitted uses. Land Use and Development Controls for Cherokee Cnty., Ga., enacted Jan 1, 1969, [Doc. 101-25] Art. V § C(2)(g). The same classification does not mention temporary shelters or dormitories. Id.

warehouse on the Property.  Id. ¶ 10.  The garage was used for repairing cars as

part of Happy Acres's mission, and the warehouse, which was equipped for

woodworking, was used primarily for building crates and storing shipments for

missionaries.  Id.; J. Young Dep. at 145.

### B.     Happy Acres's Efforts to Sell the Property

Shortly after Tom Young's death in 2016, Happy Acres decided to sell the

Property.  J. Young Aff. ¶ 11.  Jewel Young's son, Tori Young, assisted in Happy

Acres's discussions with the County about the sale of the Property and the

potential use by any subsequent owner.  Id.  In response to a request from a

potential buyer, Happy Acres submitted a zoning certification request to the

County on January 13, 2017.  Id. ¶¶ 11-12; Zoning Certification Req. [Doc. 101-

12].  On February 6, 2017, Vicki Taylor Lee ("Lee"),[3] the zoning administrator for

the County, responded to Happy Acres's request.  Letter from Vicki Taylor Lee,

zoning administrator, to Jewel Young (Feb. 6, 2017) ("First Certification Letter")

[Doc. 101-13].  Lee's letter stated:

> This is to certify that the [Property] is in the R-80 (Residential) and R-
> 20 (Residential) zoning district . . . .

---

[3] Lee's name is currently Vicki Smith, but it was Vicki Taylor Lee at the time she
was employed by the County.  Dep. of Vicki Smith (Feb. 18, 2021) ("Lee Dep.")
[Doc. 118] at 6.  For the sake of clarity, the Court will refer to Vicki Smith as Lee.

> There appears to be four (4) buildings on the parcel, a primary home, a detached garage, a dormitory and a chapel. As a legal non-conforming use, you may continue to house guests in the dormitory for short periods of time. You cannot expand the use to something different or increase the number of people served.

Id. The next day, Lee emailed Tori Young, stating:

> "You cannot expand the use to something different" means? [sic] You cannot change this to a youth hostel, housing for day laborers, or half-way housing. Using the dormitory for short term stays as a part of the ministry is fine. However, if the previous tenants were missionaries and the new tenants are planned to be recovering drug addicts, the[n] a different zoning will be required.

Email from Vicki Lee to Tori Young (Feb. 7, 2017) [Doc. 101-14]; Stipulated Facts ¶ 14.

Tori Young requested further specificity from Lee regarding the zoning certification. Lee Dep. at 21-22. In response, Lee sent a second zoning certification letter to Jewel Young via Tori Young on March 8, 2017. Id.; Letter from Vicki Taylor Lee, zoning administrator, to Jewel Young (Mar. 8, 2017) ("Second Certification Letter") [Doc. 101-15]. In addition to the information in the First Certification Letter, the Second Certification Letter stated: "[p]lease see the attached document for the NAICS Code associated with the land use" and

attached a copy of NAICS Code 624221 which is for Temporary Shelters.[4]  Second Certification Letter.

The first potential buyer did not acquire the Property, and Happy Acres thereafter entered into a Letter of Intent with Vision Warriors regarding Vision Warriors's interest in purchasing the Property.  J. Young Aff. ¶¶ 13-14.  On July 5, 2017, Tori Young, on behalf of Happy Acres, contacted Cherokee County Planning Technician Tamala Davis and requested a meeting with Lee regarding Vision Warriors's proposed acquisition of the Property.  See E-mail from Tori Young to Tamala Davis (July 5, 2017) [Doc. 101-16 at 1].

Tori Young and Kirk Driskell ("Driskell"), the founder and CEO of Vision Warriors, met with Lee on July 19, 2017.  Dep. of Timothy Kirk Driskell (Mar. 26, 2021) ("Driskell Dep.") [Doc. 111] at 166, 373-74; E-mail from Tori Young to Vicki Taylor Lee (July 31, 2017) [Doc. 101-19 at 3]; Pl.'s SUMF ¶ 11; Defs.' Resp. to Pl.'s SUMF ¶ 11.  Following that meeting, Tori Young emailed Lee and requested "an updated letter for special use."  E-mail from Tori Young to Vicki Taylor Lee (July 31, 2017).  When Lee asked why the Second Certification Letter

___

[4] The National American Industrial Classification System ("NAICS") is the basis on which County officials define certain land uses. Lee Dep. at 35-36; see also Cherokee Cnty. Ordinance Number 2018-O-003 ("2018 Zoning Amendment") [Doc. 101-31].

was not sufficient, Tori Young requested something "more case specific to Vision Warriors" because Vision Warriors's use was focused on serving men, and the prior letter referenced use for women. E-mail exchange between Tori Young and Vicki Taylor Lee (Aug. 4, 2017) [Doc. 101-19 at 2-4]. In response, Lee stated "[i]t also says homeless shelters without gender. I am the interpreter of land use and I assure you this meets Vision Warriors['s] use." Id. On August 4, 2017, Lee also sent Tori Young another zoning certification letter which outlined the same permitted use and NAICS code in the Second Certification Letter. Letter from Vicki Lee to Tori Young (Aug. 4, 2017) ("Third Certification Letter") [Doc. 101-17].

### C.   Vision Warriors's Acquisition and Initial Use of the Property

On November 22, 2017, Driskell emailed Lee and advised her that Vision Warriors would be purchasing the Property with a projected closing date of December 12, 2017. E-mail exchange between Kirk Driskell and Vicki Taylor Lee (Nov. 22, 2017) [Doc. 101-19 at 1-2]. Driskell also inquired about what steps needed to be taken to secure a business license. Id. Lee responded, stating:

> You are good to go. What will happen first is a Tenant Occupancy Change w[h]ere the Fire Marshal and a Building Inspector come out to verify the required life-safety items. When that is approved, you can get your business license.

Id.  Vision Warriors closed its purchase of the Property on December 13, 2017.

Stipulated Facts ¶ 21.

Driskell testified that a County marshal showed up on the Property on April

18 or April 19, 2018, one or two days before he applied for a Tenant Occupancy

Change.  Driskell Dep. at 324-25.  At that time, Driskell believed Vision Warriors

had abided by all County requirements.  Id. at 325.  Driskell was not on the

Property when the marshal showed up, but he called the County based on a card or

letter the marshal left on the property.  Id. at 325-27.

On April 20, 2018, Driskell met with County employees and submitted a

Tenant Occupancy Change application, and the County issued Vision Warriors a

Tenant Change Permit for the Property.  Id. at 325-26; Tenant Occupancy Change

Appl. [Doc. 111-1 at 547]; Tenant Change Permit [Doc. 111-1 at 546].  The Tenant

Occupancy Change Application included a section titled "Full Description of

Business activity" which Driskell completed with "CHURCH, SUPPORT FOR

MEN AND THEIR FAMILIES."  Tenant Occupancy Change Appl.; Driskell Dep.

at 366.  Driskell expected the County's fire marshal to show up and conduct an

inspection in the days following his April 20, 2018, meeting.  Id. at 328.

### D.     Defendants' Initial Investigation

After completion of paperwork for a Tenant Occupancy Change, the

planning system used by the County at the time Vision Warriors submitted its

application would automatically schedule a fire marshal inspection for the next

business day.  Dep. of Chad Arp, Cherokee Cnty. Chief Fire Marshal (Nov. 13,

2020) ("Arp. Dep.") [Doc. 116] at 18.  Chad Arp ("Arp"), the Chief Fire Marshal

for the County, emailed Jeff Watkins ("Watkins"), the County's director of

planning and zoning, and Margaret Stallings ("Stallings"), the County's principal

planner, to advise them that he planned to inspect the Property as a "Community

Living Arrangement" occupancy, assuming that it was a permitted use under the

zoning at the time.  Id. at 19; see also Dep. of Jeff Watkins (Nov. 13, 2020)

("Watkins Dep.") [Doc. 117] at 5, 7.  Stallings advised Arp to "hold up" on

inspecting the Property so that she could gather more information on it.  Arp Dep.

at 23.

Watkins also instructed Arp to hold off inspecting the Property so that the

County could look into Vision Warriors's specific use of the Property after

Watkins received complaints from Vision Warriors's neighbors following the

issuance of the Tenant Occupancy Change Permit.  Arp. Dep. at 27; Watkins Dep.

at 28-29, 36.  Watkins stated that the reason for the investigation was that Vision

11

Warriors's proposed use "didn't sound like it would meet up with" Happy Acres's prior use. Watkins Dep. at 37-38. Still, Arp testified that it was his decision to cancel the inspection and that his decision was based on his limited knowledge of the Property. Arp Dep. at 25.

An on-site visit of the Property eventually was scheduled by Paul Laney, the County official in charge of the building department. Arp. Dep. at 30, 37-38. This visit was attended by Arp and six other County employees. Id. at 38. Arp stated that the purpose for the visit was "to gain understanding of what the property was being used for." Id. at 39. Although Arp had never conducted a visit with the same group of officials, Arp testified that such pre-inspection visits were common. Id. at 39-40. After the visit, Arp remained unclear as to the proper use of the main building because he was uncertain about, among other things, the intended number of beds and the length of residents' stays. Id. at 39-43. Although he could not remember the specifics, Arp recalled multiple other instances when a number of officials from the fire marshal's office accompanied him on pre-inspection site visits such as the one conducted on the Property. Id. at 47-48.

**E.     Rescission of the Permit and Vision Warriors's Appeal**

On May 4, 2018, after Arp's visit to the Property, Driskell, accompanied by counsel, met with Watkins. See Letter from Ethan Underwood, counsel for Vision

Warriors, to Jeff Watkins (May 9, 2018) [Doc. 101-36].  Subsequently, Vision

Warriors wrote a letter to Watkins "intended to provide a summary of the historic

use of the Property by [Happy Acres] and to assert Vision Warriors['s] right to

continue [such] use." Id.  On June 12, 2018, counsel for the County and the Board

wrote Vision Warriors and stated, in pertinent part,

> On April 20, 2018, Vision Warriors submitted an application for a
> Tenant Occupancy Change Permit.  The Tenant Occupancy Change
> Permit was issued in error to Vision Warriors on the same day.  Based
> upon our investigation and review, we have concluded that Vision
> Warriors is engaging in an unpermitted use of the [P]roperty such that
> the Tenant Occupancy Change Permit was issued in error.  Such
> offending uses must be discontinued.
> . . .
> We have concluded that the principal use of the [P]roperty is a
> temporary shelter, which is prohibited in residential zoning districts.  In
> addition, we have determined that the [P]roperty is not being used as a
> church as alleged.  Indeed, a review of the descriptions provided by
> your office, as well as independent review and investigation, makes
> clear that the current use of the [P]roperty is actually in violation of the
> residential zoning districts in other multiple respects . . . .
> . . .
> We understand that the previous Cherokee County Zoning
> Administrator, Vicki Lee, issued zoning certification letters for Happy
> Acres Mission Transit Center.  The "certifications" were issued
> erroneously.  Temporary shelters have not been permitted in residential
> districts in the County since at least 1969.
>
> In summary, we have determined that the Tenant Occupancy Change
> Permit that was issued to Vision Warriors was issued in contravention
> to the Zoning Ordinance, is void, and is otherwise hereby rescinded.

Letter from Angela Davis, counsel for the County, to Ethan Underwood, counsel for Vision Warriors (June 12, 2018) ("June 12 Letter") [Doc. 102-1].

On July 11, 2018, Vision Warriors appealed the County and Board's decision referenced in the June 12 Letter. Stipulated Facts ¶ 31; Zoning Bd. of Appeals Variance Appl. [Doc. 101-1]. On August 9, 2018, Chapman confirmed the decision outlined in the June 12 Letter, based upon his investigation and review. Letter from Michael Chapman, zoning administrator, to J. Ethan Underwood, counsel for Vision Warriors (Aug. 9, 2018) ("August 9 Letter") [Doc. 102-4]. Chapman "concluded that the principal use of the property is a temporary shelter, which is prohibited in residential zoning districts" and that "the Tenant Occupancy Change Permit was issued in error." Id. at 2. In addition, Chapman concluded that the Property was not being used as a church and that the use by Vision Warriors was different from the prior use engaged in by Happy Acres. Id. Chapman declared the Tenant Occupancy Change Permit previously issued to be void and rescinded. Id. Vision Warriors also appealed Chapman's decision in the August 9 Letter. Stipulated Facts ¶ 35; Letter from Ethan Underwood, counsel for Vision Warriors, to Michael Chapman (Sept. 7, 2018) [Doc. 102-6]. On July 16, 2019, the Board conducted a hearing on Vision Warriors's administrative appeal and voted to deny the appeal. Stipulated Facts ¶ 49; Tr. of Appeal at 235.

14

On November 20, 2018, Vision Warriors filed applications for rezoning of the Property to "office industrial" and an application for a special use permit for the Property.  Stipulated Facts ¶ 37; Appl. for Public Hearing, Requesting Rezoning with Concurrent Variance(s) [Doc. 102-8]; Appl. for Public Hearing, Requesting Special Use Permit [Doc. 102-9].  On March 5, 2019, a public hearing on Vision Warriors's pending applications was held before the County Planning Commission.  Stipulated Facts ¶ 46.  The County Planning Commission recommended denial of both Vision Warriors's application for rezoning and its application for a special use permit and, on April 16, 2019, the Board adopted the recommendation and denied both applications.  Id. ¶ 48; Cnty. Resolution No. 2019-R-019 [Doc. 102-23]; Cnty. Resolution No. 2019-R-020 [Doc. 102-24].

Vision Warriors subsequently initiated the action now at hand, asserting claims for violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et seq. (Count I); violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, et seq. (Count II); and violation of the Fourteenth Amendment Equal Protection Clause (Count IV).[5]  Vision Warriors also seeks a declaratory judgment

_____

[5] The remaining counts were dismissed pursuant to this Court's May 19, 2020, Order [Doc. 57] which granted in part and denied in part Defendants' Motion to Dismiss [Doc. 28].

under O.C.G.A. § 9-4-2 (Count VIII) and attorney's fees and damages under

"applicable federal law" and O.C.G.A. § 13-6-11 (Count X).   Am. Compl. ¶¶ 112-

124, 131-139, 151-156, 162-166.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing

the district court of the basis for its motion and identifying those portions of the

record which it believes demonstrate the absence of a genuine issue of material

fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions," and cannot be made by the district

court in considering whether to grant summary judgment.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins.

Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must

present evidence demonstrating a genuine issue of material fact or that the movant

is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In

determining whether a genuine issue of material fact exists, the evidence is viewed

16

in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. Anderson, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Id. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita, 475 U.S. at 587.

## III. DISCUSSION

### A. Claims Under the Fair Housing Act (Count I) and the Americans with Disabilities Act (Count II)

Pursuant to the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1)(B). "Handicap" is defined as

17

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

42 U.S.C. § 3602(h).  However, the FHA's implementing regulations provide that physical or mental impairment includes "drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism."  24 C.F.R. § 100.201.  Other district courts in the Eleventh Circuit have held that certain individuals recovering from alcoholism and drug addiction had a handicap under the FHA.  See, e.g., Jeffrey O. v. City of Boca Raton, 511 F. Supp. 2d 1339, 1346-47 (S.D. Fla. 2007); New Life Outreach Ministry Inc. v. Polk Cnty., No. 8:06-CV-1547-T-27MAP, 2007 WL 2330854, at *4 n.2 (M.D. Fla. Aug. 14, 2007) (citation omitted).

Pursuant to the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similar to the FHA's definition of "handicap," the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having

18

such an impairment . . . ."  42 U.S.C. § 12102(1).  The ADA provides that while a

"qualified individual with a disability" does not include any employee or applicant

"currently engaging in the illegal use of drugs," 42 U.S.C. § 12114(a), that

prohibition shall not "be construed to exclude as a qualified individual with a

disability an individual who . . . is participating in a supervised rehabilitation

program and is no longer engaging in such use . . . ."  Id. § 12114(b)(2).

     "Due to the similarity of the ADA and the FHA's protections of individuals

with disabilities in housing matters, courts often analyze the two statutes as one.

Both the ADA and FHA apply to municipal zoning decisions."  Caron Found. of

Fla., Inc. v. City of Delray Beach, 879 F. Supp. 2d 1353, 1367 (S.D. Fla. 2012)

(citations omitted).  However, the FHA only applies to "dwellings."  Schwarz v.

City of Treasure Island, 544 F.3d 1201, 1212-13 (11th Cir. 2008); 42 U.S.C.

§ 3604(f)(1)-(2).  "Sober living homes can constitute a dwelling."  Caron, 879 F.

Supp. 2d at 1364 (citing Schwarz, 544 F.3d at 1213-16).

     "A plaintiff can establish a violation under the FHA by proving

(1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a

reasonable accommodation."  Bonasera v. City of Norcross, 342 F. App'x 581, 583

(11th Cir. 2009) (citing Schwarz, 544 F.3d at 1201; Hallmark Devs., Inc. v. Fulton

Cnty., 466 F.3d 1276, 1283 (11th Cir. 2006)).  "The FHA and ADA prohibit

disparate treatment of those with disabilities." <u>Caron</u>, 879 F. Supp. 2d at 1367

(citing 42 U.S.C. §§ 3604(f)(3)(B), 12132).  The First Amended Complaint alleges

that Defendants both discriminated against Vision Warriors and refused to make

reasonable accommodations.  <u>See</u> First Am. Compl. ¶¶ 116-17, 124.

### 1.    Intentional Discrimination

"To prove intentional discrimination, 'a plaintiff has the burden of showing

that the defendants actually intended or were improperly motivated in their

decision to discriminate against persons protected by the FHA.'" <u>Bonasera</u>, 342 F.

App'x at 584 (quoting <u>Reese v. Miami-Dade Cnty.</u>, 242 F. Supp. 2d 1292, 1301

(S.D. Fla. 2002)).  "Among the factors that are instructive in determining whether

[] discriminatory intent is present are: discriminatory or segregative effect,

historical background, the sequence of events leading up to the challenged actions,

and whether there were any departures from normal or substantive criteria."

<u>Hallmark</u>, 466 F.3d at 1283 (quoting <u>United States v. Hous. Auth. of the City of</u>

<u>Chickasaw</u>, 504 F. Supp. 716, 727 (S.D. Ala. 1980)).

> We have held that a plaintiff <u>may</u> meet this burden by presenting
> evidence that the "decision-making body acted for the sole purpose of
> effectuating the desires of private citizens, that racial [or other
> improper] considerations were a motivating factor behind those desires,
> and that members of the decision-making body were aware of the
> motivations of the private citizens."

<u>Bonasera</u>, 342 F. App'x at 584 (emphasis added) (quoting <u>Hallmark</u>, 466 F.3d

at 1284).

Defendants assert that there is no evidence in the record supporting a finding of intentional discrimination. Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") [Doc. 105-1] at 15-16. In response, Vision Warriors points to the following as evidence of Defendants' discriminatory intent: (1) Defendants' request that Vision Warriors "respond to false accusations made by neighbors," (2) the reference by County officials to neighborhood opposition in preliminary meetings with Vision Warriors, and (3) the County's unprecedented actions and departures from normal criteria in its refusal to permit Vision Warriors's proposed use of the Property. Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") [Doc. 126] at 6-8. The Court will assess the record evidence *seriatim*.

a.   **Defendants' Request that Vision Warriors Respond to Neighbors' Statements**

Vision Warriors asserts that Defendants' request that Vision Warriors respond to false accusations made by neighbors is indicative of intentional discrimination. Id. at 7. This Court disagrees.

The evidence in the record shows that counsel for Vision Warriors became aware of an email and petition being circulated by some of Vision Warriors's neighbors which, without permission, appropriated the seal of the County. E-mails between Ethan Underwood and Angela Davis (May 30, 2018 through May 31,

2018) [Doc. 101-37].  After this was brought to the attention of Defendants <u>by</u> <u>Vision Warriors</u>, Defendants' counsel asked:

> Is anything accurate there?  Does Vision Warriors intend to serve up to 60 men?  Is the rent $600 per month?  Is it a minimum one-year stay? If any of the above is true, is your client amenable to limitations should the County ultimately determine that the use is permissible?  Please know we have not reached that conclusion, but I am curious to know about the real intentions as to the expansiveness of the use.

<u>Id.</u> at 2.  In a subsequent email, Defendants' counsel stated that they were not asking Vision Warriors to disprove allegations but rather "trying to get to the bottom of the use and what it entails so that the County can make an informed decision as to what is permissible on the property."  <u>Id.</u> at 1-2.

It is clear that Defendants' questions regarding the neighbors' claims were not unprompted—they arose only after Vision Warriors brought the claims to Defendants' attention.  <u>Id.</u>  At the time, Defendants were still gathering information to "make an informed decision as to what is permissible on the property."  <u>Id.</u>  Defendants also clarified that they were not looking for a simple denial of the allegations.  <u>Id.</u> at 1.  Instead, they sought "additional information in support of [Vision Warriors]'s position" in order to advance the investigative process, and Defendants followed up with specific, related questions for Vision Warriors, which it answered.  <u>Id.</u>; E-mail from Ethan Underwood to Angela Davis (June 2, 2018) [Doc. 101-38] (stating to counsel for Defendants, "[t]hank you for

the opportunity to provide additional information."). Defendants' questions to Vision Warriors about the veracity of the neighbors' claims and asking follow-up questions were logical steps in Defendants' investigation of the Property's use, and the correspondence in no way demonstrates that Defendants accepted the neighbors' claims at face value or harbored other discriminatory intent.

### b.    Reference to Opposition in Meetings

On May 4, 2018, Watkins, Arp, and Stallings met with Driskell and an attorney for Vision Warriors, and during the meeting Driskell was advised that some neighbors were opposed to Vision Warriors's use of the Property. Answer [Doc. 46] ¶ 76; Watkins Dep. at 29-31. This meeting took place shortly after neighbors had voiced their concerns about Vision Warriors's activities on the Property. Watkins Dep. at 29-31. Watkins testified that the purpose of the May 4 meeting was to understand what exactly Vision Warriors does because it appeared that Vision Warriors's proposed use did not match Happy Acres's prior use. Id. at 32-33.

Vision Warriors contends that the mention of neighborhood opposition at the May 4 meeting somehow supports its assertion that it was subjected to intentional discrimination. Pl.'s Resp. at 7. However, Vision Warriors has not identified any evidence or authority showing that the mere notice of neighbor opposition, alone,

is demonstrative of intentional discrimination.  The Court finds that it does not

support Vision Warriors's claim of intentional discrimination.

### c.   Unprecedented Actions and Departure from Normal Criteria

Vision Warriors cites several unprecedented actions taken by Defendants.

First, Vision Warriors states that the revocation of certification of zoning for the

Property was unprecedented.  Pl.'s Resp. at 7.  Specifically, Watkins, Lee,

Johnston, and Arp all testified that they cannot recall another instance in which a

certification of zoning issued by Lee was revoked.  Watkins Dep. at 56; Lee Dep.

at 20-21; Dep. of Harry Johnston (March 31, 2021) ("Johnston Dep.") [Doc. 121]

at 55-56; Arp Dep. at 37.  Chapman also testified that he did not know if a specific

code provision granted him the authority to revoke a previously-issued certification

of zoning.  Dep. of Michael Chapman (March 31, 2021) ("Chapman Dep.") [Doc.

115] at 54.  Finally, Arp stated that he did not recall previously conducting a site

visit with the same individuals that joined him on the Property.  Arp. Dep. at 39.

"While procedural abnormalities can provide a basis for finding

discriminatory intent . . . such abnormalities are only relevant within a larger

scope." Macone v. Town of Wakefield, 277 F.3d 1, 6 (1st Cir. 2002); see also

Hallmark, 466 F.3d at 1285.  Viewed in context, none of the abnormalities cited by

Vision Warriors is sufficient to save its intentional discrimination claims from

summary judgment.  All of the testimony cited by Vision Warriors is limited to the

individual recollections of a handful of individuals as to whether specific actions

had occurred in other circumstances, and the testimony does not sufficiently show

that the actions taken were particularly unusual in the wider context of the

County's operations.  For example, although Vision Warriors asserts that "[Arp]

confirmed that the visit by seven (7) county officials to the Property was also

unprecedented," Pl.'s Resp. at 7, Arp testified only that he had not conducted a site

visit with that exact group of individuals in the last five years.  See Arp Dep. at 38-

39.  Even assuming the circumstances surrounding the revocation of zoning

certification are, as Vision Warriors contends, unprecedented, they are not

sufficient departures from the norm for a reasonable jury to find by inference that

Defendants intentionally discriminated against Vision Warriors.

> Finally, clear precedent from the Eleventh Circuit dispenses with any
> lingering doubt about whether [plaintiff] has marshalled enough
> evidence to survive summary judgment on its disparate treatment claim.
> In His House [Recovery Residence, Inc. v. Cobb Cnty., Ga., 806 F.
> App'x 780 (11th Cir. 2020)], for example, the county denied a sober
> home's request to house more than the maximum number of persons
> otherwise permitted under the zoning ordinances.  The sober home
> presented evidence that (1) its mere presence was "met with opposition
> from citizens whose concerns included the home's proximity to a
> school and playgrounds and the effect of a group home on property
> values"; (2) the county's ordinance was amended to placate this
> community pressure; and (3) a county commissioner, referring to the
> sober home, said (in a public hearing): "if anyone, no matter where you
> are, approaches your child or anything suspicious in your

neighborhood—you need to call 911."   Despite this evidence, the
Eleventh Circuit affirmed the district court's decision to grant summary
judgment against the sober home on its disparate treatment claim.

. . .

Nor was <u>His House</u> some mere aberration.  In <u>Quality of Life, [Corp. v.
City of Margate</u>, 805 F. App'x 762 (11th Cir. 2020)], the City of
Margate denied a drug-detox facility's request for zoning approval.  In
asserting its claim of intentional discrimination, the detox facility relied
heavily on the mayor's statements "that having a sober house or a drug-
recovery facility in a residential community 'would be a concern as
much as any sexual predator . . . who lives in my neighborhood.'"  Even
with this clear evidence of animus, the Eleventh Circuit (again)
affirmed the district court's order granting summary judgment against
the detox facility on its intentional discrimination claim.  Nothing
[plaintiff] has submitted . . . approaches the degree of hostility reflected
in the Margate mayor's statements.

<u>Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale</u>, No. 19-60007-CIV,

2020 WL 4736211 (S.D. Fla. Aug. 14, 2020) (citations omitted and alterations

accepted); <u>see also</u> <u>Akridge v. City of Moultrie</u>, No. 6:04 C V 31(HL), 2006 WL

292179, at *7 (M.D. Ga. Feb. 7, 2006) ("Yet, even drawing every legitimate

inference in favor of Plaintiffs, there is simply no evidence that Defendant's

deviation from normal enforcement schemes or the public's concern was due, even

in part, to the fact that Plaintiff[]'s potential client base was composed of

[protected] individuals.").

Vision Warriors also argues that the County's refusal to classify Vision

Warriors's use of the Property as a "dormitory" is evidence of intentional

discrimination.  Pl.'s Resp. at 7-8.  The NAICS is the primary resource County

26

officials consult for definitions for certain land uses, in addition to the Zoning Ordinance itself. Chapman Dep. at 44-45; see also 2018 Zoning Amendment. In the Second Certification Letter and the Third Certification Letter, both issued prior to Vision Warriors's purchase of the Property, Lee stated that the associated NAICS Code was 624221, Temporary Shelter. Second Certification Letter; Third Certification Letter. Vision Warriors did not dispute this classification prior to purchasing the Property on December 13, 2017.

Vision Warriors later appealed the County's determination that the Property was being used as a temporary shelter and declaration that Vision Warriors's Tenant Occupancy Change Permit was void, and Vision Warriors argued that its use of the Property should be permitted because it would be best classified as a dormitory under NAICS Code 721310. Zoning Board of Appeals Variance Application [Doc. 101-1] at 23.

> Irrespective of the prior use of the Property by its predecessors, at the time Vision Warriors acquired the Property and began its operations on-site, Host[el]s and Dormitories were uses permitted *as of right* upon the Property by the Cherokee County Zoning Ordinance. Even though Table 7.2 of the Zoning Ordinance was modified on April 3, 2018 to prohibit these uses, Vision Warriors began its use of the Property for these permitted uses beforehand and is entitled to continue that use.

Id.

Vision Warriors fails to explain how the County's refusal to classify the Property as a dormitory is probative of intentional discrimination. While Vision Warriors may reasonably disagree with the County's decision, Vision Warriors provides no evidence that declining to reclassify a proposed property use is a significant departure from the County's normal decision-making process and also cites no authority for the proposition that such a subjective decision would otherwise be evidence of intentional discrimination. Moreover, any argument that classification of the Property as a temporary shelter somehow demonstrates intentional discrimination is undermined by Vision Warriors's failure to protest Lee's initial classification of the Property as a temporary shelter.[6]

Accordingly, viewing the evidence in a light most favorable to Vision Warriors, there is no evidence of intentional discrimination provided by Vision Warriors sufficient to withstand summary judgment.

---

[6] In its reply, Vision Warriors appears to concede that its operations qualify as those of a temporary shelter. Pl.'s Reply at 5 (emphasis added) ("[W]ithout an accommodation, disabled residents of Vision Warriors will never be able to reside in any residential community anywhere in the County because temporary shelters are banned in all residential districts.").

## 2.    Disparate Impact

A disparate impact claim requires some comparative evidence in order to survive summary judgment.  See Shwarz, 544 F.3d at 1217-18 (granting summary judgment to the defendant where plaintiff presented no comparative evidence).  "A showing of significant discriminatory effect suffices to demonstrate a prima facie violation of the Fair Housing Act."  Bonasera, 342 F. App'x at 585 (quoting Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1543 (11th Cir. 1994)) (internal punctuation omitted and alterations accepted).  "Typically, a disparate impact is demonstrated by statistics."  Hallmark, 466 F.3d at 1286.  In addition, when assessing a disparate impact claim "the appropriate inquiry is into the impact on the total group to which a policy or decision applies."  Id. (citing Betsey v. Turtle Creek Assocs., 736 F.2d 983, 987 (4th Cir. 1984) (emphasis added).

The Eleventh Circuit's analysis in Schwarz is instructive:

> [T]he relevant comparison for disparate impact purposes "is between (1) recovering alcoholics and recovering drug abusers ('recoverings') and (2) people who are neither recovering alcoholics nor recovering drug abusers ('non-recoverings')."  Framed this way, the plaintiffs could have made a *prima facie* case of disparate impact "by providing statistical evidence (1) that $x\%$ of all of the recoverings in the city need (or have good reason) to live in the 'group settings' prohibited by the ordinance at issue, (2) that $y\%$ of all of the non-recoverings in the city need (or have good reason) to live in such group settings prohibited by the ordinance, and, crucially, (3) that $x$ is significantly greater than $y$."

Schwarz, 544 F.3d at 1217 (quoting Tsombanidis v. W. Haven Fire Dep't, 353

F.3d 565 (2d Cir. 2003) (citations omitted and alterations accepted)).  See also

Bonasera v. City of Norcross, No. 1:07-CV-1003-MHS, 2009 WL 10706601 (N.D.

Ga. Feb. 23, 2009), aff'd, 342 Fed. App'x 581 (11th Cir. 2009), at *8, 12.

As an initial matter, Vision Warriors has not provided any statistical

evidence or some other analytical mechanism in support of its disparate impact

claim; rather, Vision Warriors argues that Defendants' treatment of Happy Acres,

in comparison to the treatment of Vision Warriors, is sufficient to support its claim.

Pl.'s Resp. at 9-13.  Specifically, Vision Warriors contends that Happy Acres was a

similarly situated entity that was treated differently because the County never took

adverse action in response to Happy Acres's use of the Property to house

missionaries.  Id.

Defendants argue that Vision Warriors's disparate impact claim fails

because there is no evidence showing that Defendants had actual knowledge of

Happy Acres's use of the property to house missionaries.  Defs.' Br. at 17.  Thus,

according to Defendants, Happy Acres was treated no differently than Vision

Warriors.  Id. at 18.  In support of this argument, Defendants point to the testimony

of each County commissioner that they were unfamiliar with Happy Acres's

operations prior to Vision Warriors's purchase of the Property.  Id. at 17 (citing

Johnston Dep. at 53; Dep. of Raymond Gunnin (Mar. 25, 2021) [Doc. 119] at 19;

Dep. of Steven Brian West (Mar. 29, 2021) [Doc. 120] at 17-18; Dep. of Corey

Ragsdale (Mar. 30, 2021) [Doc. 122] at 17-19). Defendants assert, instead, that the

County's first notice that Happy Acres was housing missionaries on the Property

came through Tori Young's statements to Lee. Id. (citing Lee Dep. at 68).[7]

Vision Warriors, in response, asserts that it has produced sufficient evidence

to create a factual dispute as to whether Defendants had actual knowledge of

Happy Acres's use of the Property. Pl.'s Resp. at 9-13. First, Vision Warriors

contends that Happy Acres's building, plumbing, and electrical permits and related

subsequent county inspections demonstrate that the County knew about Happy

Acres's operations. Id. at 10-11. In particular, Vision Warriors points to plumbing

and electrical permit applications from 1986 and 1987 describing the use of the

main building as a "Mission" and requesting approval for a number of additional

sinks and toilets as well as 150 residential electrical outlets. Plumbing Permit

Application [Doc. 101-7 at 11]; Electrical Permit Application [Doc. 101-7 at 12].

These permit applications were subsequently approved by the Cherokee County

Inspection Department. Inspection Approvals [Doc. 101-7 at 14-15]. In addition,

---

[7] Vision Warriors does not argue that the County's disparate treatment of Happy
Acres occurred after Tori Young disclosed its operations to Lee.

Jewel Young stated that the County fire marshal regularly visited the property to conduct fire inspections which included inspections of the main building. J. Young Dep. at 191-193. Vision Warriors also argues that the County was aware of Happy Acres use of the Property to house missionaries because the final certificate of occupancy left the use undefined and only listed "R-E" as the use classification. Pl.'s Resp. at 11; Certificate of Occupancy.

None of Vision Warriors's cited evidence is sufficient to create a genuine dispute of material fact as to whether Defendants' knew that Happy Acres was housing missionaries and permitted those operations to continue. The documentation in the record which Happy Acres submitted to the County, including permit applications, makes no reference to temporary housing for missionaries. Moreover, there is no evidence indicating that the zoning administrator or Board were ever informed that Happy Acres intended to use the Building to house missionaries. To the contrary, the evidence shows that when Happy Acres initially sought approval for the construction of multiple housing units on the Property, the Board denied their application. Resolution No. 831 (Oct. 12, 1982). Happy Acres's subsequent filings which conveniently omit any reference to dormitory-style housing are not probative of any tacit permission on the County's part. Happy Acres's history of inspections from the fire marshal and

32

County approval for its use of the warehouse are equally inapposite.  Vision

Warriors has provided no evidence showing that either of these events involved

Happy Acres's disclosure that it was housing missionaries in the Building and,

even if that information was shared with the fire marshal or county attorney, there

is no evidence that the zoning administrator or Board was advised of the same.

Finally, even if this evidence were probative of the County's constructive

knowledge, which it is not, it would still be insufficient to create a genuine dispute

of material fact because claims based on alleged discrimination require evidence of

actual knowledge and intent.  See Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253,

1262 (11th Cir. 2001) (citation omitted) ("Discrimination is about actual

knowledge, and real intent, not constructive knowledge and assumed intent.").

Because there is insufficient evidence in the record for a reasonable jury to

find that the County was aware of Happy Acres housing operations, Vision

Warriors's argument that the two entities were similarly situated fails.

Accordingly, Defendants are entitled to summary judgment as to Vision Warriors's

disparate impact claim.[8]

---

[8] The Court notes that evidence of disparate impact also may be used to support a
finding of discriminatory intent, and in such instances, the standard for showing
disparate impact is lower.  Hallmark, 466 F. 3d at 1285.  However, for the reasons

### 3.    Reasonable Accommodations

Discrimination under the FHA also includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).  "To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a 'reasonable accommodation,' (3) that the requested accommodation was 'necessary to afford him an equal opportunity to use and enjoy a dwelling,' and (4) that the defendant refused to make the requested accommodation." Schaw v. Habitat for Human. of Citrus Cnty., Inc., 938 F.3d 1259, 1264 (11th Cir. 2019) (quoting 42 U.S.C. § 3604(f)(3)(B)) (alterations accepted).  "The FHA does not provide, however, a 'blanket waiver of all facially neutral zoning policies and rules, regardless of the facts . . . which would give the disabled carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary.'" Caron, 879 F. Supp. 2d at 1364 (quoting Bryant Woods Inn, Inc. v. Howard Cnty., Md., 124 F.3d 597, 603 (4th Cir. 1997)).

---

discussed above, the Court finds that Vision Warriors's disparate impact arguments also fail to support their intentional discrimination claim.

Regarding Vision Warriors's reasonable accommodation claim, the parties only dispute whether the requested accommodation was necessary and reasonable. "Ultimately, as set out below, the Court does not decide the thorny question of reasonableness because, under clear Eleventh Circuit precedent, [Plaintiff] has failed to meet its burden of showing that its requested accommodation is 'necessary.'" Sailboat Bend Sober Living, 479 F. Supp. 3d at 1321.

Defendants argue that Vision Warriors has not provided evidence showing that its requested accommodation, allowing over thirty men to live together in the main building of the Property, is necessary for their recovery from drug or alcohol addiction. Defs.' Br. at 22-24. In response, Vision Warriors contends that its residential program contributes to recovery in an integral, meaningful way. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") [Doc. 104-1] at 21-23.

"To be 'necessary,' there must be a direct linkage between the proposed accommodation and the equal opportunity to be provided." Caron, 879 F. Supp. 2d at 1366 (citation omitted).

> In general, the "need" created by a substance addiction is help with breaking that addiction and maintaining sobriety. Therefore, the question becomes whether . . . stays in the halfway houses contribute in a meaningful way to an addict's recovery. See Bryant Woods Inn, 124 F.3d at 605 (concluding that a municipality need not allow a group home to expand because there was "no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful"); Smith & Lee [Assocs., Inc. v. City of Taylor, Mich.], 102 F.3d [781,] 795-96

35

[(6th Cir. 1996)] (concluding that group homes were "necessary" for the elderly because they "often provide the only means by which this population can continue to live in residential neighborhoods").

Schwarz, 544 F.3d at 1227.

Vision Warriors has failed to provide evidence that its specifically-requested accommodation, the housing of a large group in one building, contributes in a meaningful way to an addict's recovery. Federal courts have acknowledged that residential living may be a necessary accommodation for individuals in recovery from drug or alcohol addiction. See, e.g., id. at 1227-28 (remanding case to the district court with instructions to conduct a full review of the record on necessity, including expert and resident testimony about the benefits and efficacy of group living); Oxford House, Inc. v. Town of Babylon, 819 F. Supp. 1179, 1185 (E.D.N.Y. 1993) (finding that recovering drug and alcohol addicts requested a necessary accommodation when they sought an exemption to the town's definition of a "family" as it pertained to single-family homes). However, Vision Warriors has not provided any authority establishing a minimum size for such group homes or requiring groups of Vision Warriors's proposed size to be permitted as a necessity.[9] Moreover, Driskell testified that he was not aware of any studies or

_____

[9] Notably, the dispute at issue in Schwarz revolved around the length of time tenants resided on the premises, and in Oxford House, the plaintiffs only sought to

data that would indicate a specific minimum or maximum community size necessary to achieve the desired community-living benefit for individuals recovering from drug or alcohol addiction.  Driskell Dep. at 166.  To the contrary, he stated that he didn't "have a clue on the minimum number" of people needed in the community, and he agreed that it was quality, rather than size, of the group that mattered.  Id. at 319.

In addition, to the extent Vision Warriors argues that its requested accommodation is necessary to provide community living at a lower cost, Pl.'s Mem. at 22-23, that argument fails for two reasons.  First, other than Driskell's unsupported testimony that financial stability is essential to recovery, Driskell Dep. at 205, Vision Warriors has provided no evidence of a link between lowered community living costs and recovery from addiction.  In fact, Driskell testified that individuals who are unable to be financially stable and responsible for themselves "probably need a different level of care" than that provided by Vision Warriors. Id. at 206.  Second, even if Driskell's testimony were sufficient evidence to raise a genuine dispute of material fact as to that issue, Vision Warriors has cited no authority for the proposition that the existence of cost as an obstacle to sobriety

_____

house between five and eight individuals in any given home.  Schwarz, 544 F.3d at 1207-08; Oxford House, 819 F. Supp. at 1184 n.7.

necessitates an accommodation for the sole purpose of lowering housing costs. See <u>Bryant Woods</u>, 124 F.3d at 605 ("While 'some minimum size may be essential to the success' of group homes, . . . the Inn has introduced no evidence that group homes are not financially viable with eight residents. . . . If Bryant Woods Inn's position were taken to its limit, it would be entitled to construct a 10-story building housing 75 residents, on the rationale that the residents had handicaps.").

There is insufficient evidence in the record to establish a genuine dispute of material fact as to whether Vision Warriors's requested accommodation was necessary under the ADA or FHA. Accordingly, Defendants are entitled to summary judgment as to Vision Warriors's reasonable accommodation claim.

**B.     Equal Protection Claim (Count IV)**

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner." <u>Leib v. Hillsborough Cnty. Pub. Transp. Comm'n</u>, 558 F.3d 1301, 1305 (11th Cir. 2009). "The preliminary step in any equal protection analysis is to determine whether persons who are similarly situated are subject to disparate treatment by the statute or ordinance." <u>Chabad of Nova, Inc. v. City of Cooper City</u>, 575 F. Supp. 2d 1280,

1292 (S.D. Fla. 2008) (citing <u>Campbell v. Rainbow City</u>, 434 F.3d 1306, 1313

(11th Cir. 2006); <u>Johnson v. Smith</u>, 696 F.2d 1334, 1336 (11th Cir. 1983)).

"To be similarly situated, the comparators must be *prima facie identical in*

*all relevant respects*." <u>Grider v. City of Auburn</u>, 618 F.3d 1240, 1264 (11th Cir.

2010) (citation and internal quotation marks omitted).

> In a facial challenge, if the parties are similarly situated the statute or
> ordinance must then be scrutinized in a manner depending on the
> classifications the statute or ordinance implicate. . . . '[u]nless a
> classification trammels fundamental personal rights or is drawn upon
> inherently suspect distinctions such as race, religion, or alienage, our
> decisions presume the constitutionality of the statutory discriminations
> and require only that the classification challenged be rationally related
> to a legitimate state interest.'

<u>Chabad</u>, 575 F. Supp. 2d at 1292 (quoting <u>City of New Orleans v. Dukes</u>, 427 U.S.

297, 303 (1976)).  Vision Warriors does not bring a facial challenge to the

County's zoning ordinances but alleges that Defendants selectively enforced and

unfairly applied the zoning ordinances to Vision Warriors.  Pl.'s Mem. at 24-26.

"[I]n order to prevail on an equal protection claim based upon the

application of a facially neutral statute, a plaintiff must establish that . . . the

defendant unequally applied the facially neutral statute for the purpose of

discriminating against the plaintiff." <u>Chabad</u>, 575 F. Supp. 2d at 1292 (citing

<u>Strickland v. Alderman</u>, 74 F.3d 260, 264 (11th Cir.1996)); <u>Campbell</u>, 434 F.3d at

1314 (citation omitted).  One type of challenge to the unequal application of a

facially-neutral statute, i.e. an as-applied challenge, is a "class of one," which "does not allege discrimination against a protected class, but rather asserts that the plaintiff 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Leib, 558 F.3d at 1306 (emphasis added) (quoting Young Apartments, Inc. v. Town of Jupiter, 529 F.3d 1027, 1032 n.1 (11th Cir. 2008)); see also SP Frederica, LLC v. Glynn Cnty., 173 F. Supp. 3d 1362, 1381 (S.D. Ga. 2016) (citation and internal quotation marks omitted) ("[A] property owner pursuing an equal protection claim as a 'class of one' must show that it has been intentionally treated different from others similarly situated and that there is no rational basis for the difference in treatment.").

Vision Warriors contends that it is entitled to summary judgment on its equal protection claim because Defendants treated Happy Acres, a similarly situated entity, differently from Vision Warriors with no rational basis. Pl.'s Mem. at 24-34. In particular, Vision Warriors argues that Defendants engaged in discriminatory decision-making in violation of the Fourteenth Amendment by (1) declaring the Certification of Zoning void, (2) classifying Vision Warriors's proposed use of the Property as a temporary shelter, and (3) denying Vision Warriors's special use application to operate a dormitory. Id. Defendants argue

that they are entitled to summary judgment on Vision Warriors's equal protection claim because Happy Acres is not a similarly situated entity to Vision Warriors, specifically, because the County was unaware of Happy Acres's operations and did not affirmatively allow them to operate a temporary shelter.  Defs.' Br. at 26-27.

As this Court discussed in Section III.A.2. *supra*, Vision Warriors has not provided any evidence that Defendants were aware of Happy Acres's use of the Property to house missionaries.  "Governmental decisionmaking challenged under a 'class of one' equal protection theory must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision."  Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1203 (11th Cir. 2007).  Obviously, whether a governmental decisionmaker has knowledge of a specific activity is one of the factors that would have been relevant in its decision to enforce a zoning ordinance.  Because there is no evidence that Defendants knew of Happy Acres's use of the Property, Vision Warriors's claim that Defendants intentionally treated the two entities differently fails.  Thus, Defendants are entitled to summary judgment as to Vision Warriors's equal protection claim.

**C.    Declaratory Judgment Against the Individual Defendants (Count VIII)**

Vision Warriors also seeks a declaratory judgment against the Individual

Defendants pursuant to O.C.G.A. § 9-4-2, contending that Defendants' denial of

Vision Warriors's right to use of the Property and its zoning appeals violates

various state constitutional provisions.  First Am. Compl. ¶¶ 151-56.  Vision

Warriors seeks a declaration that: (1) its use of the Property is allowed and

protected as a legal conforming or nonconforming use; (2) that Vision Warriors

has a vested right to that use, and that the County is barred by the doctrine of

estoppel from prohibiting such use; and (3) that Defendants' actions in denying

Vision Warriors's vested right to use the Property, including by rescinding and

refusing to reissue Vision Warriors's tenant occupancy permit, substantially

destroys Vision Warrior's property rights without payment or just compensation.

Id. ¶¶ 153-156.

The statute relied on by Vision Warriors, O.C.G.A. § 9-4-1, states "[t]he

purpose of this chapter is to settle and afford relief from uncertainty and insecurity

with respect to rights, status, and other legal relations; and this chapter is to be

liberally construed and administered."  O.C.G.A. § 9-4-1.  Courts have the power

to "to declare rights and other legal relations of any interested party petitioning for

such declaration, whether or not further relief is or could be prayed" both "in cases

of actual controversy" and "in any civil case in which it appears to the court that

the ends of justice require that the declaration should be made."  O.C.G.A. § 9-4-

2(a), (b).

> The superior court is authorized to enter a declaratory judgment upon
> petition therefor in cases of actual controversy (OCGA § 9-4-2(a)), and
> to determine and settle by declaration any justiciable controversy of a
> civil nature where it appears to the court that the ends of justice require
> that such should be made for the guidance and protection of the
> petitioner, and when such a declaration will relieve the petitioner from
> uncertainty and insecurity with respect to his rights, status, and legal
> relations.

Baker v. City of Marietta, 271 Ga. 210, 213 (1999) (citations and internal quotation

marks omitted).[10]

Defendants move for summary judgment on this claim, arguing that Vision

Warriors has provided no legal or evidentiary basis for this Court to declare that

Vision Warriors is entitled to its requested use of the Property or that Defendants

---

[10] Although O.C.G.A. § 9-4-2 only makes explicit reference to Georgia superior
courts and the State-Wide Business Court, federal courts applying Georgia law
also routinely rule on requests for declaratory judgment pursuant to the same
statute.  See, e.g., Sullivan v. Everett Cash Mut. Ins. Co., No. 4:18-CV-00207-
HLM, 2019 WL 3808464, at *2-3 (N.D. Ga. Jan. 10, 2019); Whiddon v.
Specialized Loan Servicing LLC, No. 2:16-CV-00283-RWS-JCF, 2017 WL
11151672, at *13 (N.D. Ga. June 23, 2017), R&R adopted as modified, No. 2:16-
CV-0283-RWS, 2017 WL 11151671 (N.D. Ga. Sept. 26, 2017).

violated Vision Warriors's rights under the Georgia Constitution.[11]  Defs.' Br. at

27-34.  The Court will address these arguments separately.

### 1.    Vision Warriors is Not Entitled to a Declaration That Its Requested Use of the Property Is Allowed and Protected as a Legal Conforming or Nonconforming Use.

The County's Zoning Ordinance states that "the Zoning Administrator shall

administer, interpret and enforce this Ordinance."  Zoning Ordinance § 14.1.  Both

Lee, the zoning administrator when Vision Warriors purchased the Property, and

Chapman, her successor, classified Vision Warriors's proposed use as that of a

temporary shelter.  Second Certification Letter; Third Certification Letter;

Rescission Letter.  This use was not permitted on the Property at any time Vision

Warriors owned the Property.  See June 12 Letter; August 9 Letter; Zoning

Ordinance § 7.6; Table 7.2.  Vision Warriors argues that because Vision Warriors's

---

[11] Vision Warriors moves for summary judgment on its declaratory judgment claim as well.  Pl.'s Mem. at 34-35.  However, its  argument is essentially that "Vision Warriors has demonstrated that Defendants have applied a different standard to it than similarly situated persons.  As such, Plaintiff has established that Defendants' revocation zoning and TOC permit [sic], and the Defendants['] continued refusal to recognize its vested property rights bears no substantial relation to the health, safety, morals, or general welfare.  Defendants have denied Vision Warriors due process of law."  Id. (emphasis added).  As discussed in Section III.B. supra, Vision Warriors has not provided sufficient evidence that Happy Acres (or any other entity) was similarly situated to Vision Warriors.  Accordingly, its motion for summary judgment on this claim also fails.

44

proposed use more closely matches that of a dormitory classification, it is entitled to a declaratory judgment stating the same. Pl.'s Resp. at 16-17. Vision Warriors seeks to have the Court step in and reevaluate the judgment of two prior zoning administrators as well as the Board. This Court declines to do so.

Vision Warriors has not provided any justification for this Court to declare that its proposed use of the Property is conforming. The fact that a dormitory was a permitted use at the time Vision Warriors purchased the Property is not relevant to whether Vision Warriors's use of the Property is properly classified. Further, even if Vision Warriors's proposed use is more akin to that of a dormitory than a temporary shelter, Vision Warriors has not shown that the decision of two zoning administrators and the Board is discriminatory or without basis in fact, such that this Court could properly compel a different result.

Vision Warriors's argument that it is entitled to its proposed use of the Property as a legal, nonconforming use is equally unavailing. Pursuant to the Zoning Ordinance, a nonconformity which "may be continued, even though such use does not conform with the provisions of [the] Ordinance" is defined as "a characteristic of a building, structure, or area of land, or the use of such building, structure, or area of land which was lawful prior to the date of enactment of this Ordinance . . . that does not conform to the requirements applicable to the zoning

45

district i[n] which it is located." Zoning Ordinance § 13.2. Therefore, Vision Warriors's contention that its requested use of the Property is a legal nonconforming use relies on a finding that such use was legal when it was initiated. In other words, to succeed on this issue, Vision Warriors must show that Happy Acres's use was legal prior to a change in the Zoning Ordinance.

None of the evidence in the record supports a finding that Happy Acres's use of the Property to house missionaries was lawful under the Zoning Ordinance. Vision Warriors points to Lee's Certification Letters to show that Happy Acres's operations as a temporary shelter were permitted; however, Lee testified that those letters were issued based on her assumption that Happy Acres's prior use had been previously known and permitted by the County. Lee Dep. at 63-65. As discussed above, this assumption was incorrect. See Section II.A.2. *supra*. Lee also testified that had she known the County was unaware of Happy Acres's operations, that knowledge would have affected her decision to issue the Certification Letters, and Happy Acres's use would not have met the criteria to be grandfathered in. Lee Dep. at 63-65.

> 2. **Vision Warriors is Not Entitled to a Declaration That the Doctrine of Estoppel Bars Defendants From Prohibiting Vision Warriors's Use of the Property.**

Defendants argue that, regardless of Lee's understanding of the law, she had no authority to unilaterally permit a nonconforming use of the Property. Defs.' Br. at 31-32 (citing Corey Outdoor Advert., Inc. v. Bd. of Zoning Adjustments of City of Atlanta, 254 Ga. 221, 224 (1985); Zoning Ordinance § 14.1). In response, Vision Warriors does not directly address Defendants' argument but instead asserts that Chapman was never authorized to revoke Lee's Certification of Zoning. Pl.'s Resp. at 17-18. Vision Warriors misses the mark. Under Georgia law and the Zoning Ordinance, Lee did not have the authority to modify the permitted uses of the Property; therefore, her Certification Letters were void *ab initio*. Corey Outdoor Advert., 254 Ga. 221, 224 (1985) (citation omitted) ("Not even estoppel can legalize or vitalize that which the law declares unlawful and void. If so, the conduct of individuals, whether independently or collusively, could render any and all laws invalid and impotent.").[12] Accordingly, Vision Warriors has provided no

_____

[12] Vision Warriors's assertion that Lee and Watkins believed Lee was authorized to issue the zoning certification letters at issue also is inapposite. See Pl.'s Resp. at 13. The Zoning Ordinance does not grant the zoning administrator, acting alone, the authority to re-zone a property, and that is the result sought by Vision Warriors.

evidence supporting its claim for a declaratory judgment that its requested use of the Property is allowed.

> **3.** **Vision Warriors is Not Entitled to a Declaration That Defendants Violated Vision Warriors's Rights Under the Georgia Constitution.**

Defendants also argue that none of the evidence in the record supports a declaration that Defendants violated Vision Warriors's rights under the Georgia Constitution. Defs.' Br. at 32-34. In particular, the Amended Complaint alleges that Defendants violated Vision Warriors's state due process rights and state equal protection rights. First Am. Compl. ¶¶ 151-56. The Complaint further alleges that Vision Warriors suffered an unlawful state taking as a result of Defendants' actions. Id.

Defendants argue that Vision Warriors's due process declaratory judgment claim is essentially an appeal of the Commission Board's denial of Vision Warriors's requests for rezoning and permission for a nonconforming use of the Property. Defs.' Br. at 32-33. Such an appeal is time-barred under Georgia law. Hollberg v. Spalding Cnty., 281 Ga. App. 768, 770-71 (2006). The Court of Appeals of Georgia addressed such an appeal in Hollberg, stating:

> [i]n order to obtain a declaratory judgment, a plaintiff must show that he is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to his alleged right, and which future action without direction from the court

might reasonably jeopardize his interest.  Sinclair argues that he is in a position of uncertainty as to whether the zoning of Wilma's property is AR–1 or R–2.   But there is no uncertainty about the zoning classification.  The Board rezoned the property by a unanimous vote on April 22, 2004, and the decision was not timely appealed by any party.  <u>Sinclair may not avoid the requirement of filing a timely appeal by seeking a declaration of rights that already have accrued</u>.

<u>Id.</u>; <u>see also</u> O.C.G.A. § 5-3-20 (establishing a thirty-day time limit for appeals of such decisions).  Like the plaintiff in <u>Hollberg</u>, Vision Warriors's rights have already accrued, and it cannot use a request for a declaratory judgment as a work-around for the time bar of any appeal of the County's decision.

Vision Warriors argues in response that it is not seeking an appeal of the County's decision but rather raises independent due process claims.  Still, Vision Warriors does not identify any specific grounds for those claims and vaguely states that "Defendants' actions discriminated against Plaintiff and violated state and federal constitutional protections which entitles Plaintiff to declaratory due process relief."[13]  Pl.'s Resp. at 19.  Such vague, conclusory statements, unsupported by evidence are insufficient to survive summary judgment.  <u>See</u> <u>Gray v. Donaldson</u>, No. 7:13-CV-14 HL, 2014 WL 7215200, at *1 (M.D. Ga. Dec. 17, 2014) (holding

---

[13] Vision Warriors also cites to <u>Mortgage Alliance Co. v. Pickens Cnty.</u>, 316 Ga. App. 755, 758 (2012); however, that case is inapposite as it only relates to whether an application for appeal must be filed, not whether the time bar of O.C.G.A. § 5-3-20 applies generally.

49

that self-serving statements contained in a litigant's brief without any evidentiary

support fail to demonstrate that there is no genuine issue of material fact).  Because

there is no evidence from which a reasonable jury could find for Vision Warriors

on this claim, Defendants are entitled to summary judgment as to Vision

Warriors's request for a declaratory judgment that its state due process rights were

violated.

Second, both Defendants and Vision Warriors merely incorporate their prior

equal protection arguments as they relate to Vision Warriors's request for

declaratory judgment that its state equal protection rights were violated.  Defs.' Br.

at 33; Pl.'s Resp. at 20.  In these circumstances, the equal protection provision of

the Georgia Constitution "is substantially equivalent to that of the United States

Constitution." Silverstein v. Gwinnett Hosp. Auth., 672 F. Supp. 1444, 1447 (N.D.

Ga. 1987), aff'd, 861 F.2d 1560 (11th Cir. 1988).  Thus, for the same reasons

enumerated in Section III.B. *supra*, Defendants are entitled to summary judgment

as to Vision Warriors's claims for a declaratory judgment that its state equal

protection rights were violated.

Finally, Defendants argue that Vision Warriors's declaratory judgment claim

based on an alleged state taking fails because it is time-barred and because Vision

Warriors has provided no evidence to properly support the claim.  Defs.' Br. at 33-

34.  Plaintiff's failure to respond to the substance of Defendants' argument

indicates that the argument is unopposed and constitutes an abandonment of this

claim.  See Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1284

(11th Cir. 2003) (affirming trial court's summary judgment ruling that a plaintiff's

claim was abandoned where the non-movant plaintiff failed to address the issue in

its memorandum of law in opposition to the defendants' motion for summary

judgment); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001)

(affirming summary judgment on a claim where a party did not present any

argument in its initial response to motion for summary judgment: "since Wilkerson

did not raise this issue until her supplemental reply brief, we deem it abandoned,

and the district court's grant of summary judgment on this claim is consequently

affirmed.").  Accordingly, Defendants are entitled to summary judgment as to

Vision Warriors's claims for a declaratory judgment that it suffered a state taking

in violation of the Georgia Constitution.

### D.    Attorney's Fees (Count X)

Defendants also move for summary judgment on Vision Warriors's claim

for attorney's fees and costs.  Defs.' Br. at 34.  Without any substantive claims

against Defendants remaining after summary judgment, Plaintiffs' derivative claim

for attorney's fees (Count X) fails as a matter of law.  See Stephen A. Wheat Tr. v.

Sparks, 325 Ga. App. 673, 682 (2014) ("An award of attorney fees, costs, or punitive damages is derivative of a plaintiff's substantive claims."); J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 284 Ga. App. 552, 561 (2007) (same). Accordingly, Defendants also are entitled to summary judgment as to Count X of the Complaint.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff Vision Warriors Church, Inc.'s Motion for Partial Summary Judgment [Doc. 104] is **DENIED**, and Defendants' Motion for Summary Judgment [Doc. 105] is **GRANTED** as to all remaining claims.

The Clerk is **DIRECTED** to **CLOSE** this case.

**IT IS SO ORDERED** this 17th day of February, 2022.

MARK H. COHEN
United States District Judge