**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**VISION WARRIORS CHURCH, INC.,**

**Plaintiff,**

**v.**

**CHEROKEE COUNTY BOARD OF COMMISSIONERS, HARRY JOHNSTON, STEVE WEST, RAY GUNNIN, BENNY CARTER, and COREY RAGSDALE, both individually and in their official capacities as members of the Cherokee County Board of Commissioners, and MICHAEL CHAPMAN, both individually and in his official capacity as Cherokee County Zoning Manager,**

**Defendants.**

**CIVIL ACTION FILE**

**NO. 1:19-CV-3205-MHC**

# ORDER

## I. PROCEDURAL HISTORY

On July 15, 2019, Plaintiff Vision Warriors Church, Inc. ("Vision Warriors") filed a Complaint against Defendant Cherokee County Board of Commissioners and its individual members Harry Johnston, Steve West, Ray Gunnin, Benny Carter, and Corey Ragsdale [Doc. 1], which was amended on

October 11, 2019, to, among other things, add as a Defendant Cherokee County Zoning Manager Michael Chapman. Am. Compl. [Doc. 33]. The Amended Complaint, the operative complaint in this case, challenges the actions of Defendants in initially granting and then revoking a Tenancy Occupancy Change Permit ("TOC Permit") to operate on property purchased by Vision Warriors as a faith-based rehabilitation center for men. Id. The Amended Complaint asserts federal claims for violations of (1) the Fair Housing Act, 42 U.S.C. §§ 3604 *et seq.* (Count I), (2) the Americans With Disabilities Act, 42 U.S.C. §§ 12102 *et seq.* (Count II), (3) the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc(a) (Count III), (4) the Fourteenth Amendment Equal Protection Clause (Count IV), (5) the Fourteenth Amendment Due Process Clause (Count V), and (6) the Fifth Amendment and Fourteenth Amendment Takings Clauses (Count VI). Id. ¶¶ 112-146.[1]

Defendants moved to dismiss the Amended Complaint in its entirety. Defs.' Second Mot. to Dismiss [Doc. 45]. On May 19, 2020, this Court granted in part and denied in part Defendants' Second Motion to Dismiss. May 19, 2020, Order [Doc. 57]. As relevant here, the Court dismissed the RLUIPA claim (Count III)

[1] Vision Warriors also asserted additional state law claims against the individual Defendants. Id. ¶¶ 147-66.

after determining that Defendants' actions did not, as alleged by Vision Warriors, "substantial[ly] burden . . . both Vision Warriors' and its members' religious exercise by effectively shutting down Plaintiffs' ministry." May 19, 2020, Order at 30-36 (quoting Am. Compl. ¶ 129). In making this ruling, the Court relied on then-existing Eleventh Circuit precedent in Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004), which provided that "a 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." Id. at 31 (quoting Midrash Sephardi, 366 F.3d at 1227).

After discovery, both sides filed cross-motions for summary judgment. Pl.'s Mot. for Partial Summ. J. [Doc. 104]; Defs.' Mot. for Summ. J. [Doc. 105]. The Court denied Vision Warriors' Motion for Partial Summary Judgment and granted Defendants' Motion for Summary Judgment on all remaining claims. Feb. 17, 2022, Order [Doc. 132]. Vision Warriors appealed this Court's rulings to the United States Court of Appeals for the Eleventh Circuit. Pl.'s Notice of Appeal [Doc. 135].

On January 11, 2024, the Eleventh Circuit issued its decision affirming this Court's rulings that disposed of all Vision Warriors' claims except the RLUIPA

claim. Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Commissioners, No. 22-10773, 2024 WL 125969 (11th Cir. Jan. 11, 2024). The Eleventh Circuit found that this Court erred by failing to consider Vision Warriors' RLUIPA claim in light of the subsequent Eleventh Circuit precedent of Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, 980 F.3d 821 (11th Cir. 2020). Vision Warriors Church, 2024 WL 125969, at *6-8.

> We find that the district court, in determining that Vision Warriors failed to establish a substantial burden, applied a more exacting standard than our precedent permits. Rather than adhering to only the principles in Midrash Sephardi, the district court should have considered Vision Warriors' substantial burden arguments under Midrash Sephardi as expanded by our precedent in Thai Meditation.

Id., at *6. The Eleventh Circuit remanded the remaining RLUIPA claim to this Court for reconsideration in light of Thai Meditation:

> The Eleventh Circuit's substantial burden inquiry does not require a Plaintiff to establish an "unmet" religious need in the community and its religious exercise need not be completely hamstrung to meet the substantial burden threshold. See Thai Meditation, 980 F.3d at 833. We therefore remand to the District Court for consideration in the first instance consistent with this opinion and our precedents, particularly Thai Meditation's nonexhaustive list of relevant considerations.

Id., at *8.

After the issuance of the mandate, the Court provided the parties an opportunity to supplement their prior briefs with respect to Defendants' Second Motion to Dismiss Vision Warriors' RLUIPA claim (Count III) and thereafter

determined, after an examination of the Thai Meditation factors, that Vision Warriors stated a claim that the actions of Defendants in revoking the TOC Permit imposed a substantial burden upon Visions Warriors' religious exercise. August 7, 2024, Order [Doc. 170]. The parties then engaged in a period of discovery on Vision Warriors' RLUIPA claim.

This case now comes before the Court on Vision Warriors' Second Motion for Summary Judgment ("Pl.'s Second MSJ") [Doc. 190]; Defendants' Second Motion for Summary Judgment ("Defs.' Second MSJ") [Doc. 191]; Defendants' Motion for Leave to Amend Defendants' Statement of Undisputed Material Facts to Which There is No Genuine Issue to be Tried ("Mot. to Amend") [Doc. 208]; and Vision Warriors' Motion Requesting Oral Argument on its Second Motion for Summary Judgment ("Mot. for Oral Argument") [Doc. 204].

## II. FACTUAL BACKGROUND[2]

### A. Vision Warriors' Operation and Purchase of the Property

Vision Warriors is a non-profit corporation that operates as a faith-based ministry. Stipulated Facts [Doc. 101] ¶ 20; Articles of Incorporation of Vision

[2] At the outset, the Court notes that as this case is before it on the parties' cross motions for summary judgment, the Court views the evidence presented by the parties in the light most favorable to the non-movants and has drawn all justifiable inferences in favor of the non-movants. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media

Warriors Church, Inc. [Doc. 101-20 at 3-11] at 3-4.[3] Kirk Driskell ("Driskell"), the founder and Executive Director of Vision Warriors, has been working with men in addiction recovery for over twenty-five (25) years and is "personally familiar with the numerous struggles and challenges one faces in recovery" given his own history and maintaining sobriety over the past thirty (30) years. Decl. of Krik Driskell (Mar. 11, 2025) ("Driskell Decl.") [Doc. 190-3] ¶¶ 2-4. Consequently, Vision Warriors operates as a residential addiction recovery ministry which

---

Rsch., Inc., 711 F.3d 1264, 1270 (11th Cir. 2013). In addition, the Court has excluded assertions of facts that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number). LR 56.1B(1), NDGa. Further, the Court accepts as admitted those facts in Vision Warriors' Statement of Undisputed Material Facts in Support of Plaintiff's Second Motion for Summary Judgment ("Pl.'s SUMF") [Doc. 190-2], Defendants' Statement of Undisputed Material Facts as to Which There is No Genuine Issue to be Tried ("Defs.' SUMF") [Doc. 191-2], and Defendants' Statement of Additional Material Facts as to Which There is No Genuine Issue to be Tried [Doc. 199] that have not been specifically controverted with citation to the relevant portions of the record. See LR 56.1B(2), NDGa.; Defs.' Resp. to Pl.'s SUMF [Doc. 198]; Pl.'s Resp. to Defs.' SUMF [Doc. 203]; Pl.'s Resp. to Defs.' Statement of Add'l SUMF [Doc. 207]. The Court also accepts as admitted those facts in the two identical Stipulated Facts [Docs. 101, 102] and their attached Exhibits [Docs. 101-1 to 101-38; 102-1 to 102-25] filed in support of the parties' Motions for Summary Judgment [Docs. 104, 105], which the parties have agreed to use in support of the present Second Motions for Summary Judgment. Defs.' Resp. to Pl.'s SUMF at 5 n.3.

[3] Unless otherwise provided, this Order cites to the page numbers generated by the CM/ECF file manager.

provides "recovering addicts/alcoholics a community environment which is supportive of their recovery" and is rooted in Christian faith. Dep. of Timothy Kirk Driskell ("Driskell Dep.") (Mar. 26, 2021) [Doc. 111] at 161-164. Vision Warriors "does not provide medical treatment or therapy for alcohol or drug addiction - rather, it provides temporary lodging for men seeking a community who will hold each other accountable to their pledge of sober living." Letter from J. Ethan Underwood, Vision Warriors' attorney, to Jeff Watkins, Planning and Zoning Director for the County (May 9, 2018) ("Underwood Letter") [Doc. 101-36] at 2.

On December 13, 2017, Vision Warriors purchased approximately 6.491 acres, identified in the County's records as Tax Map 02N04, Parcel 02N04 314 and Parcel 02N04 318, commonly known as 1709 Old Country Place, Woodstock, Georgia, 30188 ("the Property"). Stipulated Facts ¶¶ 2, 21; Executrix Deed (Dec. 14, 2017) [Doc. 101-22]; Limited Warranty Deed (Dec. 14, 2017) [Doc. 101-23]. The Property is comprised of two parcels: Parcel 314 is zoned to the R-80 (Residential) zoning district and Parcel 318 is zoned to the R-80 and R-20 (Residential) zoning district. Stipulated Facts ¶ 2. The Property contains several structures, including a church/dormitory, a detached garage, and a warehouse. Id. ¶¶ 4-6; Boundary Survey for 1709 Old Country Place [Doc. 101-5]. The parcels

surrounding the Property are in residential use. Planning Comm'n Staff Report for Special Use [Doc. 102-20] at 1.

### B. Happy Acres' Prior Operations on the Property

Tom and Jewel Young acquired the Property in 1972 and acquired additional portions of the Property in 1990. Stipulated Facts ¶ 3; Defs.' Resp. to Pl.'s SUMF ¶ 28. Beginning in 1982, Tom and Jewel Young used part of the Property to operate Happy Acres Mission Transit Center, Inc. ("Happy Acres"). Stipulated Facts ¶ 3; Aff. of Jewel F. Young (Mar. 5, 2025) ("J. Young Aff.") [Doc. 190-6 at 1-5] ¶ 3; Executrix Deed; Limited Warranty Deed. The purpose of Happy Acres was "to promote the recreation, health, safety, welfare, common benefit and enjoyment of missionaries and to help further aid their religious and spiritual beliefs and goals." Articles of Incorporation of Happy Acres Mission Transit Ctr., Inc. [Doc. 101-8 at 6-8] ¶ 4. The Youngs, through Happy Acres, wanted to build a church and living quarters for missionaries on the Property. J. Young Aff. ¶ 4. In 1982, the Youngs sought permission to rezone the Property and proposed building at least seven additional homes on it, but this application was denied. Id.; Resolution No. 831 (Oct. 12, 1982) [Doc. 101-6 at 1] (denying application for zoning amendment).

Following the denial of its rezoning application, Happy Acres decided to construct a larger singular structure on the Property (the "Building") that could function as a church as well as a dormitory to house missionaries and applied for a construction permit for the Building, which described the use of the Building as a "church." J. Young Aff. ¶ 4; Building Permit Appl. [Doc. 101-7 at 7]. On September 4, 1986, the County granted Happy Acres' application for a construction permit for the Building. Cherokee Cnty. Bldg. Permits [Doc. 101-7 at 1]; Building Permit [Doc. 101-7 at 8, 10]. The County issued a Certificate of Occupancy for the Building on September 21, 1989. Stipulated Facts ¶ 9; Certificate of Occupancy [Doc. 101-9].

The Certificate of Occupancy described the use classification as R-E. Certificate of Occupancy. At the time Happy Acres received its Certificate of Occupancy, "church or other place of worship" was not specifically defined in the County's Zoning Ordinance, and a "church or place of religious worship" was permitted by right in all residential zoning districts. Def. Cherokee Cnty.'s First Am. Resps. and Objs. to Pl.'s First Req. for Admis. Propounded Unto the Defs. ("Cnty. Am. Resps. to First Req. For Admis.") [Doc. 190-7] Nos. 13-14; Land Use and Dev. Controls for Cherokee Cnty., Ga., enacted Jan 1, 1969 ("1969 Zoning Ordinance") [Doc. 101-25] Art. V § C(2)(g). The R-E classification at the time did

not list temporary shelters[4] as a permitted use (or address them at all), but permitted "dormitories,[5] fraternities, & sororities" in "open use" in all residential zoning districts. Id. Art. 5 § C(2)(g); see generally 1988 Cherokee County Zoning Ordinance (1969 Zoning Ordinance as amended through June 30, 1988) ("1988 Am. Zoning Ordinance") [Doc. 101-27] (not amending dormitory use).[6] The

[4] The National American Industrial Classification System ("NAICS") is the basis on which County officials define certain land uses. See Cherokee Cnty. Ordinance Number 2018-O-003 [Doc. 101-31] at 4-5. The NAICS defines temporary shelters as "primarily engaged in providing (l) short-term emergency shelter for victims of domestic violence, sexual assault, or child abuse and/or (2) temporary residential shelter for homeless individuals or families, runaway youth, and patients and families caught in medical crises. These establishments may operate their own shelters or may subsidize housing using existing homes, apartments, hotels, or motels." Letter from Vicki Lee to Tori Young (Aug. 4, 2017) ("Third Certification Letter") [Doc. 101-17] at 2.

[5] The NAICS provides several uses for dormitories, including: off-campus dormitories, boarding houses, residential clubs, fraternity houses, organizational residence clubs, rooming and boarding houses, and workers dormitories. NAICS Search [Doc. 190-27] at 2. It also notes that "[t]hese establishments provide temporary or longer-term accommodations, which, for the period of occupancy, may serve as a principal residence." Id. The County's Zoning Ordinance currently does not provide a specific definition for "temporary shelters" or "dormitories." Cnty. Resps. to First Req. For Admis. Nos. 50-51. Chapman testified that "a dormitory is going to be something that's more associated with the educational type of use or perhaps a military base or something like that" but also testified that he didn't "recall seeing where [the NAICS code for dormitories] is exclusively for an educational or college use." Dep. of Michael Chapman ("Chapman Dep.") (Nov. 12, 2020) [Doc. 115] at 124-25.

[6] Margaret Stallings ("Stallings") has worked in planning and zoning with the County since January 20, 2005, and became the County Planning Manager in 2017

Zoning Ordinance at the time stated that "[n]o building shall be . . . used except for a use permitted in the district in which such a building or structure is located." 1969 Zoning Ordinance Art. III § C; 1988 Am. Zoning Ordinance at 33.

The Building contained seven rooms, plus a bunk room and three efficiency apartments. J. Young Aff. ¶ 8. In addition to housing missionaries in the Building, Happy Acres hosted a variety of events in the Building, including pastors' conferences, banquets, weddings and receptions, and overnight retreats. Id. ¶ 7. Some events, such as retreats for teenagers, would involve housing as many as fifty people at the same time. Dep. of Jewell Young (Mar. 27, 2021) ("J. Young Dep.") [Doc. 110] at 71. Happy Acres also housed families in the Building. J. Young Aff. ¶ 7. On average, four families stayed on the Property at one time, but some months Happy Acres hosted as many as six families. Id. One family that had an extended stay at Happy Acres had twelve (12) family members and stayed for a year. J. Young Dep. at 64-65. Happy Acres did not charge rent but suggested that residents donate $15 per day. J. Young Aff. ¶ 9.

---

and the Director of Planning and Zoning in 2022. Dep. of Margaret Helen Stallings ("Stallings Dep.") (Feb. 8, 2025) [Doc. 194-1] at 7-8. Stallings testified that the current County Zoning Ordinance is more detailed and contains more definitions than previous versions and, therefore, there are instances when a currently defined use is not included in a previous version of the ordinance. Id. at 16-17.

In 1986, Tom Young obtained a permit to build a garage and began to service vehicles for missionaries, widows, older couples, and single mothers. J. Young Aff. ¶ 10; J. Young Dep. at 143. Mr. Young did not charge for the automotive work but asked customers to pay for their materials and to donate to Happy Acres. J. Young Dep. at 143. In the early 1990s, Mr. Young also built a woodshop/warehouse on the Property to build things, and to pack and store materials for missionaries going into the field. J. Young Aff. ¶ 10; J. Young Dep. at 145-146. In 1996, the Youngs obtained a written memorandum from the County which stated that manufacturing "wooden pallets for the shipment of food and other staples to Mission activities around the world" in the woodshop/garage "would be an acceptable activity so long as there is not outside storage of any of the items." Mem. from Mark Mahler, County Attorney (Dec. 12, 1996) [Doc. 101-10].

Jewel Young testified that there were no complaints about Happy Acres' use of the Property. J. Young Dep. at 190-91. Likewise, the County does not have a record of any "written notices or communications directed to the owner or owners of the [] Property between 1989 and 2017 requesting that any existing use on the [] Property cease." Cnty.'s Resps. to Pl.'s First Request for Admissions Propounded unto the Defs. [Doc. 190-8] No. 18.

### C. Happy Acres' Efforts to Sell the Property

Shortly after Tom Young's death in 2016, Happy Acres decided to sell the Property. J. Young Aff. ¶ 11. The Youngs' son, Tori Young, assisted in Happy Acres' discussions with the County about the sale of the Property and the potential use by any subsequent owner. Id. In response to a request from a potential buyer, Happy Acres submitted a zoning certification request to the County on January 13, 2017. Id. ¶¶ 11-12; Zoning Certification Req. [Doc. 101-12]. On February 6, 2017, Vicki Taylor Lee ("Lee"),[7] the Zoning Administrator for the County from August 2002 to November 30, 2017, responded to Happy Acres' request. Letter from Lee to Jewel Young (Feb. 6, 2017) ("First Certification Letter") [Doc. 101-13]; Lee Dep. at 7, 17-18. Lee's letter stated:

> This is to certify that the [Property] is in the R-80 (Residential) and R-20 (Residential) zoning district . . . .
>
> There appears to be four (4) buildings on the parcel, a primary home, a detached garage, a dormitory and a chapel. As a legal non-conforming use, you may continue to house guests in the dormitory for short periods of time. You cannot expand the use to something different or increase the number of people served.

Id. The next day, Lee emailed Tori Young, stating:

---

[7] Lee's name is currently Vicki Smith, but it was Vicki Taylor Lee at the time she was employed by the County. Dep. of Vicki Smith (Feb. 18, 2021) ("Lee Dep.") [Doc. 118] at 7. For the sake of clarity, the Court will refer to Vicki Smith as Lee.

> "You cannot expand the use to something different" means? [sic] *You cannot change this to a youth hostel, housing for day laborers, or half-way housing. Using the dormitory for short term stays as a part of the ministry is fine. However, if the previous tenants were missionaries and the new tenants are planned to be recovering drug addicts, the[n] a different zoning will be required.*

Email from Vicki Lee to Tori Young (Feb. 7, 2017) [Doc. 101-14]; Stipulated Facts ¶ 14.

Tori Young requested further specificity from Lee regarding the zoning certification. Lee Dep. at 22-23. In response, Lee sent a second zoning certification letter to Jewel Young via Tori Young on March 8, 2017. Id.; Letter from Lee to Jewel Young (Mar. 8, 2017) ("Second Certification Letter") [Doc. 101-15]. In addition to the information in the First Certification Letter, the Second Certification Letter stated:

> There appears to be four (4) buildings on the parcel, a primary home, a detached garage, a dormitory with a chapel, and a warehouse. As a legal non-conforming use, you may continue to house guests in the dormitory for short periods of time. You cannot expand the use to a different land use or increase the number of people served. Please see the attached document for the NAICS Code associated with the land use."

Id. (attaching copy of NAICS Temporary Shelters reference).

The first potential buyer did not acquire the Property and Happy Acres thereafter entered into a Letter of Intent with Vision Warriors regarding Vision Warriors' interest in purchasing the Property. J. Young Aff. ¶¶ 13-14. On July 5,

2017, Tori Young, on behalf of Happy Acres, contacted Cherokee County Planning Technician Tamala Davis and requested a meeting with Lee regarding Vision Warriors' proposed acquisition of the Property (noting that they would operate as "a church for recovering addicts"). Id. ¶ 14; E-mail from Tori Young to Tamala Davis (July 5, 2017) [Doc. 101-16 at 1]. Tori Young and Driskell met with Lee on July 19, 2017. Defs.' Resp. to Pl.'s SUMF ¶ 64.

Following that meeting, Tori Young emailed Lee and requested "an updated letter for special use." E-mail from Tori Young to Vicki Taylor Lee (July 31, 2017) [Doc. 101-19 at 3]. When Lee asked why the Second Certification Letter was not sufficient, Tori Young requested something "more case specific to Vision Warriors" because Vision Warriors' use was focused on serving men, and the prior letter referenced use for women. Id. at 2-3. In response, Lee stated "[i]t also says homeless shelters without gender. I am the interpreter of land use and I assure you this meets Vision Warriors use." Id. at 2. On August 4, 2017, Lee sent Tori Young another zoning certification letter which stated:

> There appears to be four (5) [sic] buildings on the two parcels, a primary home, a detached garage, a dormitory a chapel, and another accessory structure. As a legal non-conforming use, you may continue to house guests in the dormitory for short periods of time. You cannot expand the use to a different land use or increase the number of people served. Please see the attached document for the NAICS Code [for temporary shelters] associated with the land use.

Third Certification Letter at 1 (again attaching copy of NAICS Temporary Shelters reference).

Lee testified that certifications of zoning are used to assure a current or subsequent property owner that their intended use of a property will be permitted by the County. Lee Dep. at 22-23. Section 14.1 of the County Zoning Ordinance (as amended through August 4, 2017) provides that "[e]xcept at otherwise provided in these regulations the Zoning Administrator shall administer, interpret, and enforce this Ordinance." 2017 Cherokee Cnty. Zoning Ordinance (1992 Zoning Ordinance as amended through Aug. 4, 2017) ("Current Zoning Ordinance") [Doc. 101-30] at 220. Lee testified that she understood that she had authority to issue zoning certifications for legal nonconforming uses,[8] Lee Dep. at 18, and Jeff Watkins ("Watkins"), the County's Planning and Zoning Director at the time, also testified that Lee had authority to issue the certification of zoning to

[8] Chapman testified that a nonconforming use is "something that was allowed, could have been allowed, could have been legal under a previous version of the zoning ordinance. Subsequent to that, the ordinance changed; therefore, it no longer conforms to the current version of the ordinance, or it could be something that's nonconforming just in the sense that it's never complied with the ordinance." Chapman Dep. at 16.

Vision Warriors. Dep. of Jeff Watkins ("Watkins Dep.") (Nov. 13, 2020) [Doc. 190-28] at 2, 8.

### D. Vision Warriors' Acquisition and Initial Use of the Property and Grant of a TOC Permit

On November 22, 2017, Driskell emailed Lee and advised her that Vision Warriors would be purchasing the Property with a projected closing date of December 12, 2017. E-mail exchange between Driskell and Lee (Nov. 22, 2017) [Doc. 101-19 at 1-2]. Driskell also inquired about what steps needed to be taken to secure a business license. Id. Lee responded, stating:

> You are good to go. What will happen first is a Tenant Occupancy Change w[h]ere the Fire Marshal and a Building Inspector come out to verify the required life-safety items. When that is approved, you can get your business license.

Id. Vision Warriors closed its purchase of the Property on December 13, 2017. Stipulated Facts ¶ 21. On April 20, 2018, Vision Warriors applied for and was issued a TOC Permit, which contained the following description: "Vision Warriors Church, Inc. - church/transitional housing for men and their families (501c3) - large building." Stipulated Facts ¶¶ 24-25; Tenant Change Permit [Doc. 101-34]. Under the Zoning Ordinance at the time of the purchase, temporary shelters were not permitted in residential zoning districts, although dormitories, fraternities, and sororities would have been allowed on the Property in open use. Current Zoning

Ordinance at 101; Cherokee Cnty. Zoning Ordinance 2018-O-003, Addition of Special Use Permits, adopted April 3, 2018 [Doc. 101-31] at 26; Cnty. Am. Resps. to First Req. For Admis. Nos. 68-69. Further, at the time of the purchase, residential mental health facilities and residential substance abuse facilities were permitted by special use permit in residential districts. Cnty. Am. Resps. to First Req. For Admis. No. 67.

Vision Warriors used the Building to house residents and used the garage and woodshop for automobile repairs and creating products, both of which supported the ministry financially. Underwood Letter at 2. Vision Warriors also hosted various regular weekly meetings which are open to non-residents. Id. at 1. Driskell states that the Property "is and was intended to be the main campus – the heart and lifeblood of the ministry."[9] Second Decl. of Krik Driskell (Apr. 10, 2025) ("Second Driskell Decl.") [Doc. 203-2] ¶ 6. When Vision Warriors purchased the Property, it understood that it could house fifty to fifty-five (50-55)

---

[9] Driskell testified that Vision Warriors had two other locations outside of Cherokee County, one which had nine beds and one which had thirteen beds, which are located in more traditional residential settings. Dep. of Timothy Krik Driskell as Rep. of Vision Warriors ("30(b)(6) Driskell Dep.") (Feb. 5, 2025) [Doc. 192-1] at 22, 74-75. Driskell stated that after Vision Warriors purchased the Property, it shut down the nine-person residence because its "intent was to consolidate the ministry's residences and move those residents onto the Property." Second Driskell Decl. ¶ 5.

people, but initially it only set up thirty-one (31) beds and never exceeded thirty-one (31) residents. 30(b)(6) Driskell Dep. at 54. Driskell testified that

> When we acquired the property, with the approvals that we were given to have 50 to 55 people, we, as the organization, set 31 beds in that campus because, A, it was going to fit with who we were, the experience that we need to create, how the community is going to be cultivated, and everything else about the whole experience inside of their living with us . . . .

Id. However, Driskell also testified that "there was no magical number that we had; it was really a delicate balance of trying -- who do we really -- who can we serve and then where and what capacity do we need to be so that if something happened, we're not going to have someone out on the street." Id. at 93-94.

Driskell testified that Vision Warriors charges at least 50% less than other recovery programs and that, at some point in the residents' recovery, they are expected to contribute $600 per month based on their individual situation. Driskell Dep. (Mar. 26, 2021) [Doc. 111] at 209, 246, 340. While entry to the Visions Warriors program is not contingent on financial resources, being unable to pay the monthly dues would be one of "a lot of other factors" in asking someone to leave the program. Id. at 206.

**E. Rescission of the TOC Permit**

After Vision Warriors purchased the Property, it initially operated without any known complaints from neighbors. Driskell Decl. ¶ 11. Driskell states that

"[n]eighbors began expressing opposition to Vision Warriors only after a neighbor, Richard Jordan, became aware that our residents are in recovery, after one of our residents knocked on his door and requested to board a horse during his stay at Vision Warriors in April 2018." Id. ¶ 12. Judy Holmes, whose house is near the Property, avers that "[s]hortly thereafter, that same neighbor (who was approached about boarding a horse) then began organizing opposition to Vision Warriors and scheduled a neighborhood meeting. . . . [N]eighbors were making untrue statements about them." Decl. of Judy Holmes ("Holmes Decl.") (Mar. 8, 2025) [Doc. 190-29] ¶¶ 8-9.

On or about May 4, 2018, Vision Warriors and its attorney J. Ethan Underwood ("Underwood") met with County officials, including Watkins. See generally Underwood Letter. On May 9, 2018, Underwood sent the County the Underwood Letter which detailed the history and current use of the property. See generally id. On May 30, 2018, Underwood offered to meet again with the County for an inspection of the Property and to answer questions raised by the complaints. See Email Exchange Between Underwood and Angela E. Davis, attorney for the County [Doc. 101-37]. On June 2, 2018, Vision Warriors, through Underwood, responded to a request from the County asking for additional information about its

operations, occupancy, and policy of asking members to contribute monthly to the ministry. Email from Underwood to Davis (June 2, 2018) [Doc. 101-38].

On or about June 7, 2018, the Cherokee County Board of Commissioners held a public meeting where neighbors of Vision Warriors "voiced their concerns with the operation of the Vision Warriors Church's ministry." CHEROKEE TRIBUNE & LEDGER-NEWS, *Vision Warriors housing dispute continues; County to reach conclusion 'shortly'* (June 7, 2018) [Doc. 190-22] at 1-2.[10] On June 12, 2018, Davis, on behalf of the County, informed Vision Warriors of the rescission of the TOC Permit:

> On April 20, 2018, Vision Warriors submitted an application for a Tenant Occupancy Change Permit. The Tenant Occupancy Change Permit was issued in error to Vision Warriors on the same day. Based upon our investigation and review, we have concluded that Vision Warriors is engaging in an unpermitted use of the property such that the Tenant Occupancy Change Permit was issued in error. Such offending uses must be discontinued.
>
> . . .
>
> We have concluded that the principal use of the property is a temporary shelter, which is prohibited in residential zoning districts. In addition, we have determined that the property is not being used as a church as alleged. Indeed, a review of the descriptions provided by your office,

[10] Defendants object to consideration of this article because it was not properly authenticated. Defs.' Resp. to Pl.'s SUMF ¶ 99. However, newspaper articles are self-authenticating. Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Pol'y No. 187581, 56 F.4th 1280, 1288 n.2 (11th Cir. 2023) (citing FED. R. EVID. 902(6)). Accordingly, Defendants' objection to Docket Number 190-22 is **OVERRULED**.

> as well as independent review and investigation, makes clear that the current use of the property is actually in violation of the residential zoning districts in other multiple respects not detailed herein, including without limitation, multiple principal uses on the property, impermissible "accessory" uses on the property, and operation of commercial businesses.
>
> We understand that the previous Cherokee County Zoning Administrator, Vicki Lee, issued zoning certification letters for Happy Acres Mission Transit Center. The "certifications" were issued erroneously. Temporary shelters have not been permitted in residential districts in the County since at least 1969.
>
> In summary, we have determined that the Tenant Occupancy Change Permit that was issued to Vision Warriors was issued in contravention to the Zoning Ordinance, is void, and is otherwise hereby rescinded. The current residents need to find alternative housing, and the commercial uses of the property (to include, without limitation, the woodworking shop, the auto shop, and the import/export business) must be discontinued within thirty (30) days of the date of this letter. To the extent good faith efforts are being made to comply with the Cherokee County Zoning Ordinance and the directives in this correspondence, the County will consider working with Vision Warriors to provide a reasonable length of time to transition its residents from the property.

Letter from Davis to Underwood (June 12, 2018) ("June 12 Letter") [Doc. 102-1].

Lee testified that her decision making in issuing the TOC Permit was in part based upon Happy Acres' longstanding use of the property, including attaining building permits. Lee Dep. at 64-65. Specifically, Lee testified

> based on what I did have, it appeared that being there was permits and everything, someone would have said something earlier if it was a problem. Now again, looking at the pure letter of the law, no, it didn't

> meet the criteria. But based on those other factors is what led me to believe, led me to the decision to grandfather it in.

Id. at 65.

Lee testified that she does not recall ever having a zoning certification revoked by the County.[11] Id. at 21-22. Watkins testified that Lee reported to him, he never had any issues with how she did her job, and he had no information to believe that Lee was misinformed regarding Vision Warriors' proposed use of the Property. Watkins Dep. at 6-8, 10, 23. Watkins also testified that the revocation of Vision Warriors' zoning permit was the only time in Lee's seventeen years with the County that a certification of zoning that she issued was revoked. Id. at 56. Stallings testified that she participated in review of some grandfathered uses when Lee was zoning manger and does not recall raising an objection or concern about any of Lee's zoning certifications. Stallings Dep. at 12, 17.

---

[11] Vision Warriors also cites to an email sent by Lee to Driskell on June 18, 2028, in which Lee states that she "was horrified to learn of the difficulties visited upon your ministry by the County" and that when she read a newspaper account of the dispute her "horror turned to anger." Email from Vicki Lee to Kirk Driskell (June 18, 2018) [Doc. 190-12]. Defendants believe this email is immaterial given that Lee testified that had she known all the facts she might have reached a different conclusion. Defs.' Resp. to Pl.'s SUMF ¶ 104; see Lee Dep. at 71-3. It would be improper for this Court to resolve Lee's credibility on this point when determining the grant or denial of summary judgment.

Chapman testified that he had not spoken with Lee regarding the certification of zoning that she issued to Vision Warriors. Chapman Dep. at 53. Chapman was unaware of what portion of the Zoning Ordinance gave him authority to revoke a previously issued certificate of zoning or if he is vested with the authority to revoke the TOC Permit. Id. at 17, 54. According to Chapman, the revocation of Vision Warriors' permit was the only instance in his tenure as zoning manager where a previously issued zoning certification was revoked. Id. at 18.

### F. Vision Warriors' Appeal and Subsequent Applications for a Special Use Permit and Request for Rezoning

On July 11, 2018, Vision Warriors appealed the County's June 12, 2018, decision to rescind the TOC Permit. Stipulated Facts ¶ 31; Zoning Bd. of Appeals Variance Appl. [Doc. 101-1]. On August 9, 2018, Chapman sent a letter "intended to supplement" the June 12, 2018, decision rescinding the permit and to "address" a portion of the letter appealing the County's decision. Stipulated Facts ¶ 34; Letter from Chapman to Underwood (Aug. 9, 2018) [Doc. 102-4]. Chapman's letter in fact repeated much of Davis's June 12, 2018, letter, and concluded by stating that the letter "will serve as my response to your letter and 'Notice' described above including my interpretations of the Zoning Ordinance as the Zoning Administrator." Id. On September 7, 2018, Vision Warriors, "out of an

abundance of caution," also appealed Chapman's determination. Stipulated Facts ¶ 35; Letter from Underwood to Chapman (Sept. 7, 2018) [Doc. 102-6].

In October 2018, in the midst of Vision Warriors' zoning issues, the County amended its Zoning Ordinance to provide definitions for places of worship and religious organizations and to change zoning requirements for religious institutions. See generally Cherokee Cnty. Zoning Ordinance 2019-O-014, Revisions to Places of Worship, adopted Oct. 16, 2018 [Doc. 101-32]. The Amendment defined a religious organization as:

> An assembly of people: (1) whose members organize voluntarily as a distinct entity as a means of religious exercise, endorsing a recognized creed and form of worship (2) which is organized and led by a licensed, commissioned, or ordained member of the organization; and (3) which convenes regular meetings that are regularly published to the general public in established places of worship for religious instruction, prayer, and/or worship.

Id. at 4. The Amendment defines a place of worship as "[a] permanent structure built for the purpose of accommodating a Religious Organization in its exercise of religious worship, prayer, and/or religious instruction." Id. The Amendment also provided that the following may be permitted as an accessory use[12] to a place of worship:

[12] "Accessory Use" is defined in the Current Zoning Ordinance as follows:

> Health and Social Services, including but not limited to, temporary shelters, transitional housing, and other similar facilities that are provided free of charge[13] in furtherance of the ministry and/or goals of the Place of Worship. No commercial uses or uses that result in a profit-seeking or profit based enterprise shall be permitted as an accessory use, even if the proceeds derived from the commercial use are said to be for purposes of supporting the Religious Organization.

Id. at 7.

On November 20, 2018, while its appeal of the decision to rescind the TOC Permit was pending, Vision Warriors filed an application for a special use permit

---

> A use of land or of a building or portion thereof customarily incidental and subordinate to the principal use of the land or building and located on the same lot with such principal use.
>
> > Factors used to determine if a use of land or of a building is accessory to the principal use shall include:
> >
> > a. Area devoted to the accessory use
> > b. Frequency of the use
> > c. Active versus passive activities associated with the use
> > d. Number of employees and hours of operation; and
> > e. Whether the use is subordinate to the principal use, or is a different, alternative or additional use (Ord. No. 2015-0-008, 10-06-15)

Current Zoning Ordinance at 12.

[13] Stallings testified that, from her standpoint and the Zoning and Planning Director, she is not aware of any zoning impacts that would be different for a shelter that is free of charge versus one that is not free of charge. Stallings Dep. at 30-31.

for the Property for a "religious institution and dormitory" housing up to fifty-five (55) individuals at a time and, in the alternative, an application for rezoning of the Property to "office industrial." Stipulated Facts ¶ 37; Appl. for Public Hr'g, Requesting Rezoning with Concurrent Variance(s) [Doc. 102-8]; Appl. for Public Hr'g, Requesting Special Use Permit [Doc. 102-9]. Prior to a public hearing on the appeal, a Planning Commission Staff Report was prepared for each of Vision Warriors' alternative zoning applications. Planning Comm'n Staff Report for Special Use Permit [Doc. 102-20]; Planning Comm'n Staff Report for Rezoning [Doc. 102-21]. The Planning Commission Staff Reports discussed the existing zoning and land use, and the potential impact of the new proposed use. See generally Planning Comm'n Staff Report for Special Use; Planning Comm'n Staff Report for Rezoning. The report regarding the special use permit application stated:

> The area near the intersection of Earney Road and Old Country Place maintains a primarily residential appearance while the area towards the back of the lot has a decidedly more institutional/commercial character. A wooded area visibly and physically separates much of the back portion of the lot from Old Country Place and the surrounding residential properties. If such a buffer were preserved and enhanced through supplemental plantings, walls, fences, earthen berms, or any combination thereof, it could mitigate sound, light, and other potential nuisances created by this use. Old Country Place and Earney Road should be able to handle the traffic generated by this land use. As a result, the use may be compatible with the surrounding area and there may be grounds to support the Special Use Permit.

Planning Comm'n Staff Report for Special Use at 1. The report also noted that "onsite sewerage is managed by a septic system. The existing septic system may not be appropriately sized for the proposed use. With this in mind, the use may not be compatible with the surrounding area and may therefore be grounds to not support the special use permit."[14] Id. The report stated that the Property was located in two separate zoning character areas, but that future land uses envisioned for both character areas include "semi-public and institutional uses." Id. at 7.

On March 5, 2019, a public hearing on Vision Warriors' pending applications was held before the County Planning Commission. Stipulated Facts ¶ 46. On March 31, 2019, prior to the meeting at which the Board of Commissioners was to consider Vision Warriors' applications, Board of Commissioners Chairman Harry Johnston emailed a group called the "Hickory Flat Folks" and stated in part as follows: "I plan to vote to sustain the denial recommendations [of the Planning Commission], and I think it's likely the other commissioners will do the same. But I want them all to have the opportunity to

---

[14] Driskell states that "In December 2021, and at the County's request, Vision Warriors completed an estimated $20,000 in on-site upgrades and repairs to the septic system in accordance with a permit issued by the County." Driskell Decl. ¶ 16.

vote on them."[15] Email from Harry Johnston to Hickory Flat Folks (Mar. 31, 2019) [Doc. 190-15] at 1-2. On April 16, 2019, the Board of Commissioners unanimously denied both of Vision Warriors' applications for rezoning and for a special use permit. Id. ¶ 48; Cnty. Resolution No. 2019-R-019 [Doc. 102-23]; Cnty. Resolution No. 2019-R-020 [Doc. 102-24].

On July 16, 2019, the Board of Commissioners conducted a hearing on Vision Warriors' administrative appeal. Stipulated Facts ¶ 49; Tr. of Proceedings Before Cnty. Bd. of Comm'rs ("Appeal Tr.") [Doc. 102-25] (July 16, 2019). Prior to the hearing, in reply to an email from a citizen asking why Vision Warriors' prior applications were not approved, Chairman Johnston replied:

> Vision Warriors isn't over. There's still a hearing on July 16 at which they will appeal the current zoning administrator's ruling that their current R-80 zoning doesn't allow their use.
>
> We denied their Re-zoning and Special Use Permit requests because we don't think the use is appropriate in the neighborhood. A similar but smaller dormitory/halfway house could potentially be OK. But they propose to house 50 men there. The traffic and parking alone are inappropriate for the residential area. As good a service as it is, you might not want it next door to your home either.
>
> It's not about business or monied interests. No one else wants the property, as far as I know. If Vision Warriors ultimately fails to get

---

[15] Watkins testified that, in his view, "it would seem to be unfair [for the Board of Commissioners] to render a decision before hearing everything." Watkins Dep. at 66-67.

> approval for their use, the property will have to revert back to a less-valuable single-family residence.

Email from Johnston to John Martin (June 21, 2019) [Doc. 190-16].

At the close of the July 16 hearing, Chairman Johnston stated:

> You know, there's some pros and cons. It's not all crystal clear, but the best evidence I see is that the primary use Vision Warriors is making the property does not appear to be a church. Maybe they have some church-like aspects, but it's pretty clear to me that is not the primary use.
>
> So what is the use? You could loosely use the term dormitory, but I think I agree with Mr. Chapman's determination that shelter was a much better fit with the zoning code and related definitions.

Appeal Tr. at 229-30. The Commission voted unanimously to adopt the Zoning Administrator's decision and denied Vision Warriors' appeal. Id. at 234-35; Stipulated Facts ¶ 49.

### G. Effect of the Zoning Decisions on Vision Warriors

Based on the record before the Court, the last communications Vision Warriors received from the County regarding its use of the Property are the June 12 Letter directing Vision Warriors to vacate residents from the Property and cease its commercial operations, and the denials of Vision Warriors' administrative appeal, rezoning application, and special use permit application. The Property is zoned for R-80 and R-20, which is for single-family residential use, and Vision

Warriors has no permission for a legal non-conforming use or a restricted use. The County's Current Zoning Ordinance defines "family" as:

> An individual, or two or more persons related by blood, marriage, adoption or guardianship, or a group of not more than four unrelated persons, occupying a single dwelling unit; provided however that domestic servants employed on the premises may be housed on the premises without being counted as a separate family or families. The term "family" does not include any organization or institutional group.

Cnty. Resps. to First Req. For Admis. No. 71. Stallings avers as follows:

> The County Zoning Ordinance permits four unrelated individuals (exclusive of domestic servants) to reside on each parcel of the Property (a total of eight unrelated individuals, exclusive of domestic servants for the Property as a whole), under the R-80 and R-20 zoning classifications in which the Property is located. This restriction is intended to approximate the impact of the typical family size and the impact of such residential use on infrastructure, services and surrounding properties.

Decl. of Margaret Stallings ("Stallings Decl.") [Doc. 191-3] ¶ 4. Stallings testified that any alteration or exception to the Zoning Ordinance would require a variance, review by the zoning board of appeals, and a public hearing. Stallings Dep. at 17-20.

Driskell testified that the $600 monthly membership dues offset the fixed costs of Vision Warriors, but that Vision Warriors has other sources of income,

including their car repair ministry and woodshop.[16] 30(b)(6) Driskell Dep. at 55-56. Driskell also testified that Vision Warriors would not change its standard $600 membership dues rate. Id. at 56. Driskell testified that over the past several years, he and his wife have personally contributed approximately $200,000 "to keep Vision Warriors' doors open and to pay the bills," and that he is working without salary as the director because the organization cannot afford to hire someone in the role. Driskell Decl. ¶ 13.

Driskell testified that over the past few years, Vision Warriors had looked at fifty to sixty (50-60) properties, but that none had "location or a price point that would work for what we're experiencing and doing currently [at the Property]." 30(b)(6) Driskell Dep. at 118. Driskell further testified that

> For what we need and how we function, there's not another campus environment like this available anywhere close in proximity to us that we could even come close to affording. And there's not – there's not one. And I'm still – I'm still shocked that we even have this one. And if it wasn't because of [the Youngs'] willingness to work with us[17] and

[16] The June 12 Letter stated that the commercial uses of the property (to include, without limitation, the woodworking shop, the auto shop, and the import/export business) must be discontinued within thirty (30) days of the date of this letter.

[17] Driskell testified that Vision Warriors purchased the Property pursuant to the following arrangement with the Youngs: Happy Acres donated a portion of the Property, and upon closing on the Property Vision Warriors paid Happy Acres $750,000 and provided a note for $250,000. Driskell Dep. at 299-302.

> everybody else and God just showing up and making it available, it wouldn't have -- it wouldn't have worked then.

Id. at 61-62. Driskell also avers that Vision Warriors' location in a residential neighborhood is crucial to the success of its residents' recovery. Driskell Dep. at 399-400.

## III. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law. Celotex, 477 U.S. at 324. In

determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. Anderson, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Id. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita, 475 U.S. at 587.

## IV. DISCUSSION

### A. Preliminary Matters

#### 1. Vision Warriors' Motion for Oral Argument

Vision Warriors requests an oral argument on its Second Motion for Summary Judgment because "this case has an extensive history and a voluminous record of facts and evidence. Many of the facts previously presented before this Court for consideration on the parties' original motions for summary judgment

have now been supplemented by additional testimony and documentary evidence." Mot. for Oral Arg. at 1. Defendants oppose the Motion for Oral Argument, arguing that the evidence remains largely unchanged and that "the issues before the Court are not complicated and the Court is more than capable of reviewing the arguments of the Parties and applying the Thai Meditation considerations to the facts of this case." Defs.' Resp. in Opp'n to Pl.'s Mot. Requesting Oral Arg. on Pl.'s Second MSJ, and Alternatively, Mot. for Oral Argument on Defs.' Second MSJ. [Doc. 205] at 2. Defendants also argue that if the Court grants oral argument on Plaintiff's Second Motion for Summary Judgment, it should likewise grant oral argument on their Second Motion for Summary Judgment. Id. at 5. Given the Court's familiarity with this case and the extensive briefing on the Second Motions for Summary Judgment, the Court finds that oral argument would not significantly assist the Court in arriving at its decision on the pending motions. Accordingly, Plaintiff's Motion for Oral Argument is **DENIED**. See St. James Ent. LLC v. Crofts, 837 F. Supp. 2d 1283, 1287 (N.D. Ga. 2011) (denying the plaintiff's request for oral argument on its partial motion for summary judgment "[b]ecause the Court finds the briefing on these motions sufficient").

### 2. Motion to Amend

In its Reply in Support of Second Motion for Summary Judgment ("Pl.'s Reply in Supp. of MSJ") [Doc. 206], Vision Warriors objects to certain of Defendants' citations of facts and/or evidence[18] in their Brief in Support of Defendants' Second Motion for Summary Judgment ("Defs.' MSJ Br.") [Doc. 191-1] "that have never been presented in their statement of undisputed facts or in their additional statement of facts." Pl.'s Reply in Supp. of MSJ at 5. In response, Defendants filed the Motion to Amend in which they argue that these facts may be considered but, in "an abundance of caution," alternatively move the Court to amend their Statement of Undisputed Material Facts as to Which There is No Genuine Issue to be Tried. Mot. to Amend at 2.

In the Motion to Amend, Defendants argue that the facts at issue are either an acknowledgment of the lack of evidence in the record or a more detailed statement of already established facts. Id. at 6-7. Defendants further argue that "all of the identified facts contain specific record cites so the facts are readily identifiable and produce no hardship for the Court or counsel" and that other courts in this District have held that they may "'consider materials in the record other

[18] See Pl.'s Reply in Supp. of MSJ at 5 n.4 for a list of disputed facts and/or evidence.

than those cited by the Parties,' notwithstanding the strict dictates of Local Rule 56.1." Id. at 5-6 (quoting Aldridge v. Travelers Home & Marine Ins. Co., No. 1:16-CV-01247-SCJ, 2019 WL 8439150, at *2 (N.D. Ga. Feb. 21, 2019).

Federal Rule of Civil Procedure 56 specifically provides that the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "In any event, the Court has authority both to overlook a party's failure to comply with Local Rule 56.1 and to go beyond the materials cited by the parties in their respective statements of facts." Stinson v. Nat'l Credit Sys. Inc., No. 1:17-CV-1106-SCJ-JKL, 2018 WL 3954764, at *2 (N.D. Ga. June 26, 2018), R&R adopted, No. 1:17-CV-1106-SCJ, 2018 WL 4471930 (N.D. Ga. July 27, 2018) (internal citation omitted). The Court finds that it is appropriate to consider the facts cited only in Defendants' brief but not in their statement of material facts given the small number of facts at issue in the Motion to Amend, the nature of those facts (generally restating other evidence or pointing out the lack of evidence), and the already voluminous factual record in this case. Accordingly, there is no need for Defendants to file an amended statement of facts and their Motion to Amend is **DENIED AS MOOT**.

### B. Motions for Summary Judgment

Congress enacted RLUIPA "in order to provide very broad protection for religious liberty." Holt v. Hobbs, 574 U.S. 352, 356 (2015). "RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." Cutter v. Wilkinson, 544 U.S. 709, 714 (2005). Pursuant to RLUIPA,

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

To establish a *prima facie* case under RLUIPA, a plaintiff must demonstrate that "the challenged law, regulation, or practice substantially burdens his exercise of religion." Knight v. Thompson, 797 F.3d 934, 943 (11th Cir. 2015).

> This Court reads the RLUIPA to impose a two-part test: A plaintiff must demonstrate (1) that they are engaged in "religious exercise;" and (2) that the land use regulation at issue imposes a "substantial burden" upon their religious exercise. See Midrash Sephardi 366 F.3d at 1226. The burden then shifts to the government to demonstrate that its land use satisfies strict scrutiny, meaning that it is (3) narrowly tailored to

> (4) further a compelling government interest. Thai Mediation, 980 F.3d at 833.

Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Comm'rs, No. 22-10773, 2024 WL 125969, at *5 (11th Cir. Jan. 11, 2024).

> "[A] 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior . . . ." Midrash, 366 F.3d at 1227. . . . Accordingly, it isn't necessary for a plaintiff to prove . . . that the government required her to completely surrender her religious beliefs; modified behavior, if the result of government coercion or pressure, can be enough.

Thai Meditation, 980 F.3d at 831.

In determining whether the government imposes a significant pressure on religious exercise, the Eleventh Circuit provided the following factors for consideration:

> - whether the plaintiffs have demonstrated a genuine need for new or more space—for instance, to accommodate a growing congregation or to facilitate additional services or programming;
>
> - the extent to which the [County]'s decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise;
>
> - whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise;
>
> - whether the [County]'s decisionmaking process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have

been, are being, or will be (to use a technical term of art) jerked around;

- whether the [County]'s denial of the plaintiffs' zoning applications was final or whether, instead, the plaintiffs had (or have) an opportunity to submit modified applications that might satisfy the City's objections; and

- whether the alleged burden is properly attributable to the government (as where, for instance, a plaintiff had a reasonable expectation of using its property for religious exercise) or whether the burden is instead self-imposed (as where the plaintiff had no such expectation or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements).

Id. at 831-32 (footnotes omitted).

The parties do not dispute that Vision Warriors is engaged in a religious exercise under RLUIPA. Vision Warriors argues that it is entitled to summary judgment because it has demonstrated that the County's zoning restrictions impose a substantial burden on its religious exercise under the Thai Meditation factors. Pl.'s Mem. in Supp. of Second Mot. for Summ. J. ("Pl.'s MSJ Br.") [Doc. 190-1] at 17-34. Defendants argue that the Thai Mediation factors entitle them to summary judgment. Defs.' MSJ Br. at 11-23. For the reasons stated below, this Court finds that there are disputed issues of material fact as to whether Defendants' actions have imposed a substantial burden on Vision Warriors' religious exercise which must be resolved by the trier of fact.

### 1. Whether Defendants' Actions Imposes a Substantial Burden on Vision Warriors' Religious Exercise

#### a. Whether Vision Warriors has demonstrated a genuine need for new or more space

Throughout this litigation, Vision Warriors has conceded that this factor does not apply because Vision Warriors "does not seek to add new buildings or expand the pre-existing uses." Pl.'s MSJ Br. at 18; see also Vision Warriors Church, 2024 WL 125969, at *6 (acknowledging Vision Warriors' position that the first Thai Meditation factor is "inapplicable").[19]

#### b. The extent to which the County's decision, and the application of its zoning policy more generally, effectively deprives Vision Warriors of any viable means by which to engage in protected religious exercise

Vision Warriors contends that the County's withdrawal of the TOC Permit and denial of applications for a special use permit or rezoning deprive Vision Warriors "all viable means to operate its ministry" and that the County did not offer any alternative, much less a feasible one. Pl.'s MSJ Br. at 19. Specifically,

[19] Defendants take exception to treating this factor as "inapplicable" and argue that the Court should weigh the factor against Vision Warriors. Defs.' MSJ Br. at 12. This Court disagrees and believes that disregarding factors that are inapplicable to the analysis is more appropriate than weighing such a factor in favor of one side or the other.

Vision Warriors argues that the County's recent assertion that the Current Zoning Ordinance permits Vision Warriors to serve up to four unrelated individuals in each of two residential buildings, even if true, is not a viable option because the financial feasibility of the Property would be adversely affected, a group limited to eight individuals would "compromise the dynamics of the community," and stifle the religious environment by, among other things, preventing regular worship and Bible meetings. Id. at 19-21. Vision Warriors further asserts that "relocating to another property is not a feasible or realistic option." Id. at 21. Defendants argue that Vision Warriors "retains a viable means to engage in religious exercise" because it is permitted to continue non-residential operations and to house up to eight non-related persons on the Property and there is no evidence that Vision Warriors would have to "shut down its ministry." Defs.' MSJ Br. at 12-13, 15.

The Court finds that there is a disputed issue of material fact as to whether the County's decision to rescind the TOC Permit and to deny Vision Warriors its applications for a special use permit and for rezoning would effectively deprive Vision Warriors of a viable means to engage in the exercise of its religion. There is evidence that the County's zoning decisions prevent Vision Warriors from operating on the Property altogether. See June 12 Letter (stating that the current residents on the Property must relocate and commercial uses of the Property must

be discontinued). Vision Warriors also asserts that there are no other locations in Cherokee County that could provide a viable alternative. 30(b)(6) Driskell Dep. at 118, 299-300 (describing the lack of other viable properties). Further, although there is evidence that Vision Warriors previously operated on smaller properties with as few as nine people, id. at 22, 74-75, it could be argued that housing nine people in a traditional residence is different from housing eight people on a 6.491-acre property with four buildings. See Stipulated Facts ¶¶ 2, 21.

On the other hand, there is evidence that Vision Warriors could continue to exercise its religious activities as long as no more than four unrelated individuals reside on each parcel of the Property (for a total of eight persons). Stallings Decl. ¶ 4 (stating that the Current Zoning Ordinance allows four unrelated individuals to reside on each residentially zoned parcel of land); Cnty. Resps. to First Req. For Admis. No. 71 (defining family use of residential property in the Current Zoning Ordinance). However, no evidence exists in the record demonstrating that this possibility has ever been communicated to Vision Warriors outside of the present litigation.[20] Further, there is evidence in the record making it unclear if Vision

---

[20] And if the finder of fact determines that Vision Warriors is permitted by the County to house up to eight residents on the Property, Vision Warriors has offered evidence that such limitation would negatively affect its ability to exercise its religious beliefs by placing a financial restraint on the organization. See Visions Warriors' financial records from 2022-2024 which purportedly show the impact of

Warriors' use of the Property as a "family" would be permitted under the Current Zoning Ordinance.[21] In addition, Defendants have not offered evidence demonstrating that other properties exist in Cherokee County that would be zoned in a manner to fulfill Vision Warriors' ability to conduct its residential ministry. The resolution of issues of (1) whether Vision Warriors could use the Property as a "family" and house four people on each parcel and eight people total on the

---

such a reduction in the average annual income if the eight-resident limitation is imposed. [Doc. 192-1 at 179, 181, 183]; 30(b)(6) Driskell Dep. at 56.

[21] In the June 12 Letter, the County stated

> The current residents need to find alternative housing, and the commercial uses of the property (to include, without limitation, the woodworking shop, the auto shop, and the import/export business) must be discontinued within thirty (30) days of the date of this letter. To the extent good faith efforts are being made to comply with the Cherokee County Zoning Ordinance and the directives in this correspondence, the County will consider working with Vision Warriors to provide a reasonable length of time to transition its residents from the property.

June 12 Letter. Taking the June 12 Letter at face value, it appears that the County at that time was requiring all Vision Warriors residents to vacate the property. Although the County now asserts that Vision Warriors can house up to eight people on the Property as "family" use, the Current Zoning Ordinance specifically states that "[t]he term "family" does not include any organization or institutional group." Cnty. Resps. to First Req. For Admis. ¶ 71. Thus, because Vision Warriors is an organization, there is evidence that, if credited by the trier of fact, may indicate Vision Warriors is prohibited from use of the Property as a "family."

Property, and (2) whether such a use, even if permitted, would still deprive Vision Warriors of a viable means of engaging in its residential ministry is for the trier of fact. Based on the record before the Court, the Court cannot resolve this factor without engaging in factual determinations.

Defendants argue that the scenario in this case is analogous to that in Men of Destiny Ministries, Inc. v. Osceola Cnty., No. 6:06-CV-624-ORL-31DAB, 2006 WL 3219321, at *5 (M.D. Fla. Nov. 6, 2006), in which the court held that a county's refusal to provide a conditional use permit for a "men's discipleship program" located in a residential district and primarily housing men in addiction recovery was not a substantial burden pursuant to RLUIPA. This decision predates Thai Meditation and the district court, relying on Midrash Sephardi, concluded that the failure to grant a conditional use permit did not impose a substantial burden on the plaintiff's religious exercise because

> [the plaintiff] remains free to relocate its program to another location in the [c]ounty where it can operate as a matter of right, or to operate its ministry by other methods-such as a non-residential facility, for example-that do not run afoul of the requirements of the [zoning code]. There is no argument that [the plaintiff] can exercise their religion only at the Michigan Avenue location or only by way of the seven-to-fourteen person residential program currently operating there. [The plaintiff] may believe that other locations or other methods would be less convenient or less effective, but so long as other locations and methods are reasonably available, Osceola County has not imposed a substantial burden on [the plaintiff's] religious exercise.

Men of Destiny, 2006 WL 3219321, at *5. However, in Men of Destiny, the court did not discuss or appear to consider any evidence as to the role of a residential ministry in the plaintiff's religious practice or the financial reasonableness of available alternatives. See Bethel World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d 548, 557 (11th Cir. 2013) (citations omitted) (holding that "[w]hen a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden. . . . This is so even though other suitable properties might be available, because the 'delay, uncertainty and expense' of selling the current property and finding a new one are themselves burdensome."). In this case, there is evidence that arguably supports both parties' positions.

**c. Whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the Vision Warriors' religious exercise**

Vision Warriors contends that the County's zoning decisions "undisputedly result in coercing Vision Warriors to, at a minimum, significantly modify its behavior such that it cannot fulfill its mission" in operating a residential ministry for men in addiction recovery. Pl.'s MSJ Br. at 23. Defendants argue that a sufficient nexus between the County's actions and Vision Warriors' religious activities cannot be established based upon a reduced number of individuals being

permitted to reside on the Property. Defs.' MSJ Br. at 17-18. Defendants also emphasize that Vision Warriors can continue to hold religious services, faith-based meetings, bible studies, and prayer gatherings. Id. at 16. Once again, there is a disputed issue of material fact that prevents the Court from making a determination as to the weight of this factor.

Viewing the evidence in the light most favorable to Vision Warriors, it purchased the Property in reliance on the County's permitting Happy Acres to house larger groups of residents and in granting Vision Warriors the TOC Permit. 30(b)(6) Driskell Dep. at 54; Second Driskell Decl. ¶ 5; Lee Dep. at 22-23; J. Young Aff. ¶ 7. A trier of fact could determine that the actions of the County in rescinding the TOC Permit and failing to grant Vision Warriors applications to permit the usage of the property for larger groups of residents constitutes a sufficient nexus between the County's actions and the ability of Vision Warriors to carry out its religious mission. See Thai Meditation, 980 F.3d at 831 (citations and quotation marks omitted) ("[A] substantial burden exists when government action coerces or pressure religious adherents to change their behavior, even if that coercion or pressure isn't so extreme as to require them, to forgo their beliefs completely."). Viewing the evidence in the light most favorable to Defendants, the County has not prevented Vision Warriors from exercising its religious activities

with a smaller group of up to eight residents and Vision Warriors requires no specific number of residents to engage in its religious practice; therefore, no nexus exists between the County's actions and Vision Warriors' religious exercise. See Stallings Decl. ¶ 4; Cnty. Resps. to First Req. For Admis. No. 71; 30(b)(6) Driskell Dep. at 93-94 ("[T]here was no magical number that we had; it was really a delicate balance of trying -- who do we really -- who can we serve and then where and what capacity do we need. . . ."). The trier of fact will have to assess the County's actions and their purported nexus with Vision Warriors' religious exercise by weighing the evidence presented.

**d. Whether the County's decision-making process concerning Vision Warriors' applications reflect any arbitrariness of the sort that might evince animus or otherwise suggest that Vision Warriors have been, are being, or will be "jerked around"**

Vision Warriors argues that there is evidence to show that the County's decisionmakers acted arbitrarily and with animus in rescinding the TOC Permit and in failing to grant the applications for a special permit or for rezoning, including by placing the blame upon Visions Warriors for engaging in previously permitted uses of the property, first approving and then rescinding the TOC Permit, making its decisions prior to hearing all the evidence based upon limited

community opposition, and failing to engage Vision Warriors in an effort to arrive at a mutually beneficial solution. Pl.'s MSJ Br. at 25-32.

In response, Defendants first misstate the Eleventh Circuit's and this Court's alleged "determinations" as to Plaintiff's failure to establish a discriminatory motive. Defs.' MSJ Br. at 18-19. The Eleventh Circuit's affirmance of this Court's prior grant of summary judgment on Visions Warriors' claims of intentional discrimination under the FHA and ADA by stating that the facts offered by Vision Warriors did not show discriminatory animus for purposes of those claims do not bind this Court with respect to consideration of the fourth factor in the Thai Meditation analysis under RLUIPA. There does not need to be evidence of intentional discrimination in order to show that Vision Warriors was "jerked around" during the application process.[22] Defendants also contend that their actions were not arbitrary because the County took corrective action with respect to the TOC Permit upon discovery of Lee's error in granting the permit and nothing stated by Chairman Johnston prior to the hearings constitutes prejudgment of the issues before the Board of Commissioners. Defs.' Reply Br. at 11-13.

---

[22] In their reply brief, Defendants admit that "the facts previously presented to the Eleventh Circuit in this case were in addressing FHA/ADA claims." Defs.' Reply Br. in Supp. of Second MSJ (Defs.' Reply Br.") [Doc. 209] at 11.

Once again, the evidence before the Court with respect to this factor could support two alternative findings. Viewing the evidence in the light most favorable to Vision Warriors, the County's application of the Zoning Ordinance could reflect arbitrariness or animus because:

> (1) the County issued building permits and a certificate of occupancy to Happy Acres indicating it should have been aware of its use of the Property, see Cherokee Cnty. Bldg. Permits; Building Permit; Certificate of Occupancy;
>
> (2) the County gave Vision Warriors permission for legal non-conforming use of the Property through the TOC Permit, see First, Second, and Third Certification Letters;
>
> (3) the County revoked that permission once neighbors began complaining about living next door to men in recovery from addiction, see Driskell Decl. ¶ 11; Holmes Decl. ¶¶ 8-9; June 12 Letter;
>
> (4) the County refused to allow other zoning changes which reflect an appropriate and more accurate use of the Property and which would comply with the Zoning Ordinance, see supra § II(F); and
>
> (5) and the County updated the Zoning Ordinance to allow for similar use of the Property, but with limitations that would prohibit Vision Warriors' use, see generally Cherokee County Zoning Ordinance 2019-O-014, Revisions to Places of Worship, adopted Oct. 16, 2018 (requiring that temporary shelters or transitional housing in furtherance of a Place of Worship be offered free of charge).

However, viewing the evidence in the light most favorable to Defendants, the evidence could show a lack of arbitrariness or animus because

> (1) the Court has not been directed to any evidence which demonstrates that the County was aware of the scope of Happy Acres' use of the Property;

> (2) Lee made an honest mistake in determining that Vision Warriors could operate as a legal non-conforming temporary shelter, and this mistake came to light once neighbors raised opposition to Vision Warriors' use of the Property, see June 12 Letter (stating that "the certifications were issued erroneously"); Lee Dep. at 64-65 (discussing Lee's assumptions about Happy Acres' use of the Property); and
>
> (3) Defendants made a good-faith decision that Vision Warrior's use of the Property most closely aligned with a temporary shelter and could not be otherwise categorized in compliance with the Zoning Ordinance, see Tr. of Appeal at 208-09 (describing the zoning decisions); Cnty. Resolution No. 2019-R-019 (unanimously denying Vision Warriors' application for special use); Cnty. Resolution No. 2019-R-020 (unanimously denying Vision Warriors' application for rezoning).

The trier of fact will need to make factual findings in order for this factor to be properly weighed.

**e. Whether the County's denial of Vision Warriors' zoning application was final or whether, instead, Vision Warriors had an opportunity to submit modified applications that might satisfy the County's objections**

Vision Warriors argues that it "has demonstrated, and the County has conceded, that its zoning decisions are final." Pl.'s MSJ Br. at 32. Defendants respond that the County only acknowledged this at the local level and only for the purposes of the Motion to Dismiss. Defs.' Opp'n to Pl.'s MSJ at 32. Defendants disagree, apparently based on the fact that Vision Warriors did not appeal the final administrative zoning decisions to the state courts and failed to submit an

application for a special use permit "that would have allowed a religious practice in housing a lower number of residents on the Property." Defs.' MSJ Br. at 20-21.

Defendants' argument that the decision was not final because Vision Warriors was able to appeal the zoning decision to state court and to submit a modified special use permit application fails. As stated in this Court's August 7, 2024, Order,

> [t]the issue is not whether Vision Warrior had the ability to file an appeal to the superior court but whether the County would have given reasonable consideration to a modified application to enable Vision Warriors to conduct religious services for more than eight individuals. See Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, (11th Cir. 2007) ("[W]hether the denial of the application is absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on [a plaintiff] to change its behavior.").

Aug. 7, 2024, Order at 30-31. The Westchester Day School court elaborated that

> When the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior, since it could just as easily file a second application that remedies the problems in the first. As a consequence, as we said when this case was earlier before us, "rejection of a submitted plan, while leaving open the possibility of approval of a resubmission with modifications designed to address the cited problems, is less likely to constitute a 'substantial burden' than definitive rejection of the same plan, ruling out the possibility of approval of a modified proposal." Westchester Day Sch., 386 F.3d at 188.

Westchester Day Sch., 504 F.3d at 349.

In this case, the uncontroverted evidence demonstrates that Vision Warriors administratively appealed the revocation of its TOC Permit and submitted applications for a special use permit and rezoning of the Property. Stipulated Facts ¶ 31, 37, 49; Zoning Bd. of Appeals Variance Appl.; Tr. of Appeal at 235; Appl. for Public Hr'g, Requesting Rezoning with Concurrent Variance(s); Appl. for Public Hr'g, Requesting Special Use Permit. None of the County's written or oral rejections of these efforts cited any grounds in which Vision Warriors was left open the opportunity to submit a modified application which could be favorably considered.[23] See June 12 Letter; Tr. of Appeal at 208-09; Cnty. Resolution No. 2019-R-019; Cnty. Resolution No. 2019-R-020. Thus, this factor weighs in favor of Vision Warriors.

**f. Whether the alleged burden is properly attributable to the government or whether the burden is self-imposed**

Vision Warriors contends that it had a reasonable expectation that it could use the Property in the manner intended due to its discussions with the County and reliance upon Lee's representations. Pl.'s MSJ Br. at 33-34. Defendants argue that

---

[23] Although an email from Chairman Johnston to a private citizen indicates that a "smaller dormitory/halfway house could potentially be OK," there is no evidence that this was ever communicated to Vision Warriors. See Email from Johnston to John Martin.

Vision Warriors' decision to shut down its operations is self-imposed and cannot be based on any action by the County in rescinding the TOC Permit and denying Visions Warriors' zoning applications. Defs.' MSJ Br. at 22-23.

Once again, there is a material issue of disputed fact that must be resolved by the trier of fact. There is evidence demonstrating that Vision Warriors relied on the County's assurance through Lee's actions that it could operate its residential religious ministry with a significant number of residents, Vision Warriors purchased the property in reliance on that representation, and the County made an error causing Vision Warriors to be unable to continue its operation and exercise its religious practices. See First, Second, and Third Certification Letters; E-mail exchange between Driskell and Lee (Nov. 22, 2017) (stating that Vision Warriors is "good to go"); 30(b)(6) Driskell Dep. at 54 (providing that Vision Warriors understood that it could house up to fifty-five residents when it purchased the Property); Lee Dep. at 22-23 (wherein Lee testified that certifications of zoning are used to assure a property owner that their intended use will be permitted by the County); June 12 Letter (stating that the TOC Permit was issued in error).

However, there is also evidence that Vision Warriors should have been on notice that different zoning for the Property would be required given Lee's email stating

> *You cannot change this to a youth hostel, housing for day laborers, or half-way housing. Using the dormitory for short term stays as a part of the ministry is fine. However, if the previous tenants were missionaries and the new tenants are planned to be recovering drug addicts, the[n] a different zoning will be required.*

Email from Lee to Tori Young (Feb. 7, 2017). Further, Defendants offer evidence that Vision Warriors is permitted to operate its religious ministry with a maximum of eight persons and therefore Vision Warriors' decision to shut down its operations is self-imposed. Decl. of Margaret Stallings ¶ 4; Cnty. Resps. to First Req. For Admis. No. 71. Whether any burden on Vision Warriors is attributable to Defendants is a factual determination that cannot be made by the Court on summary judgment.

Consequently, because there are disputed issues of material fact which preclude this Court from determining as a matter of law whether application of the Thai Meditation factors support or oppose a finding that the actions of Defendants imposed a substantial burden on Vision Warriors' use of the Property for religious exercise in violation of RLUIPA, both parties' motions for summary judgment are **DENIED**. See Emanuel Baptist Church v. City of Chicago. No. 17-cv-0932, 2022 WL 767253, at *8 (N.D. Ill. Mar. 14, 2022) (denying both parties' motions for summary judgment and finding there were questions of fact about whether the government's conduct imposed a substantial burden under RLUIPA); Spirit of

Aloha Temple v. Cnty. of Maui, 322 F. Supp. 3d 1051, 1065-66 (D. Haw. 2018) (same).

### B. Whether the Application of the Zoning Ordinance Satisfies Strict Scrutiny

Because there are genuine issues of fact for the trier of fact about whether Defendants' actions imposed a substantial burden on Vision Warriors' exercise of its religion, the Court need not rule whether the actions of Defendants satisfy the strict scrutiny test. See Spirit of Aloha Temple, 322 F. Supp. 3d at 1065 ("Given issues of fact [regarding whether the county's regulations imposed a substantial burden], this court has no reason to rule on whether the County of Maui satisfies the strict scrutiny test.").

## V. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Plaintiff's Second Motion for Summary Judgment [Doc. 190] and Defendants' Second Motion for Summary Judgment [Doc. 191] are **DENIED**.

It is further **ORDERED** that Defendants' Motion for Leave to Amend Defendants' Statement of Undisputed Material Facts to Which There is No Genuine Issue to be Tried [Doc. 208] is **DENIED AS MOOT**.

It is further **ORDERED** that Plaintiff's Motion Requesting Oral Argument on Plaintiff's Second Motion for Summary Judgment [Doc. 204] is **DENIED**.

It is further **ORDERED** that the parties shall file their proposed consolidated pretrial order no later than thirty (30) days from the date of this Order. See LR 16.4, NDGa.; Standing Order Regarding Civil Litigation [Doc. 2] at 17-19.

The Court notes that this litigation has been ongoing for nearly seven years. When all of the brouhaha is put aside, the bottom line comes down to this: Vision Warriors has indicated it can operate a residential recovery ministry with up to thirty-one residents and Defendants now agree to permit them to do so with eight residents. Surely there are reasonable minds that can enter into negotiations to come to some consensus that could resolve this dispute without the expense and time of a trial and another possible appeal to follow. Accordingly, the Court **DIRECTS** the parties to discuss the possibility of mediating this case before a United States Magistrate Judge of this District or another neutral no later than fourteen (14) days after the entry of this Order, and to advise the Court whether this case should be stayed pending any such mediation.

**IT IS SO ORDERED** this 19th day of March, 2026.

Mark H. Cohen

MARK H. COHEN
United States District Judge